ACCEPTED
03-16-00521-CV
12435072
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/30/2016 9:30:22 AM
JEFFREY D. KYLE
CLERK

Cause No. 03-16-00521-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/30/2016 9:30:22 AM
JEFFREY D. KYLE
Clerk

WEST TRAVIS COUNTY PUBLIC UTILITY AGENCY
Appellant,

v.

CCNG DEVELOPMENT CO., L.P.
Appellee.

**APPELLEE'S MOTION TO DISMISS FOR WANT OF JURISDICTION AND MOTION FOR "JUST DAMAGES" UNDER RULE 45**

TO THE HONORABLE JUSTICES OF THE THIRD COURT OF APPEALS:

On August 5, 2016, the West Travis County Public Utility Agency ("WTCPUA") filed a Notice of Appeal of a district court Order Granting Motion for New Trial and Motion to Reinstate Case (the "Order"). WTCPUA claims this Court has interlocutory jurisdiction under section 51.041(a)(8), Tex. Civ. Pr. & Rem. Code. WTCPUA is wrong.

Section 51.041(a)(8) allows interlocutory appeals *only* from an order that grants or denies a plea to the jurisdiction by a governmental agency. The trial court here did no such thing. The Order merely granted a simple motion seeking procedural reinstatement of a lawsuit that was erroneously dismissed due to a clerical error. No plea to the jurisdiction was before the court. The Order does not decide any jurisdictional issues. Indeed, the trial judge expressly stated at the hearing that he was only ruling on the "simple motion" to reinstate, and doing so "without prejudice" to the WTCPUA's right to "urge in a different hearing a motion to dismiss for lack of jurisdiction."

CCNG Development Co., L.P. ("CCNG") respectfully requests that the Court dismiss this improper appeal under Tex. R. App. Pro. 42.3. CCNG further requests that the Court award "just damages" to CCNG pursuant to Tex. R. App. Pr. 45, as this appeal is frivolous and was filed for purposes of delay only.

## BACKGROUND

CCNG filed its Original Petition in this lawsuit on January 16, 2014. WTCPUA answered on February 14, 2014. WTCPUA's answer included a Plea to the Jurisdiction that has never been set for hearing. CCNG filed a First Amended Original Petition on April 8, 2014. *See* Exhibit 1.

On July 14, 2016, CCNG's lawsuit was erroneously included in a blanket order dismissing numerous cases for want of prosecution. *See* Exhibit 2. The dismissal order violated Travis County Local Rule 8.3, which requires the Court Administrator to provide notice to the parties and the opportunity to file a motion to retain before a case is dismissed for lack of prosecution. The Court Administrator did not provide the required notice prior to the issuance of the blanket order. *See* Motion for New Trial and Motion to Reinstate Case, attached as Exhibit 3, pp. 1-2.

CCNG received notice of the dismissal order on July 25, 2016. On July 26, CCNG filed a Motion for New Trial and Motion to Reinstate Case and promptly set a hearing on the Motion for August 5, 2016. *Id.*, p. 5.

On the afternoon of August 4, 2016, right before the hearing scheduled for the next morning, WTCPUA filed a Response in Opposition to Plaintiff's Motion for New Trial and Motion to Reinstate Case on the Basis of Lack of Subject Matter Jurisdiction.

2

*See* Exhibit 4. In its Response, WTCPUA argued that there was no longer a live controversy because on the eve of the hearing WTCPUA had tendered checks in the amounts of $552,983 and $582,625 to CCNG, which WTCPUA incorrectly claimed was all of the relief CCNG sought in its First Amended Petition. *Id.*, p. 4.

WTCPUA's mootness argument is incorrect. In its First Amended Petition, CCNG seeks as damages for breach of contract "the balance due and owed under the Utility Agreement," *including interest*. *See* Exhibit 1 ¶ 53. CCNG also seeks *attorneys' fees*. *Id.* at ¶ 65. The Utility Agreement specifically provides for recovery of both interest and attorneys' fees in the event of a default. *See* Exhibit 4, Exhibit B-1 §§ 10.02(b) & 11.01(c) at pp. 21-23. WTCPUA's two payments on the eve of the hearing include no amounts for interest or attorneys' fees. CCNG's claims for interest and attorneys' fees remain pending. They have not been adjudicated by the court, and they have not been paid by WTCPUA. It is therefore indisputable that the partial payments tendered by WTCPUA on August 4 did not resolve the live controversy between the parties.

Further, WTCPUA's partial payments do not moot CCNG's claims seeking a declaratory judgment to resolve a controversy about how to calculate the date when Reimbursable Costs become due, a declaration that may apply to future Reimbursable Costs under the Utility Agreement. *See* Exhibit 1 ¶ 58. Nor do those partial payments moot CCNG's claims for injunctive relief to enjoin WTCPUA's directors from denying service to CCNG. *See id.* ¶ 62.

At the August 5, 2016 hearing on CCNG's Motion, District Judge Scott Jenkins declined to rule upon any arguments regarding jurisdiction. In granting CCNG's Motion for New Trial and Motion for Reinstate, the Court specifically pointed out that the jurisdictional issues would need to be addressed at another time:

> "This is without prejudice to your opportunity to continue to argue or reargue, urge *in a different hearing* a motion to dismiss for lack of jurisdiction because the case is moot."

*See* Exhibit 5, Hearing Transcript, at 17 (Emphasis added). The Court had already noted that the only matter that had been set for hearing that day was "a simple motion," and that the Court had very limited time available to hear it: "You're set on the 15-minute rocket docket. You have seven minutes a side." *Id.* at 4. Although the PUA Defendants attempted to make jurisdictional arguments at that hearing based on arguments raised for the first time on the eve of the hearing, the Court deferred consideration of those arguments for a later time:

> "But what I'm saying is they need to have an opportunity to respond to the evidence on record. . . . It may be when they have an opportunity to respond to your 215-page filing last night, they might be able to raise a fact question that essentially shows that it's not entirely moot."

*Id.* at 9. The District Judge heard argument only on CCNG's Motion for New Trial and Motion to Reinstate Case and entered an order granting that Motion. *See* Exhibit 6.

## ARGUMENT

I.     **The appeal should be dismissed because the Order did not grant or deny a plea to the jurisdiction by WTCPUA.**

Section 51.041(a)(8) of the Texas Civil Practice and Remedies Code provides that:

"(a) A person may appeal from an interlocutory order of a district court, county court at

4

law, statutory probate court, or county court that: … (8) grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001."

An appellate court lacks jurisdiction over an appeal of an interlocutory order that does not explicitly rule on a plea to the jurisdiction or implicitly rule on a such a plea by ruling on the merits of the case. *Texas Dep't of Pub. Safety v. Salazar*, No. 03-11-00206-CV, 2011 WL 1469429, *1 (Tex. App.—Austin 2011, no pet.) (order continuing hearing on plea to jurisdiction and authorizing discovery was not a grant or denial of plea).

This is particularly true where the trial court explicitly defers a ruling on jurisdictional issues. *Tex. Parks & Wildlife Dep't v. Rubio*, 483 S.W.3d 797, 799 (Tex. App.—El Paso 2016, no pet.) (where order denied non-jurisdictional motion for summary judgment and trial judge expressly stated he was staying ruling on jurisdiction, order was not grant or denial of plea to jurisdiction); *City of Galveston v. Gray*, 93 S.W.3d 587, 590 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (where order continued hearing on plea to jurisdiction and allowed discovery and trial judge specifically stated he was not ruling on plea to jurisdiction, order was not grant or denial of plea to jurisdiction);

In this case, there was no plea to the jurisdiction before the trial court at the August 5 hearing. The only matter set for hearing was CCNG's Motion for New Trial and Motion to Reinstate Case. The trial court's Order does not address any plea to the jurisdiction or any jurisdictional argument. There is no implicit denial of a plea to the jurisdiction. The Order does not rule on any part of the merits of the lawsuit. It simply administratively reinstates a lawsuit that had been dismissed in error, and without notice to the parties. The trial court explicitly stated that it was granting the Motion "without

5

of this Motion. There is no good faith argument that any such ruling has occurred in this lawsuit. The case law provides no support for any argument that a simple order reinstating a case that had been erroneously dismissed due to a clerical error is somehow a ruling on jurisdictional arguments. That is especially true where, as here, the trial court expressly deferred any such ruling on jurisdiction and left that to be decided "in a different hearing."

Second, WTCPUA's underlying argument − that there is no longer a live controversy between the parties − is itself a frivolous contention that is directly contradicted by the pleadings and the contract that WTCPUA attached to its Response. The Utility Agreement expressly states that CCNG is entitled to Reimbursable Costs *plus* interest and attorneys' fees. *See* Exhibit 4, Exhibit B-1 §§ 10.02(b) & 11.01(c) at pp. 21-23. The First Amended Petition seeks the balance due and owed under the Agreement, *plus* interest and attorneys' fees. WTCPUA cannot, in good faith, claim that its tender of checks in the amount of $552,983 and $582,625 is full payment of CCNG's breach of contract claim. Interest and attorneys' fees are still owed, and CCNG's claims for those amounts remain pending. Further, CCNG also has asserted claims for declaratory judgment and injunctive relief that have not yet been resolved or addressed by the Court.[1]

Third, WTCPUA blatantly misrepresented the record in its arguments to the trial court:

---

[1] CCNG subsequently updated its claims by filing a Second Amended Petition on August 10, 2016. The Second Amended Petition includes CCNG's claims for interest, attorneys' fees, declaratory relief, and injunctive relief, as well as additional claims for service and Reimbursable Costs. These additional claims had been discussed by the parties for many months during the pendency of CCNG's First Amended Petition, *see, e.g.,* Exhibit 7, but they were not formally added to CCNG's pleading until after the trial court granted CCNG's Motion for New Trial and Motion to Reinstate Case.

....my response is only five pages. 195 pages of it is the contract, which is in evidence to demonstrate to the Court – it's a very long contract. And ***nowhere in that 195 pages is there any entitlement under the contract to attorneys' fees or interest***.

*See* Exhibit 5, Hearing Transcript, at 10 (emphasis added). As already discussed above, that statement was false on the face of the documents filed by the WTCPUA itself. The default provision of the Utility Agreement specifically does entitle CCNG to both attorneys' fees and interest:

> Any costs incurred by CCNG or the MUDs, including but not limited to engineering fees, construction costs, ***attorney's fees*** or other legal or administrative fees, in implementing such curative actions shall be fully reimbursed by LCRA within thirty (30) days after notice from CCNG or the MUDs; ***LCRA shall pay CCNG interest*** at a rate determined in accordance with section 10.02(b) on any such reimbursement amouts that it fails to pay CCNG within thirty (30) days after notice from CCNG or the MUDs.

*See* Exhibit 4, Exhibit B-1 § 11.01(c) at 23 (emphasis added).

Fourth, WTCPUA was specifically informed of the absence of any good faith basis for its appeal, and was specifically provided an opportunity to withdraw the Notice of Appeal. *See* Exhibit 7. Despite that notice, WTCPUA refused, injecting unnecessary delay into this controversy and forcing all parties and this Court to address WTCPUA's meritless arguments.

Fifth, WTCPUA's Notice of Appeal suggests that WTCPUA filed the Notice for purposes of delay, rather than in any reasonable belief that it would succeed in the appeal. The Notice of Appeal claims that: "This interlocutory appeal stays all proceedings in the trial court pending resolution of this appeal," citing Tex. Civ. Prac. & Rem. Code § 51.014(b). But section 51.014(c) states that a denial of a plea to the jurisdiction

8

described in section 51.014(a)(8) "is not subject to an automatic stay under Subsection(b)" unless the plea to the jurisdiction "is filed and requested for submission or hearing before the trial court not later than the later of:

(1)     a date set by the trial court in a scheduling order entered under the Texas Rules of Civil Procedure; or

(2)     the 180th day after the date the defendant files:

(A)     the original answer;

(B)     the first other responsive pleading to the plaintiff's petition; or

(C)     if the plaintiff files an amended pleading that alleges a new cause of action against the defendant and the defendant is able to raise a defense to the new cause of action under Subsection (a)(5), (7), or (8), the responsive pleading that raises that defense.

In this case, there is no scheduling order. WTCPUA filed its original answer on February 14, 2014. *See* Exhibit 6. WTCPUA did not request submission or a hearing on a plea to the jurisdiction within 180 days of February 14, 2014, so the stay does not apply.

CCNG has informed counsel for WTCPUA that its interlocutory appeal is contrary to the case law and that its mootness argument is contrary to the Utility Agreement and has requested that WTCPUA withdraw its Notice of Appeal. Counsel for WTCPUA has repeatedly refused to withdraw the Notice.

**CONCLUSION AND PRAYER**

CCNG respectfully requests that the Court dismiss WTCPUA's appeal for want of jurisdiction under Rule 42.3 and award just damages to CCNG under Rule 45 of the Texas Rules of Appellate Procedure.

9

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, TX 78701
(512) 480-5680 Telephone
(512) 480-5880 Telecopier

By: _____
G. Douglas Kilday
State Bar No. 00787834
dkilday@gdhm.com
Robin A. Melvin
State Bar No. 13929590
rmelvin@gdhm.com
David P. Lein
State Bar No. 24032537
dlein@gdhm.com

ATTORNEYS FOR PLAINTIFF CCNG DEVELOPMENT
CO., L.P.

## CERTIFICATE OF CONFERENCE

As indicated above at pp. 8 & 9, and as shown in Exhibit 7, I hereby certify that I have conferred with counsel for the Appellant, WTCPUA, about the merits of the foregoing Motion. Counsel for the WTCPUA has indicated that he is opposed to dismissal of the WTCPUA's appeal.

_____
G. Douglas Kilday

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent to the following counsel listed below, via email, on this 30th day of August, 2016:

James N. Rader
Associate General Counsel
LOWER COLORADO RIVER AUTHORITY
Austin, Texas  78767-0220
(512) 578-3559
Fax: (512) 473-4010
james.rader@lcra.org

Jose de la Fuente
James Parker
David Klein
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas  78701
(512) 322-5818
Fax: (512) 472-0532
jdelafuente@lglawfirm.com
dklein@lglawfirm.com
jparker@lglawfirm.com

G. Douglas Kilday

# EXHIBIT 1

CAUSE NO. D-1-GN-14-000163

| | | |
|---|---|---|
| CCNG DEVELOPMENT CO., L.P., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, LOWER | § | |
| COLORADO RIVER AUTHORITY, and | § | TRAVIS COUNTY, TEXAS |
| LARRY FOX, MICHAEL MURPHY, | § | |
| RAY WHISENANT, BILL GOODWIN, | § | |
| and SCOTT ROBERTS, each in his | § | |
| official capacity as a director of the | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, | § | |
| Defendants. | § | 345th JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff CCNG DEVELOPMENT CO., L.P. ("CCNG") files this action against the WEST TRAVIS COUNTY PUBLIC UTILITY AGENCY ("WTCPUA"), the LOWER COLORADO RIVER AUTHORITY ("LCRA"), and LARRY FOX, MICHAEL MURPHY, RAY WHISENANT, BILL GOODWIN, and SCOTT ROBERTS, each in his official capacity as a director of WTCPUA. Plaintiff seeks damages for breaches of a utility agreement, a declaratory judgment on the rights, status and legal relations of the parties under that agreement, a declaratory judgment that WTCPUA's directors violated CCNG's equal protection rights when they denied Plaintiff's request for "interim" water and wastewater service, and injunctive relief requiring the directors to provide "interim service" to CCNG.

## I. DISCOVERY CONTROL PLAN

1. Pursuant to Rule 190.1, Plaintiffs allege that discovery is intended to be conducted under Level 3.

## II. BACKGROUND AND OVERVIEW

2.      This lawsuit seeks remedies for at least two separate breaches of a contract that CCNG entered into with LCRA in 1999. That contract involved water and wastewater infrastructure improvements that were constructed and installed by CCNG in Western Travis County.

3.      Pursuant to its contract with LCRA, CCNG constructed and then conveyed the water and wastewater infrastructure improvements to LCRA. LCRA agreed to reimburse CCNG for the cost of those improvements, with 70% paid at the time of the conveyance, and 30% to be paid at a later time when certain conditions were met on each defined tract. The total amount to be paid was specifically calculated by LCRA, and the 70% portion was paid by LCRA.

4.      LCRA subsequently conveyed the water and wastewater improvements to WTCPUA. The conveyance to WTCPUA was either an assignment, with WTCPUA assuming all liabilities owed by LCRA, or a license that was expressly subject to all terms and conditions that LCRA had previously agreed upon with CCNG.

5.      After LCRA's conveyance to WTCPUA, some of CCNG's rights to remaining reimbursements have matured, and those amounts are now owed. As to two tracts known as the "Los Robles" tract and "Spanish Oaks Section I," the remaining conditions have been met, and the remaining 30% in reimbursements is now due and owing to CCNG. CCNG seeks the contractually agreed-upon sums for the remaining 30% owed in reimbursement for both the Los Robles Tract and Spanish Oaks Section I.

6.      In the same contract, LCRA agreed (on behalf of itself and its successors and assigns) to use the infrastructure improvements built by CCNG "to provide retail treated water

2

and wastewater services to customers on the CCNG Tract." This contractual obligation to provide water and wastewater services to CCNG and its customers is absolute and unconditional.

7. Following LCRA's conveyance of the infrastructure improvements to WTCPUA, those improvements are now being operated by WTCPUA. Requests for service under CCNG's contract have been and are being administered by WTCPUA.

8. In December 2013, before the filing of this Lawsuit, CCNG submitted a request to WTCPUA for water and wastewater service to support a very modest but needed expansion of CCNG's office. Despite clear contractual obligations to provide service to CCNG, WTCPUA has stalled and then declined to approve CCNG's request even though it has approved other requests from applicants who lack CCNG's contractual entitlement. In stalling and then declining CCNG's request while approving similar requests from others, WTCPUA has violated both (i) CCNG's contractual right to service, and (ii) CCNG's constitutional right to equal protection of the laws under the Texas Constitution. CCNG seeks damages for breach of contract, as well as declaratory, injunctive, and other relief.

### III. PARTIES

9. Plaintiff CCNG is a Texas limited partnership with its principal office in Travis County, Texas.

10. Defendant WTCPUA is a public utility agency created by Hays County, Texas, the City of Bee Cave, Texas, and West Travis County Municipal Utility District No. 5 under Chapter 572 of the Texas Local Government Code. Its principal office is in Travis County, Texas. WTCPUA has been served and has answered in this cause.

3

11.     Defendant LCRA is a conservation and reclamation district created by the Texas Legislature. Its principal office is in Travis County, Texas. LCRA has been served and has answered in this cause.

12.     Defendant LARRY FOX is a director of WTCPUA. Mr. Fox may be served with process at 12117 Bee Cave Road, Building 3, Suite 120, Bee Cave, Texas 78738.

13.     Defendant MICHAEL MURPHY is a director of WTCPUA. Mr. Murphy may be served with process at 12117 Bee Cave Road, Building 3, Suite 120, Bee Cave, Texas 78738.

14.     Defendant RAY WHISENANT is a director of WTCPUA. Mr. Whisenant may be served with process at 12117 Bee Cave Road, Building 3, Suite 120, Bee Cave, Texas 78738.

15.     Defendant BILL GOODWIN is a director of WTCPUA. Mr. Goodwin may be served with process at 12117 Bee Cave Road, Building 3, Suite 120, Bee Cave, Texas 78738.

16.     Defendant SCOTT ROBERTS is a director of WTCPUA. Mr. Roberts may be served with process at 12117 Bee Cave Road, Building 3, Suite 120, Bee Cave, Texas 78738.

## IV. JURISDICTION AND VENUE

17.     This Court has jurisdiction under Article V, § 8 of the Texas Constitution, under Sections 24.007 and 24.008 of the Texas Government Code, and under Chapter 37 of the Texas Civil Practice and Remedies Code. The amount in controversy exceeds the minimum jurisdictional limits of this Court.

18.     Venue is proper in Travis County, Texas under Section 15.002 of the Texas Civil Practice and Remedies Code because the principle offices of WTCPUA and LCRA are in Travis County, Texas, and because all or a substantial part of the events giving rise to the claims occurred in Travis County. Venue is also proper in Travis County under Section 15.035 of the Texas Civil Practice and Remedies Code because the written contract upon which suit is brought

4

provides that all obligations of the parties are performable in Travis County, Texas, and venue for any action arising under the contract shall be in Travis County, Texas.

## V. BACKGROUND FACTS

### A. LCRA's Agreement With CCNG

19. In 1999, CCNG and LCRA entered into a Utility Facilities Acquisition Agreement. In 2002, CCNG and LCRA executed a First Amendment to the 1999 agreement. The original 1999 agreement and the first amendment will be referred to herein, collectively, as the "Utility Agreement."

20. CCNG and LCRA agreed that LCRA would provide retail water and wastewater services to customers within the "CCNG Tract." The "CCNG Tract" is a defined term under the Utility Agreement. The CCNG Tract includes both (i) an original 983-acre tract as defined in the Utility Agreement, plus (ii) any additional real property within an agreed-upon area (as specified within the Utility Agreement) that is subsequently acquired, owned or controlled by CCNG or its affiliates and that CCNG subsequently designates as part of the CCNG Tract.

21. LCRA agreed to construct certain off-site water and wastewater facilities necessary to provide retail water and wastewater services to the CCNG Tract (the "Regional Facilities"), at LCRA's expense.

22. CCNG agreed to construct the water and wastewater facilities within the boundaries of the CCNG Tract necessary to provide retail service to the CCNG Tract (the "Internal Facilities"), at CCNG's expense, and to convey the phases of the Internal Facilities to LCRA as they were completed. LCRA agreed that it "shall use" the water and wastewater facilities installed by CCNG "to provide retail treated water and wastewater services to

5

customers on the CCNG Tract." LCRA also agreed to reimburse CCNG for the "Reimbursable Costs" of the Internal Facilities in two parts.

23. LCRA agreed to reimburse CCNG for seventy percent (70%) of the Reimbursable Costs of a particular phase of the Internal Facilities on the date on which that phase is conveyed to LCRA.

24. LCRA agreed to reimburse CCNG for the remaining thirty percent (30%) of the Reimbursable Costs of the same phase of the Internal Facilities, plus interest, within thirty days following the occurrence of two events:

(a) the CCNG Tract, according to the tax appraisal authority, has an appraised value equal to at least ten times the amount of LCRA's capital expenditures for the design, engineering, permitting, construction and/or acquisition of those portions on a pro rata basis of the Regional Facilities and of the Internal Facilities necessary to serve the CCNG Tract; and

(b) eighty percent (80%) of all living unit equivalents ("LUEs") projected to be served by any previously constructed phases of the Internal Facilities, purchased from CCNG by LCRA, have connected to LCRA regional water and wastewater system (the "West Travis County Regional System") and are receiving retail water and wastewater service from LCRA.

25. The Utility Agreement defines "Reimbursable Costs" as all planning, design, engineering, construction, permitting, legal, engineering, interest and other costs and fees reasonably incurred and related to the construction of the Internal Facilities and to the extent permitted by Texas Commission on Environmental Quality regulations for municipal utility district financing of similar facilities.

6

**B. "Reimbursable Costs" Due and Owing to CCNG**

26. Between 2002 and 2009, CCNG constructed 18 separate phases of the Internal Facilities and conveyed them to LCRA. In each case, LCRA reimbursed CCNG 70% of the Reimbursable Costs of each phase of the Internal Facilities at the time of each conveyance.

27. In December 2009, CCNG conveyed the phase of the Internal Facilities necessary to serve Lots 1 and 2, Block A of the Los Robles Addition located within the CCNG Tract (the "Los Robles Addition") to LCRA. LCRA reimbursed CCNG for 70% of the total Reimbursable Costs of those Internal Facilities, which LCRA determined were $1,876,085.84.

28. On March 2, 2010, CCNG sent a letter to LCRA requesting that LCRA reimburse CCNG for the remaining 30% of the Reimbursable Costs of the Los Robles Addition Internal Facilities, which totaled $552,983, plus interest.

29. As of March 2010, the Travis Central Appraisal District's final tax appraisal value for the CCNG Tract was $292,071,360. Also as of March 2010, LCRA's capital expenditures for the Regional Facilities and Internal Facilities necessary to serve the CCNG Tract were $13,231,763. Thus, the appraised value of the CCNG Tract was in excess of 10 times LCRA's capital expenditures to serve the CCNG Tract, and the first requirement for the payment of the remaining 30% of the Reimbursable Costs for the Los Robles Addition Internal Facilities had been met.

30. CCNG's March 2, 2010 letter provided documentation to LCRA demonstrating that more than 80% of the LUEs projected to be served by the Los Robles Addition Internal Facilities had been connected to the West Travis County Regional System and were receiving retail water and wastewater from LCRA. So the second requirement for the payment of the remaining 30% of the Reimbursable Costs for the Los Robles Addition also had been met.

7

31.     LCRA did not reimburse CCNG for the remaining 30% of the Reimbursable Costs of the Los Robles Addition Internal Facilities at that time. WTCPUA also has not reimbursed CCNG for these costs.

32.     Subsequent to the filing of this Lawsuit, an additional section of the CCNG Tract surpassed the thresholds set forth in the Utility Agreement to trigger CCNG's right to the remaining 30% of Reimbursable Costs. In Spanish Oaks Section 1, more than 80% of the LUEs projected to be served by the Spanish Oaks Section 1 Facilities have been connected to the West Travis County Regional System and are receiving retail water and wastewater from LCRA. The amount of $582,625, plus interest is now owed for the Spanish Oaks Section 1 Internal Facilities, representing the remaining 30% owed in Reimbursable Costs. Although LCRA has previously reimbursed CCNG for the initial 70% owed in Reimbursable Costs, neither LCRA nor WTCPUA have reimbursed CCNG for the remaining 30% owed in Reimbursable Costs.

C.     **Transfer of System to WTCPUA**

33.     In March 2012, LCRA transferred to WTCPUA the right to manage and control the West Travis County Regional System and to set rates for services from the System pursuant to a Utilities Installment Purchase Agreement between LCRA and WTCPUA dated as of January 17, 2012 (the "Purchase Agreement"). The Purchase Agreement identified the Utility Agreement as an infrastructure agreement that required the consent of a third party to the assignment of the rights under the contract to LCRA.

34.     The Purchase Agreement provided that, if the required consent were not obtained, then to the extent the contact was not assignable or not transferable because of the required consent, "this Agreement shall not constitute an assignment or transfer of those contracts if such an assignment or transfer would constitute a breach thereof or a violation of any law, absent

8

Required Consent." The Purchase Agreement further provided that: "In the event a Required Consent pertaining to infrastructure included in the Assets is not obtained by the Operations Transfer Date, this Agreement shall constitute a license from LCRA to [WTCPUA] for [WTCPUA] to possess and use said infrastructure subject otherwise to the terms of the Agreement by which LCRA obtained rights to such infrastructure."

**D.      Request for CCNG's "Consent," With Proposal to Fundamentally Change the Deal**

35.      LCRA and WTCPUA sought CCNG's consent to an assignment of LCRA's rights under the contract to WTCPUA. But rather than simply assigning all rights and liabilities to WTCPUA, the proposed "consent" document included proposed changes to the substance of the Utility Agreement that would have fundamentally changed the bargain CCNG had made with LCRA. Among other proposed changes, the draft consent to assignment purported to (i) reduce CCNG's entitlement to water and wastewater services, and (ii) eliminate WTCPUA's obligation to pay Reimbursable Costs. CCNG has never agreed to reduce its contractual entitlement to services, and CCNG is not interested in doing so. Further, CCNG has never agreed to eliminate its right to receive the remaining 30% of Reimbursable Costs that are owed, and will become owed, to CCNG, and CCNG is not interested in doing so. For those reasons, CCNG has not executed the document that purported to make those changes while also consenting to the LCRA's assignment to WTCPUA.[1]

36.      In early 2013, representatives of WTCPUA took the position that it would not approve service to CCNG unless CCNG agreed to its request for reduction of CCNG's contractual rights. On March 20, 2013, CCNG communicated its concerns about WTCPUA's position to WTCPUA's counsel. Attached as "Exhibit A" is a true and correct copy of that letter,

---

[1]      CCNG and WTCPUA have engaged in extensive negotiations, from March 2012 to March 2013, over these and other issues. In those negotiations, CCNG has articulated to WTCPUA the concessions it was willing to make. But those negotiations have never resulted in a meeting of the minds among the parties.

9

from David Armbrust (representing CCNG) to Ms. Lauren Kalisek (representing WTCPUA). Among other things, Mr. Armbrust's letter indicates that CCNG would be willing to make some concessions, but not the concessions requested by WTCPUA.

37. WTCPUA has never responded to Mr. Armbrust's March 20, 2013 letter.

**E.     Failure to Pay "Reimbursable Costs" Due and Owing to CCNG**

38. Neither LCRA nor WTCPUA has reimbursed CCNG for the remaining 30% of the Reimbursable Costs of the Los Robles Lot 1, Block A Internal Facilities. Further, neither LCRA nor WTCPUA has reimbursed CCNG for the remaining 30% of the Reimbursable Costs of the Spanish Oaks Section I Internal Facilities.

39. The 2013 final appraised value of the CCNG Tract was $392,185,036 – greatly in excess of the triggering threshold set forth in the Utility Agreement to require the remaining 30% in Reimbursable Costs to be paid (i.e., ten times LCRA's $13,231,763.77 in capital expenditures to serve the CCNG Tract). Further, as discussed above, for both the Los Robles Tract and Spanish Oaks Section 1, 80% or more of the LUEs projected to be served for those phases have connected to the WTCPUA system, and are receiving water and wastewater service.

40. The remaining 30% of Reimbursable Costs is due and owing to CCNG for both the Los Robles Tract and Spanish Oaks Section I. That obligation is binding on LCRA's successors and assigns. The failure and refusal to pay those amounts owed constitutes a breach of the Utility Agreement.

**F.     Refusal to Provide CCNG With Service**

41. As noted above, Section 11.01 of the Utility Agreement provides: "Following the completion of construction on and, if appropriate, the conveyance by CCNG of the Regional Facilities and the Internal Facilities to LCRA, LCRA shall use the Regional Facilities and

10

Internal Facilities to provide retail treated water and wastewater services to customers on the CCNG Tract." That obligation is also binding on LCRA's successors and assigns.

42. On December 23, 2013, CCNG filed a request for service with WTCPUA. CCNG requested wastewater service for 10,405 square feet of office space in two existing buildings that already receive water service from WTCPUA. CCNG also requested water and wastewater service for 6,960 square feet of office space in two proposed buildings. CCNG requested two additional LUEs of water service and six LUEs of wastewater service for the office expansion. An "LUE" or Living Unit Equivalent is the amount of water or wastewater service that WTCPUA has determined is sufficient to serve a single-family residence.

43. CCNG filed is Original Petition in this cause on January 16, 2014, complaining of the failure to pay Reimbursable Costs owed.

44. On about February 12 and again on February 17, 2014, WTCPUA's in-house engineer told CCNG's engineer that because of the recently-filed lawsuit, WTCPUA staff had been instructed not to process any CCNG requests for services. WTCPUA's counsel told CCNG's counsel that no such instruction had been given, and that the service request for CCNG's office expansion would be processed.

45. As WTCPUA's February 20, 2014 board meeting was approaching, CCNG noticed that its service request was not on the agenda. CCNG's counsel raised this with WTCPUA's counsel. WTCPUA's counsel stated that CCNG's December 23, 2013 service request was somehow submitted too late to be placed on the agenda of WTCPUA February 20, 2014 Board meeting. WTCPUA's counsel did not indicate why a request submitted fifty-nine (59) days prior to the February 20, 2014 board meeting was insufficient.

11

46. CCNG's request for service was placed on the agenda of WTCPUA's March 20, 2014 board meeting. In the days immediately prior to the March 20, 2014 board meeting, CCNG was provided with a draft service availability letter for the CCNG office expansion request. The draft service availability letter stated that water and wastewater would not be made available to CCNG for the office expansion until WTCPUA completes construction and begins operations of a new wastewater treatment plant, called the Bohl's Tract Wastewater Treatment Plant. Completion of the new wastewater treatment plant is currently scheduled for summer 2014.

47. The Utility Agreement does not condition service to the CCNG Tract on completion of that project or any other project. Under the terms of the Utility Agreement, WTCPUA is not entitled to deny service to CCNG based upon the timing of completing a wastewater treatment plant.

48. Prior to the March 20, 2014 board meeting, CCNG raised these concerns with WTCPUA's General Manager. WTCPUA's General Manager informed CCNG that it should request "interim service" from WTCPUA for the CCNG office expansion – that is, service that would begin immediately, before the Bohl's Tract Wastewater Treatment Plant is completed and begins operating, at the Board meeting. CCNG told the General Manager, orally and in writing, that it would request that the service availability letter be amended to allow "interim service."

49. At its March 20, 2014 meeting, WTCPUA's Board took up three requests for "interim service" before it took up CCNG's request for interim service. In two of those three cases, WTCPUA's contract with the requestor expressly provided that the requestor would receive no water and wastewater service from WTCPUA until completion of the Bohl's Tract Wastewater Treatment Plant. The third WTCPUA contract provided that an office building could not be occupied until the earlier of the completion of the Bohl's Tract Wastewater

12

Treatment Plant or July 1, 2014. Despite these restrictions on the part of these other applicants, WTCPUA Board voted to approve a total of approximately 61 LUEs of "interim service" for these three requestors.

50. When CCNG's request for service was reached on the agenda, one of the WTCPUA Board members asked if CCNG was the applicant that had not yet finalized a consent to assignment agreement with WTCPUA. When he was told that CCNG indeed was that applicant, he immediately moved to table CCNG's request for service. The WTCPUA Board then went into executive session. After the executive session, Board member Murphy made a motion to approve interim service to the CCNG office expansion. The vote on this motion was 2 to 2, so it did not pass.

51. As a result of the action of WTCPUA board, CCNG has been denied service despite the fact that CCNG has an express contractual entitlement to service under the Utility Agreement. The WTCPUA board has granted requests from other applicants who lack the contractual entitlement that CCNG has. Indeed, the other applicants have specific contractual limitations allowing WTCPUA to deny service until the completion of the Bohl's Tract Wastewater Treatment Plant. In denying service to CCNG, the actions of WTCPUA, acting through its board, have caused delay and added expense to CCNG's construction project.

## VI. CAUSES OF ACTION

### Breach of Contract

52. Plaintiff incorporates by reference the allegations in paragraphs 12 through 36.

53. LCRA and WTCPUA have breached the Utility Agreement by its failure to reimburse CCNG for the remaining 30% of the Reimbursable Costs of (i) the Los Robles

13

Addition Internal Facilities, and (ii) Spanish Oaks Section I, plus interest. CCNG seeks as damages the balance due and owed to CCNG under the Utility Agreement.

54. LCRA and WTCPUA have breached the Utility Agreement by failing to provide water and wastewater service to customers within the CCNG Tract upon request. CCNG seeks as damages the value of the service due and owing under the Utility Agreement, the additional expense caused by the denial of interim service, and other damages.

55. Section 12.02 of the Utility Agreement provides that: "In the event LCRA fails or refuses to timely comply with LCRA's obligations or is unable to do so as a result of LCRA's acts or failure to act, CCNG shall have the following remedies: (i) to enforce this Agreement by writ of mandamus, specific performance, injunction, or any other remedy available at law or in equity in a court of competent jurisdiction including but not limited to an action for damages. CCNG requests that the court require LCRA and/or WTCPUA, by issuance of a writ of mandamus or specific performance to immediately comply with their duties to reimburse CCNG and provide the CCNG Tract with water and wastewater service. CCNG seeks all such remedies.

### Declaratory Judgment: WTCPUA

56. Plaintiff incorporates by reference the allegations in paragraphs 12 through 36.

57. A dispute has arisen among the parties as to LCRA's or WTCPUA's obligation to reimburse CCNG for 30% of the Reimbursable Costs of the phases of the Internal Facilities that CCNG has built or will build pursuant to the Utility Agreement. This dispute would be resolved by a declaratory judgment entered pursuant to the Uniform Declaratory Judgments Act, Chapter 37 of the Texas Civil Practice and Remedies Code, construing the Utility Agreement.

58.    Plaintiff asks the Court to declare that the Utility Agreement obligates LCRA and WTCPUA to reimburse CCNG for 30% of the Reimbursable Costs of a particular phase of the Internal Facilities on the first date that: (1) the appraised value of the CCNG Tract is in excess of ten times the amount of the capital expenditures that LCRA or WTCPUA has made on the Regional Facilities and Internal Facilities necessary to provide retail water and wastewater service to the CCNG Tract; and (2) 80% of all LUEs projected to be served by that same phase of the Internal Facilities have connected to the West Travis County Regional Systems.

### Declaratory Judgment and Injunctive Relief: WTCPUA Directors

59.    Plaintiff incorporates by reference the allegations in paragraphs 12 through 36.

60.    A publicly-owned utility may not unreasonably discriminate in the provision of utility service. The constitutional guarantee of equal protection of the laws, TEX. CONST. art. I, § 3, is violated unless the utility service is available to all persons similarly situated upon the same terms and conditions. WTCPUA's Directors violated CCNG's constitutional right to equal protection when they denied "interim service" to CCNG – which has a contractual right to service upon request – while granting "interim service" to requestors who do not have that contractual right and applied for larger quantities of service.

61.    Plaintiff asks the Court to declare that WTCPUA's Directors violated CCNG's constitutional right to equal protection when they denied "interim service" to CCNG – which has a contractual right to service upon request – while granting "interim service" to requestors who do not have that contractual right and applied for larger quantities of service.

62.    Plaintiff also asks the court to enjoin WTCPUA's directors from denying "interim service" to CCNG.

15

## VII. NO GOVERNMENTAL IMMUNITY

63.     Section 271.152 of the Texas Local Government Code and Section 113.002 of the Texas Civil Practice & Remedies Code both waive WTCPUA's and LCRA's immunity from this suit.  As to the individual Defendants, governmental immunity does not bar an action for prospective declaratory and injunctive relief against a Director who has violated a constitutional provision while acting in his official capacity.

## VIII.  CONDITIONS PRECEDENT

64.     All conditions precedent have been performed or have occurred as required by Texas Rule of Civil Procedure 54.

## IX.  ATTORNEYS' FEES

65.     Pursuant to Chapters 37 and 38 of the Texas Civil Practice and Remedies Code and Section 271.153(a)(3) of the Texas Local Government Code, Plaintiff seeks an award of their reasonable attorneys' fees incurred in prosecuting this action.  Further, in the event of an appeal, Plaintiffs would be entitled to any additional reasonable attorneys' fees which may be incurred.

## X.  JURY TRIAL

66.     Plaintiff demands a jury trial and the required jury fee has already been paid.

## XI.  PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff CCNG DEVELOPMENT CO., L.P. prays that this Court render judgment:

    a.      awarding Plaintiff such damages as are authorized by law for breach of the Utility Agreement;

16

b.	granting a writ of mandamus or specific performance enforcing WTCPUA's and/or LCRA's obligations under the Utility Agreement;

c.	declaring that the Utility Agreement obligates LCRA and WTCPUA to reimburse CCNG for 30% of the Reimbursable Costs of a particular phase of the Internal Facilities on the first date that: (1) the appraised value of the CCNG Tract is in excess of ten times the amount of the capital expenditures that LCRA or WTCPUA has made on the Regional Facilities and Internal Facilities necessary to provide retail water and wastewater service to the CCNG Tract; and (2) 80% of all LUEs projected to be served by that same phase of the Internal Facilities have connected to the West Travis County Regional Systems;

d.	declaring that WTCPUA's Directors have violated CCNG's constitutional right to equal protection by failing to provide "interim service" to CCNG and enjoining WTCPUA's Directors from denying "interim service" to CCNG.

e.	awarding Plaintiff its reasonable attorneys' fees, costs of court, and pre-judgment and post-judgment interest; and

f.	granting Plaintiffs such other and further relief, at law and in equity, as this Court may deem just and proper.

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, TX 78701
(512) 480-5680 Telephone
(512) 480-5880 Telecopier

By: _____
G. Douglas Kilday
State Bar No. 00787834
dkilday@gdhm.com
Robin A. Melvin
State Bar No. 13929590
rmelvin@gdhm.com

ATTORNEYS FOR PLAINTIFF CCNG DEVELOPMENT CO., L.P.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent to the following counsel listed below, via certified mail, return receipt requested, on this 8th day of April, 2014:

John W. Rubttom
James N. Rader
Madison D. Jechow
LOWER COLORADO RIVER AUTHORITY
P.O. Box 220
Austin, Texas 78767

David Klein
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

_____
G. Douglas Kilday

18

# EXHIBIT 2

# ORDER OF DISMISSAL
## FROM THE DISTRICT COURTS OF TRAVIS COUNTY, TEXAS

Filed in The District Court
of Travis County, Texas

JUL 1 4 2016

At_____ 2:49 ____M.

Velva L. Price, District Clerk

| | |
|---|---|
| D-1-AG-13-000696 | IN RE CAVANAUGH |
| D-1-AG-13-000710 | IN RE PRATT |
| D-1-AG-13-000737 | IN RE BAILEY |
| D-1-AG-13-000750 | IN RE GREER |
| D-1-AG-13-000829 | IN RE SAN MIGUEL |
| D-1-AG-13-000841 | IN RE TREJO |
| D-1-AG-13-000861 | IN RE GONZALEZ BENITEZ |
| D-1-AG-13-000883 | IN RE MORRISON |
| D-1-AG-13-000898 | IN RE COLEMAN |
| D-1-AG-13-000912 | IN RE GARBER |
| D-1-AG-13-000997 | IN RE MILLER |
| D-1-AG-13-001075 | IN RE TAYLOR |
| D-1-AG-13-001106 | IN RE JOSEPH |
| D-1-AG-13-001165 | IN RE SANCHEZ |
| D-1-AG-13-001168 | IN RE CANTU |
| D-1-AG-13-001173 | IN RE BURKS |
| D-1-AG-13-001284 | IN RE LUGALA |
| D-1-AG-13-001318 | IN RE GONZALEZ |
| D-1-AG-13-001330 | IN RE ALBA |
| D-1-AG-13-001357 | IN RE ORTA |
| D-1-AG-13-001368 | IN RE PEREZ |
| D-1-AG-13-001396 | IN RE MCDONALD |
| D-1-AG-13-001406 | IN RE GIBOYEAUX |
| D-1-AG-13-001409 | IN RE VILLARREAL |
| D-1-AG-13-001416 | IN RE SELVEY |
| D-1-AG-13-001421 | IN RE MORALES |
| D-1-AG-13-001429 | IN RE RENTERIA |
| D-1-AG-13-001451 | IN RE GONZALES |
| D-1-AG-13-001463 | IN RE CARRINGTON |
| D-1-AG-13-001531 | IN RE RAMIREZ MARTINEZ |
| D-1-AG-13-001537 | IN RE ALVAREZ |
| D-1-AG-13-001560 | IN RE CLOVER |
| D-1-AG-13-001582 | IN RE HENSARLING |
| D-1-AG-13-001618 | IN RE BRYANT |
| D-1-AG-13-001624 | IN RE FLORES |
| D-1-AG-13-001724 | IN RE MCMILLON |
| D-1-AG-13-001734 | IN RE HANEY |
| D-1-AG-13-001737 | IN RE SIFUENTES |
| D-1-AG-13-001762 | IN RE WILSON |
| D-1-AG-13-001766 | IN RE SCHAVE |
| D-1-AG-13-001780 | IN RE GARCIA |
| D-1-AG-13-001781 | IN RE ALARCON |
| D-1-AG-13-001788 | IN RE MALDONADO |
| D-1-AG-13-001821 | IN RE GARZA |
| D-1-AG-13-001824 | IN RE BROWN |
| D-1-AG-13-001825 | IN RE BLEVINS |
| D-1-AG-13-001829 | IN RE CAMERON |
| D-1-AG-13-001868 | IN RE FOREMAN |
| D-1-AG-13-001894 | IN RE GRANADOS-MORENO |
| D-1-AG-13-001907 | IN RE LARA COLIN |
| D-1-AG-13-001928 | IN RE IVANOV |
| D-1-AG-13-001933 | IN RE COOPER |
| D-1-AG-13-002017 | IN RE LEE |
| D-1-AG-13-002042 | IN RE PENSON-RECTOR |
| D-1-AG-13-002055 | IN RE LEWIS |
| D-1-AG-13-002145 | IN RE TANNER |

# ORDER OF DISMISSAL
## FROM THE DISTRICT COURTS OF TRAVIS COUNTY, TEXAS

| | |
|---|---|
| D-1-GN-13-003912 | RUETTEN V. LEE |
| D-1-GN-13-003926 | CITY OF CARROLLTON VS. ABBOTT |
| D-1-GN-13-003942 | EBCO VS CHAMPION SITE |
| D-1-GN-13-003950 | LARRY C MILLS VS BROOKS |
| D-1-GN-13-003953 | ACI DESIGN VS MY BAR |
| D-1-GN-13-003961 | ALLISON RASP VS AMY GROSS |
| D-1-GN-13-003971 | KENNETH HARDIN VS CRAWFORD |
| D-1-GN-13-003982 | DELAINE JAMES INC VS COBALT |
| D-1-GN-13-003993 | MARKARIAN V. TEXAS DPT OF MV |
| D-1-GN-13-004015 | DEUTSCHE BANK V CAMPOS |
| D-1-GN-13-004020 | TD BANK USA NA VS ERAZO |
| D-1-GN-13-004043 | HIGHT V. INVENIO MARKETING |
| D-1-GN-13-004064 | PEOPLES V AUSTIN COMMUNITY COL |
| D-1-GN-13-004087 | DGC REALTY VS TWC |
| D-1-GN-13-004093 | BISCOE V RAUCH |
| D-1-GN-13-004094 | DR JENNIFER L KIENING VS HARRI |
| D-1-GN-13-004105 | SCI PARMER FUND V. IBC |
| D-1-GN-13-004119 | SUAREZ VS CITY OF AUSTIN |
| D-1-GN-13-004121 | CUSTOPHARM VS PJW INVESTMENT |
| D-1-GN-13-004132 | ZBRANEK VS PARTNERS STONE |
| D-1-GN-13-004142 | SHEPARD VS SMITH |
| D-1-GN-13-004143 | BARKER VS KATHMAN |
| D-1-GN-13-004171 | HOLEWYNE V MCGARY |
| D-1-GN-13-004187 | MONARCH V. TEXAS COMMISSION |
| D-1-GN-13-004190 | CARRASCO V NEDELKOFF |
| D-1-GN-13-004191 | KEEFER VS H20XIDATION LLC |
| D-1-GN-13-004199 | LEWIS CONCRETE VS KIVA INC |
| D-1-GN-13-004212 | HARDEN HEALTHCARE V. JORDE |
| D-1-GN-13-004230 | IN RE VIA METROPOLITAN |
| D-1-GN-13-004231 | DR SWANSON CO VS FIELDTURF USA |
| D-1-GN-13-004237 | CAL TEX LUMBER V. TWC |
| D-1-GN-13-004245 | DARTT VS CBA DESIGN AND BUILD |
| D-1-GN-13-004246 | TERRY ASSET V TEXAS HEALTH |
| D-1-GN-13-004255 | PROGRESSIVE V. THORNTON |
| D-1-GN-13-004305 | HUGHBANKS V PATINO |
| D-1-GN-13-004328 | DISCOVER BANK VS CROFFORD |
| D-1-GN-13-004341 | HOUSING AUTHORITY V. ABBOTT |
| D-1-GN-13-004345 | OVAIS V QUSSAD MORTGAGE CORP |
| D-1-GN-13-004355 | SUSAN SMITH VS CW VENTURES INC |
| D-1-GN-13-004362 | IN RE GRISELDA SANCHEZ |
| D-1-GN-13-004364 | BONILLA HERNANDEZ V CONN APPLI |
| D-1-GN-13-004371 | DEER OAKS VS AUS TEX UTILITY |
| D-1-GN-14-000009 | INDEPENDENT BANK V. VANOUNOU |
| D-1-GN-14-000016 | ACCC GENERAL AGENCY V JACKSON |
| D-1-GN-14-000022 | TEXAS MUTUAL VS INLAND SITE |
| D-1-GN-14-000025 | JOHNSON V. TEXAS DEPARTMENT OF |
| D-1-GN-14-000035 | TRIEAGLE ENERGY VS SUSAN COMBS |
| D-1-GN-14-000065 | COUNTRYSIDE NURSERY V LORANC |
| D-1-GN-14-000069 | STATE FARM MUTUAL V ARROYASOSA |
| D-1-GN-14-000083 | DAWSON V. PENNA |
| D-1-GN-14-000101 | BENTON VS RESENDIZ |
| D-1-GN-14-000153 | CALIBER HOLDINGS V SUSAN COMBS |
| D-1-GN-14-000160 | FIRSTMARK CREDIT V RMG HOLDING |
| D-1-GN-14-000163 | CCNG DEVELOPMENT V WEST TRAVIS |
| D-1-GN-14-000190 | ECOENERGY V. TX ST SECURITIES |
| D-1-GN-14-000196 | TEXAS CAPITAL BANK V MCGEE |
| D-1-GN-14-000202 | AKA BUILDERS VS FREEMAN |

# ORDER OF DISMISSAL
## FROM THE DISTRICT COURTS OF TRAVIS COUNTY, TEXAS

On the 20th day of May, 2016, the matter of dismissal for want of prosecution came on for consideration by the Court in the above-styled and numbered causes; and it appearing to the Court that these causes of action have been pending in the District Courts of Travis County, Texas, for a period of time in excess of the standards set forth in Rule 6 of the Texas Rules of Judicial Administration and the Local Rules of Civil Procedure for the Travis County District Courts; that the notice of the Court's intention to dismiss these causes for want of prosecution was sent to all parties and attorneys of record whose addresses are in the files of the District Clerk of Travis County, Texas; and that said causes should be dismissed for want of prosecution.

It is therefore ORDERED, ADJUDGED and DECREED that the above-styled and numbered causes be, and are hereby DISMISSED for want of prosecution.

Signed this 14th day of July, 2016

District Judge Presiding

# EXHIBIT 3

7/26/2016 3:04:00 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-14-000163**
**Nancy Rodriguez**

CAUSE NO. D-1-GN-14-000163

| | | |
|---|---|---|
| CCNG DEVELOPMENT CO., L.P., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, LOWER | § | |
| COLORADO RIVER AUTHORITY, and | § | TRAVIS COUNTY, TEXAS |
| LARRY FOX, MICHAEL MURPHY, | § | |
| RAY WHISENANT, BILL GOODWIN, | § | |
| and SCOTT ROBERTS, each in his | § | |
| official capacity as a director of the | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, | § | |
| Defendants. | § | 345th JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION FOR NEW TRIAL AND MOTION TO REINSTATE CASE

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff CCNG Development Co., L.P. files this Motion for New Trial and Motion to Reinstate Case, and in support thereof respectfully shows as follows:

### I.
### Motion for New Trial and Motion to Reinstate Case

1.      On July 14, 2016, the Court erroneously included this cause in a blanket order dismissing numerous cases for want of prosecution. The inclusion of this cause in that blanket order was in violation of the Travis County Local Rules and the requirements of Due Process of Law. Local Rule 8.3 states that the Court Administrator:

> ...*will give notice* that certain cases will be dismissed for want of prosecution. Such matters will be dismissed summarily without further proceedings *on the dismissal date indicated in the notice* of dismissal or thereafter *unless at least one party files a motion to retain* that complies with the requirements of this chapter.

(Emphasis added.) The procedure described in the Local Rules is consistent with Due Process, as it requires that parties be given notice and an opportunity to be heard before any dismissal.

The procedure leading to the erroneous dismissal of this cause did not provide CCNG with either notice or an opportunity to be heard, and accordingly did not comply with Due Process.

2. The Court Administrator did not provide the notice required by Local Rule 8.3. The Court's docket reflects no notice. Ex. 1 (court's docket). Plaintiff's attorneys did not receive the required notice. Ex. 2 (affidavit of G. Douglas Kilday) at ¶¶ 4-5. Similarly, the LCRA's attorneys did not receive the required notice. *Id.* The first notice of any dismissal that Plaintiff received was after the fact. It was mailed by the Court on July 22, 2016 and arrived on July 25, 2016. *Id.* at ¶5. It reflected that this cause had been dismissed 11 days earlier, on July 14, 2016. Ex. 2-B (notice).[1]

3. Had Plaintiff received the notice required by Local Rule 8.3, Plaintiff would have filed a Motion to Retain this cause for the following reasons.

4. Plaintiff filed this breach of contract action in January 2014. The Lower Colorado River Authority ("LCRA") owes Plaintiff reimbursement for water and wastewater infrastructure that Plaintiff constructed in part for the LCRA's benefit. The LCRA claims to have assigned its reimbursement obligation to the West Travis County Public Utility Agency (the "WTCPUA"). However, the WTCPUA has not unconditionally agreed to honor the obligations owed to CCNG, and has not honored those obligations.

5. The parties engaged in settlement discussions immediately after the Defendants answered. Ex. 2 at ¶ 3. Those discussions lasted until approximately one month ago, *id.*, when the WTCPUA abruptly reneged on earlier commitments that were fundamental to the proposed settlement. As the settlement discussions proceeded, Plaintiff served discovery requests in April

---

[1] Plaintiff's counsel has conferred with the Court Administrator's office to determine whether that office nonetheless believes that it issued the required notice. A representative of the Court Administrator's office has advised that notices are typically sent automatically, but that several attorneys have indicated that no notice was received for the July 14, 2016 dismissal docket. Ex. 2 at ¶ 4.

2

2014. The WTCPUA and LCRA, however, requested that the Plaintiff extend its discovery deadlines 22 times, while the parties continued settlement negotiations. As reflected by the Rule 11 agreements attached as Exhibit 2-A to this Motion, as a gesture of good faith the Plaintiff agreed to all 22 of those requests. The last agreed extension expired on June 16, 2016. Despite having received the Plaintiff's requests over 2 years and 3 months ago, the WTCPUA has still not produced a single document.

6. The Plaintiff has also attempted to confer with Defendants about a trial date. The LCRA has been responsive to these attempts. The WTCPUA has not. As recently as last week, the undersigned proposed the week of October 31, 2016 in order to accommodate a conflict that attorneys for the WTCPUA have during the first month of September. The WTCPUA would not agree to that date, but would also not propose any other date.

7. The Plaintiff intends to quickly pursue this cause through trial. Plaintiff will update its claims by filing a Second Amended Petition immediately upon the reinstatement of this Cause. The Second Amended Petition will reflect additional claims for Reimbursable Costs owed, and service requests not yet approved, as the parties have been discussing.

## II.
## Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Court:

a. grant Plaintiff's Motion for New Trial and Motion to Reinstate Case;

b. reinstate this cause on the Court's docket;

c. set this cause for trial on October 31, 2016; and

d. grant Plaintiff such other and further relief, at law and in equity, as this Court may deem just and proper.

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, TX 78701
(512) 480-5680 Telephone
(512) 480-5880 Telecopier

By: _____
G. Douglas Kilday
State Bar No. 00787834
dkilday@gdhm.com
Robin A. Melvin
State Bar No. 13929590
rmelvin@gdhm.com
David P. Lein
State Bar No. 24032537
dlein@gdhm.com

ATTORNEYS FOR PLAINTIFF CCNG DEVELOPMENT CO., L.P.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent to the following counsel listed below, via email, on this 26th day of July, 2016:

James N. Rader
Associate General Counsel
LOWER COLORADO RIVER AUTHORITY
Austin, Texas 78767-0220
(512) 578-3559
Fax: (512) 473-4010
james.rader@lcra.org

James Parker
David Klein
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5818
Fax: (512) 472-0532
dklein@lglawfirm.com
jparker@lglawfirm.com

_____
G. Douglas Kilday

4

## CERTIFICATE OF CONFERENCE

I hereby certify that on July 25, 2016, I conferred with James Rader, counsel for the LCRA, regarding this motion. Mr. Rader indicated that the LCRA does not oppose the relief requested in this Motion. I separately called David Klein, counsel for the WTCPUA, to learn whether the WTCPUA opposed this Motion. Mr. Klein was not available, and he has not returned my call.

G. Douglas Kilday

## NOTICE OF HEARING

Please take notice that this Motion has been set for hearing on Friday, August 5, 2016 at 9:00 am, at the Travis County District Court, 1000 Guadalupe, Austin, Texas.

G. Douglas Kilday

# EXHIBIT 1

(https://www.traviscountytx.gov)

# District Clerk - AARO - Attorney Access to Records Online

# Details

Updated : Monday, July 25, 2016 5:08:43 AM

| | | |
|---|---|---|
| **Cause Number** | D-1-GN-14-000163 | Request Documents (/aaro/Content/record_search |
| **Style** | CCNG DEVELOPMENT V WEST TRAVIS | |
| **Filed Date** | 1/16/2014 | New Search (/aaro/) |
| **Court** | 345 | |
| **Type** | BREACH OF CONTRACT (GEN LIT ) | |
| **Case Status** | DISM WANT PROS | |
| **Action/Offense** | | |
| **Hearing Date** | 20/5/2016 01:45 PM | |

| Attorney | Type | Party - Full/Business | Party - Person |
|---|---|---|---|
| | DEFENDANT | | ROBERTS , SCOTT |
| | DEFENDANT | | GOODWIN , BILL |
| | DEFENDANT | | WHISENANT , RAY |
| | DEFENDANT | | MURPHY , MICHAEL |
| | DEFENDANT | | FOX , LARRY |
| RADER JAMES N | DEFENDANT | LOWER COLORADO RIVER AUTHORITY | |
| KILDAY GLEN DOUGLAS | PLAINTIFF | CCNG DEVELOPMENT CO LP | |
| MELVIN ROBIN A | PLAINTIFF | CCNG DEVELOPMENT CO LP | |
| KLEIN DAVID JASON | DEFENDANT | WEST TRAVIS COUNTY PUBLIC UTILITY AGENCY | |

| Date | Court | Party | Description | Category | Pages | |
|---|---|---|---|---|---|---|
| 7/14/2016 | LJL | | DWOP BLANKET ORDER | ORD | 0 | PDF not available |
| 3/9/2015 | 345 | PL | OTHER FILING | OTHER | 1 | Download (/aaro/Default/GetPdf?barCodeId=3921065) |
| 4/8/2014 | 345 | PL | AMENDED PETITION/SUPPLEMENTAL | PET-PL | 18 | Download (/aaro/Default/GetPdf?barCodeId=3451955) |
| 2/14/2014 | 345 | DF | ANSWER & ADDITIONAL PLEADING | ANS-RESP | 4 | Download (/aaro/Default/GetPdf?barCodeId=3379421) |
| 2/13/2014 | 345 | DF | ORIGINAL ANSWER | ANS-RESP | 2 | Download (/aaro/Default/GetPdf?barCodeId=3379617) |
| 1/27/2014 | 345 | DF | EXECUTED SERVICE | SRVPROCESS | 2 | Download (/aaro/Default/GetPdf?barCodeId=3355729) |
| 1/27/2014 | 345 | DF | EXECUTED SERVICE | SRVPROCESS | 2 | Download (/aaro/Default/GetPdf?barCodeId=3355728) |
| 1/17/2014 | 345 | DF | ISS:CITATION | ISSUANCE | 0 | PDF not available |
| 1/17/2014 | 345 | DF | ISS:CITATION | ISSUANCE | 0 | PDF not available |
| 1/16/2014 | 345 | PL | ORIGINAL PETITION/APPLICATION | PET-PL | 10 | Download (/aaro/Default/GetPdf?barCodeId=3345230) |

# EXHIBIT 2

CAUSE NO. D-1-GN-14-000163

| | | |
|---|---|---|
| CCNG DEVELOPMENT CO., L.P., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, LOWER | § | |
| COLORADO RIVER AUTHORITY, and | § | TRAVIS COUNTY, TEXAS |
| LARRY FOX, MICHAEL MURPHY, | § | |
| RAY WHISENANT, BILL GOODWIN, | § | |
| and SCOTT ROBERTS, each in his | § | |
| official capacity as a director of the | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, | § | |
| Defendants. | § | 345th JUDICIAL DISTRICT |

## AFFIDAVIT OF G. DOUGLAS KILDAY

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, personally appeared G. Douglas Kilday, who after being duly sworn, did depose and state as follows:

1. My name is Douglas Kilday. I am an attorney for Plaintiff CCNG Development Co. in this in this cause. All of the facts in this affidavit are true and correct, and all are within my personal knowledge.

2. I am the lead attorney for Plaintiff in this cause. I signed and filed Plaintiff's Original Petition and Plaintiff's Original Petition. My address, phone number, fax number and email address appear on both pleadings.

3. Since the time when this lawsuit was filed, the parties have engaged in lengthy settlement negotiations over many months. Those negotiations began immediately after the Defendants appeared, and they continued into early June 2016. As a result

of those negotiations, the Defendants requested numerous extensions for their deadline to respond to our written discovery requests. We have accommodated those requests. On March 9, 2015, I filed with the Court a Rule 11 Agreement reflecting the ninth of twenty-two agreements I made to extend discovery deadlines for the Defendants. That filing also reflected my address, phone number, fax number, and email address. True and correct copies of Rule 11 agreements reflecting all twenty-two extensions are attached to this affidavit as Exhibit 2-A.

4. I never received a notice that this case would be dismissed unless one of the parties filed a motion to retain the case. That is, I never received the notice contemplated by Local Rule 8.3. I have conferred with James Rader, counsel for the LCRA, who confirmed to me that he also did not receive the notice contemplated by Local Rule 8.3. I spoke with a representative of the Court Administrator's Office, who reported to me that those notices are typically sent automatically, but that several attorneys have indicated that no notice was received for the July 14, 2016 dismissal docket.

5. I am familiar with the records kept by my law firm for this case. I have reviewed my firm's file. It contains no notice from the Court stating that this case would be dismissed unless one of the parties files a motion to retain. The first time my firm received any notice related to dismissal was on July 25, 2016, when my firm received notice stating that this case had been dismissed eleven days earlier, on July 14, 2016. A true and correct copy of that notice is attached to this affidavit as Exhibit 2-B.

G. Douglas Kilday

SWORN TO AND SUBSCRIBED BEFORE ME this 26th day of July, 2016.

_____

Notary Public in and for the State of Texas

My Commission Expires: 6-9-2019



JEANNETTE LANGER
NOTARY PUBLIC
ID# 10171994
State of Texas
Comm. Exp. 06-09-2019

# EXHIBIT 2-A



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

April 22, 2014

David Klein                                                           *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

Madison Jechow                                                       *Via Electronic Mail (Madison.jechow@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Dear David and Madison:

This letter confirms my agreement to extend the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. The due date for all Defendants to respond to those discovery requests shall be June 20, 2014 (i.e., an extension of 35 days).

Please let me know if you would like to discuss this matter further.

Best regards.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
    G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
       Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

May 19, 2014

David Klein                                                    *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

Madison Jechow                                                 *Via Electronic Mail (Madison.jechow@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant a second extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the first extension, the deadline was June 20, 2014. (*See* my letter to you dated April 22, 2014.) You have requested an additional thirty (30) days, and I have agreed. With this second extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be July 21, 2014, which is the Monday following the additional thirty (30) days.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
     G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
       Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

G. Douglas Kilday
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

July 8, 2014

David Klein                                      *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

Madison Jechow                                   *Via Electronic Mail (Madison.jechow@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant a third extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the second extension, the deadline was July 21, 2014. (*See* my letter to you dated May 19, 2014.) You have requested an additional thirty (30) days, and I have agreed. With this third extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be August 20, 2014.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
       Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX  7876-99987

August 4, 2014

David Klein                                           *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

Madison Jechow                                       *Via Electronic Mail (Madison.jechow@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas  78703

RE:     Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant a fourth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014.  With the third extension, the deadline was August 20, 2014.  (*See* my letter to you dated July 8, 2014.)  You have requested an additional thirty (30) days, and I have agreed.  With this fourth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be September 20, 2014.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
        G. Douglas Kilday

GDK/jyl
cc:     client *(via email)*
         Robin A. Melvin [firm]

 **GD HM**

**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

August 22, 2014

David Klein                                    *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

Madison Jechow                                 *Via Electronic Mail (Madison.jechow@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:  Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant a fifth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the fourth extension, the deadline was September 20, 2014. (*See* my letter to you dated August 4, 2014.) You have requested an additional thirty (30) days, and I have agreed. With this fifth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be October 20, 2014.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
    G. Douglas Kilday

GDK/jyl
cc:  client *(via email)*
     Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

October 6, 2014

David Klein                                *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

Madison Jechow                             *Via Electronic Mail (Madison.jechow@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas  78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant a sixth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014.  With the fifth extension, the deadline was October 20, 2014.  (*See* my letter to you dated August 21, 2014.)  You have requested an additional thirty (30) days, and I have agreed.  With this sixth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be November 19, 2014.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
       Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

G. Douglas Kilday
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

November 12, 2014

David Klein                                          *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

Madison Jechow                                    *Via Electronic Mail (Madison.jechow@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant a seventh extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the sixth extension, the deadline was November 19, 2014. (*See* my letter to you dated October 6, 2014.) You have requested an additional thirty (30) days, but I am granting a sixty (60) day extension. With this seventh extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be January 19, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
        Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX  7876-99987

January 9, 2015

David Klein                                 *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                 *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas  78703

RE:  Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant an eighth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014.  With the seventh extension, the deadline was January 19, 2015.  (*See* my letter to you dated November 12, 2014.)  You have requested an additional sixty (60) days.  With this eighth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be March 20, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By:  _____
G. Douglas Kilday

GDK/jyl
cc:     client *(via email)*
        Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

3/9/2015 3:21:54 PM

**G. Douglas Kilday**  **Velva L. Price**
512.480.5680     **District Clerk**
512.480.5880 (fax)  **Travis County**
dkilday@gdhm.com  **D-1-GN-14-000163**

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

March 9, 2015

David Klein                *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant a ninth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the eighth extension, the deadline was March 20, 2015. (*See* my letter to you dated January 9, 2015) You have requested an additional thirty (30) days. With this ninth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be April 20, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
/G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
        Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

April 17, 2015

David Klein                                        *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                        *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:   Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant a tenth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the ninth extension, the deadline was April 20, 2015. (*See* my letter to you dated March 9, 2015) You have requested an additional thirty (30) days. With this tenth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be May 20, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
      G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
        Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

G. Douglas Kilday
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

May 20, 2015

David Klein                                   *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                   *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant an eleventh extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the tenth extension, the deadline was May 20, 2015. (*See* my letter to you dated April 17, 2015) You have requested an additional sixty (60) days. With this eleventh extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be July 20, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
       Robin A. Melvin [firm]

 **GD**
**HM**

**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

July 17, 2015

David Klein                                          *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                          *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant an twelfth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the eleventh extension, the deadline was July 20, 2015. (*See* my letter to you dated May 20, 2015) You have requested an additional thirty (30) days. With this twelfth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be August 19, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
       Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

August 18, 2015

David Klein                                    *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                    *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas  78703

RE:     Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant an thirteenth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the twelfth extension, the deadline was August 19, 2015. (*See* my letter to you dated July 17, 2015) With this thirteenth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be September 30, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
G. Douglas Kilday

GDK/jyl
cc:     client *(via email)*
        Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

G. Douglas Kilday
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

September 24, 2015

David Klein                                   *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                   *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:     Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant an fourteenth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the thirteenth extension, the deadline was September 30, 2015. (*See* my letter to you dated August 18, 2015) With this fourteenth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be October 30, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By:  _____
     G. Douglas Kilday

GDK/jyl
cc:     client *(via email)*
        Robin A. Melvin [firm]

2355602.1



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

October 29, 2015

David Klein                                    *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                    *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As previously indicated via email, this letter again confirms my agreement to grant an fifteenth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the fourteenth extension, the deadline was October 30, 2015. (*See* my letter to you dated September 24, 2015) With this fifteenth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be December 14, 2015.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
    G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
       Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

November 16, 2015

David Klein                                    *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                    *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas  78703

RE:  Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As we discussed this morning, this letter confirms my agreement to grant a sixteenth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014.  With the fifteenth extension, the deadline was December 14, 2015.  (*See* my letter to you dated October 29, 2015)  With this sixteenth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be January 29, 2016.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
/G. Douglas Kilday

GDK/jyl
cc:   client *(via email)*
      Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

January 12, 2016

David Klein                             *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                             *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:    Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As we discussed this morning, this letter confirms my agreement to grant a seventeenth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the sixteenth extension, the deadline was January 29, 2016. (*See* my letter to you dated November 16, 2015) With this seventeenth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be March 29, 2016.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
G. Douglas Kilday

GDK/jyl
cc:    client *(via email)*
       Robin A. Melvin [firm]



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

G. Douglas Kilday
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

March 25, 2016

David Klein                              *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                              *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:   Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As we discussed this morning, this letter confirms my agreement to grant an eighteenth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the seventeenth extension, the deadline was March 29, 2016. (*See* my letter to you dated January 12, 2015) With this eighteenth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be April 12, 2016.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By:   _____
      G. Douglas Kilday

GDK/jyl
cc:   client *(via email)*
      Robin A. Melvin [firm]

401 Congress Avenue   Suite 2200   Austin, Texas 78701   512.480.5600   www.gdhm.com          2503974.1



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

April 12, 2016

David Klein                                    *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                    *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:     Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As we discussed yesterday, this letter confirms my agreement to grant an nineteenth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the eighteenth extension, the deadline was April 12, 2016. (*See* my letter to you dated March 25, 2016) With this nineteenth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be April 21, 2016.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
     G. Douglas Kilday

GDK/jyl
cc:     client *(via email)*
        Robin A. Melvin [firm]

401 Congress Avenue    Suite 2200    Austin, Texas 78701    512.480.5600    www.gdhm.com

2512491.1



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

G. Douglas Kilday
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

April 20, 2016

David Klein                                          *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                          *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:     Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As we discussed yesterday, this letter confirms my agreement to grant a twentieth extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the nineteenth extension, the deadline was April 21, 2016. (*See* my letter to you dated April 12, 2016) With this twentieth extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be May 26, 2016.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By: _____
G. Douglas Kilday

GDK/jyl
cc:     client *(via email)*
        Robin A. Melvin [firm]

2516804.1



**GDHM**

**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**G. Douglas Kilday**
512.480.5680
512.480.5880 (fax)
dkilday@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX 7876-99987

June 9, 2016

David Klein                                     *Via Electronic Mail (dklein@lglawfirm.com)*
LLOYD GOSSELINK ROCHELLE & TOWNSEND, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701

James Rader                                     *Via Electronic Mail (james.rader@lcra.org)*
LOWER COLORADO RIVER AUTHORITY
3700 Lake Austin Boulevard
Austin, Texas 78703

RE:   Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency, et al.*; In the 345th Judicial District Court, Travis County, Texas

Gentlemen:

As we discussed today, this letter confirms my agreement to grant a twenty-second extension of the deadline for all responses to discovery requests that were served by CCNG Development Co., L.P. ("CCNG") on or about April 16, 2014. With the twentieth-first extension, the deadline was June 9, 2016. (*See* my letter to you dated May 26, 2016) With this twenty-second extension, the due date for all Defendants to respond to all discovery requests served by CCNG shall be June 17, 2016.

Please let me know if you would like to discuss this matter further.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

By:  _____
     G. Douglas Kilday

GDK/jyl
cc:   client *(via email)*
      Robin A. Melvin [firm]

# EXHIBIT 2-B

# NOTICE OF COURT SETTING

IN THE DISTRICT COURTS OF TRAVIS COUNTY, TEXAS

FOR CAUSE NO.   D-1-GN-14-000163

CCNG DEVELOPMENT CO LP

VS.

WEST TRAVIS COUNTY PUBLIC UTILITY AGENCY

UPON THE MOTION OF THE COURT THE ABOVE CASE HAS BEEN
DISMISSED FOR WANT OF PROSECUTION
ON July 14, 2016.

VELVA L. PRICE
DISTRICT CLERK
TRAVIS COUNTY, TEXAS

DATED:  7/14/2016

300

OFFICE OF COURT ADMINISTRATOR
TRAVIS COUNTY COURTHOUSE
P.O BOX 1748
AUSTIN, TX 78767



PRESORTED
FIRST CLASS

U.S. POSTAGE >> PITNEY BO
ZIP 78701  $ 000.4
02  4W
0000334691 JUL  22  20

MELVIN ROBIN A
401 CONGRESS AVE., SUITE 2240
AUSTIN       TX    78701



U.S. POSTAGE >> PITNEY
ZIP 78701  $ 000
02  4W
0000334691 JUL  22

# EXHIBIT 4

CAUSE NO. D-1-GN-14-000163

| CCNG DEVELOPMENT CO., L.P., | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, LOWER | § | |
| COLORADO RIVER AUTHORITY, and | § | 345th JUDICIAL DISTRICT |
| LARRY FOX, MICHAEL MURPHY, | § | |
| RAY WHISENANT, BILL GOODWIN, | § | |
| and SCOTT ROBERTS, each in his | § | |
| official capacity as a director of the | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, | § | |
| | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |


**DEFENDANT WEST TRAVIS COUNTY PUBLIC UTILITY AGENCY'S RESPONSE
IN OPPOSITION TO PLAINTIFF'S MOTION FOR NEW TRIAL AND
MOTION TO REINSTATE CASE ON THE BASIS OF
LACK OF SUBJECT MATTER JURISDICTION**

Defendant West Travis County Public Utility Agency ("WTCPUA"), on behalf of itself

and its Directors, Larry Fox, Michael Murphy, Ray Whisenant, Bill Goodwin, and Scott Roberts,

who are sued in their official capacities, responds to the Motion for New Trial and Motion to

Reinstate Case (the "Motion") of Plaintiff CCNG Development Co., L.P. ("CCNG") on the basis

that the Court lacks subject matter jurisdiction over the case:

**I.
EXECUTIVE SUMMARY**

A live case-in-controversy is a requirement for the Court to exercise subject matter

jurisdiction over a matter. Since the dismissal of this case, WTCPUA has paid all amounts that

CCNG claims are due and owed to it in its First Amended Petition. Accordingly, there is no live

case-in-controversy between the parties, and the Court lacks subject matter jurisdiction.

## II.
## BACKGROUND FACTS[1]

WTCPUA is a governmental entity that operates the water and wastewater system formerly operated by the Lower Colorado River Authority ("LCRA") located in western Travis and northern Hays County (the "LCRA System"). (Pl.'s 1st Am. Pet. at ¶¶10, 33-34.) As part of the transfer of the LCRA System to WTCPUA in 2012, LCRA assigned certain contracts to WTCPUA. (*Id.* at ¶34.) Among those contracts assigned to WTCPUA was the 1999 Utility Facilities Acquisition Agreement (the "Utility Agreement") between CCNG and LCRA. (*Id.* at ¶¶19, 34.)

Under the Utility Agreement, CCNG agreed to construct certain water and wastewater facilities, for which it would receive reimbursement from LCRA upon meeting certain metrics. (*Id.* at ¶22.) CCNG alleges that LCRA assigned the liability for such reimbursements to WTCPUA in 2012 along with other transfers. (*Id.* at ¶¶33-34.) CCNG further alleges that it has met the metrics on two tracts, Los Robles Addition and Spanish Oaks Section I, entitling it to reimbursement under the Utility Agreement in the amount of $552,983 and $582,625, respectively. (*Id.* at ¶¶26-32.) In addition, CCNG claims that it is entitled to water and wastewater service on its office expansion project. (*Id.* at ¶46.)

---

[1] In opposition to CCNG's Motion for New Trial and Motion to Reinstate Case, WTCPUA attaches the following Exhibits, which are incorporated by reference as though fully set forth herein:

**Exhibit A:** Affidavit of James F. Parker, III.

> **Exhibit 1:** A true and correct copy of the August 4, 2016, letter from James F. Parker, III to G. Douglas Kilday, with enclosures.

**Exhibit B:** Affidavit of Curtis Wilson

> **Exhibit 1:** A true and correct copy of the Utility Facilities Acquisition Agreement between CCNG Development Co., L.P. and the Lower Colorado River Authority.

> **Exhibit 2:** A true and correct copy of the Minutes of the April 17, 2014, meeting of the Board of Directors of the West Travis County Public Utility Agency.

Shortly after this lawsuit was filed, WTCPUA granted CCNG's service request for its office expansion project. (Ex. B2.) Accordingly, CCNG has had service on its office expansion project since 2014. (Ex. B.)

In addition, WTCPUA has paid the amounts that CCNG claims are due and owed for reimbursement on the Los Robles Addition and Spanish Oaks Section I. On August 4, 2016, WTCPUA transmitted to CCNG two checks for $552,983 and $582,625. (Ex. A1.) CCNG does not seek any additional amount due and owed under the provisions of the Utility Agreement.

## III.
## ARGUMENT AND AUTHORITIES

The Court should not reinstate a case over which it has no subject matter jurisdiction in the first place. And inasmuch as CCNG's claims have been mooted by performance or payment, there is no controversy between the parties and the Court lacks jurisdiction.[2]

### A.     *A live case-in-controversy is a predicate to the Court's exercise of subject matter jurisdiction.*

Standing is a constitutional prerequisite to maintaining suit in federal or state court. *South Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 307 (Tex.2007); *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex.2000). "The general test for standing in Texas requires that there (a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993) (quoting *Board of Water Eng'rs v. City of San Antonio*, 283 S.W.2d 722, 724 (Tex. 1955)). As a component of subject matter jurisdiction, standing is never presumed and cannot be waived. *Id.* at 443-45.

---

[2] WTCPUA does not style this Response a "plea to the jurisdiction" because the case has been dismissed for want of prosecution. Accordingly, there is no active case over which the Court has asserted jurisdiction. However, from the standpoint that a reinstatement of the case would constitute an exercise of jurisdiction by the Court, WTCPUA urges the Court to deny the Motion, and WTCPUA's Response is therefore the functional equivalent of a plea to the jurisdiction.

Standing requires that a controversy must between the parties at *every stage* of the legal proceedings. *See Rawlings v. Gonzalez*, 407 S.W.3d 420, 425 (Tex. App.—Dallas 2013, no pet.). "If a controversy ceases to exist—the issues are no longer 'live' or the parties lack a legally cognizable interest in the outcome—the case becomes moot." *Id.* (quoting *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex.2001)). "If a case becomes moot, the parties lose standing to maintain their claims." *Id.*

### B. There is no live case-in-controversy between WTCPUA and CCNG set forth in Plaintiff's First Amended Petition.

CCNG raises three claims in its First Amended Petition: (a) denial of water and wastewater service on its office extension project, (2) failure to pay a reimbursement of $552,983 in connection with utilities installed on the Los Robles Addition and (3) failure to pay a reimbursement of $582,625 in connection with utilities installed on the Spanish Oaks Section I tract. (Pl.'s 1st Am. Pet.) The undisputed evidence shows, however, that all of these claims have been satisfied. WTCPUA provided the service CCNG requested to the office extension project in April 2014. (Ex. B.) WTCPUA paid reimbursements of $552,983 and $582,625 on August 4, 2016. (Ex. A.) In other words, CCNG has received 100 cents on the dollar for what it claims in the First Amended Petition.

CCNG argues that there is a controversy between the parties arising from its alleged entitlement to attorneys' fees and interest.[3] But inasmuch as CCNG is not entitled to any contract damages, it cannot be a "prevailing party" entitled to attorneys' fees under Chapter 38 of the Civil Practice & Remedies Code. *See Intercontinental Gp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 (Tex. 2009) ("A zero on damages necessarily zeroes out 'prevailing

---

[3] "Parties are free to contract for a fee-recovery standard either looser or stricter than" that set forth in Chapter 38 of the Civil Practice & Remedies Code. *Intercontinental Gp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650 (Tex. 2009). The Agreement, however, contains no contractual right to either attorneys' fees or interest. (Ex. A2.) CCNG alleges its right to attorneys' fees arises solely out of Chapter 38. (Pl.'s 1st Am. Pet. at ¶65.)

party' status."). Likewise, an award of prejudgment interest necessarily implies a judgment on which the plaintiff recovered damages, as any interest rate on $0 will always yield $0 in interest, no matter how often it is compounded.

Because CCNG has received the service for which it seeks specific performance and has received the amounts it claims are due and owed, there is no controversy between the parties. Instead, CCNG's claims are moot. It lacks standing, and the Court lacks subject matter jurisdiction.

### C.    *CCNG cannot reopen this case to serve as a shell for future allegations.*

Since it has no live claims in its First Amended Petition, CCNG promises to file a Second Amended Petition if this case is reinstated, alleging "additional claims for Reimbursable Costs owed, and service requests not yet approved." (Pl.'s Mot. for New Trial at ¶7.) But why? If it has new claims, those claims can be brought in a new lawsuit.

In essence, CCNG asks the Court to reinstate a case that has no active dispute, just to preserve a cause number. That "14" cause number will then allow CCNG to "quickly pursue this cause through trial," which it would like to set less than three months from now. (*Id.* at ¶¶6-7.) WTCPUA would obviously be unable to prepare its defense to such claims—the details of which remain a mystery—in such little time.

And that is CCNG's purpose.

The Court should reject CCNG's gamesmanship. There is no case in controversy in this case as it is presently pleaded, and as a result the Court lacks subject matter jurisdiction. The Court cannot grant a new trial and reinstate a case over which it lacks subject matter jurisdiction. Accordingly, the Court should deny CCNG's Motion.

WHEREFORE, PREMISES CONSIDERED, Defendant West Travis County Public Utility Agency, on behalf of itself and its Directors sued in their official capacities, respectfully

pray the Court to deny the Motion for New Trial and Motion to Reinstate the Case of Plaintiff

CCNG Development Co., L.P. for lack of subject matter jurisdiction.

Respectfully submitted,

**LLOYD GOSSELINK
 ROCHELLE & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas  78701
Telephone:     (512) 322-5800
Facsimile:      (512) 472-0532


By:         */s/ Jose E. de la Fuente*
            JOSE E. de la FUENTE
            State Bar No. 00793605
            jdelafuente@lglawfirm.com
            DAVID J. KLEIN
            State Bar No. 24041257
            dklein@lglawfirm.com
            JAMES F. PARKER, III
            State Bar No. 24027591
            jparker@lglawfirm.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the Court's electronic filing case management system and electronic mail on this 4th day of August, 2016:

G. Douglas Kilday
dkilday@gdhm.com
Robin A. Melvin
rmelvin@gdhm.com
David P. Lein
dlein@gdhm.com
Graves, Dougherty, Hearon, & Moody, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701

James N. Rader
james.rader@lcra.org
Lower Colorado River Authority
Austin, Texas 78767

                                        */s/ James F. Parker, III*
                                        JAMES F. PARKER, III

# EXHIBIT A

| CCNG DEVELOPMENT CO., L.P., | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, LOWER | § | |
| COLORADO RIVER AUTHORITY, and | § | 345th JUDICIAL DISTRICT |
| LARRY FOX, MICHAEL MURPHY, | § | |
| RAY WHISENANT, BILL GOODWIN, | § | |
| and SCOTT ROBERTS, each in his | § | |
| official capacity as a director of the | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, | § | |
| | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## AFFIDAVIT OF JAMES F. PARKER, III

BEFORE ME, the undersigned authority, came on this day James F. Parker, III, who, being personally known to me, was placed under oath and testified as follows:

1.     "My name is James F. Parker, III. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am counsel of record for West Travis County Public Utility Agency ('WTCPUA') in the above-styled and –numbered action, and the following facts are true and correct and within my personal knowledge as WTCPUA's attorney.

2.     "On August 4, 2016, I drafted, signed, and transmitted by courier to G. Douglas Kilday, counsel of record for Defendant CCNG Development Co., L.P. the attached letter:

> **Exhibit 1:**     A true and correct copy of a letter from James F. Parker, III to G. Douglas Kilday dated August 4, 2016, with enclosures (redacted to remove banking information).

Exhibit 1 is a true, complete, accurate, and correct copy of the original, with the exception of redactions made to remove banking account information.

THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK

FURTHER AFFIANT SAITH NAUGHT.



_____
James F. Parker, III

Sworn to and subscribed before me the undersigned authority on this the 4th day of August, 2016.

_____
Notary Public, State of Texas

CATHERINE ANN DANIELS
NOTARY PUBLIC
ID# 6515283
State of Texas
Comm. Exp. 12-18-2017

# EXHIBIT 1



816 Congress Avenue, Suite 1900
Austin, Texas 78701
Telephone: (512) 322-5800
Facsimile: (512) 472-0532

www.lglawfirm.com

Mr. Parker's Direct Line: (512) 322-5878
Email: jparker@lglawfirm.com

August 4, 2016

**_VIA Hand Delivery_**
Mr. Doug Kilday
GRAVES DOUGHERTY HEARON & MOODY
401 Congress Avenue, Suite 2200
Austin, Texas 78701

> Re: Cause No. D-1-GN-14-000163; *CCNG Development Co., L.P. v. West Travis County Public Utility Agency*, in the 345[th] District Court of Travis County, Texas.

Dear Doug:

Please find enclosed checks from my client, West Travis County Public Utility Agency ("WTCPUA") in the amounts of $582,625.00 and $552,983.00. These are the amounts identified by CCNG Development Co., L.P. ("CCNG") as being due and owing to it for reimbursement in Paragraphs 32 and 28 of Plaintiff's First Amended Petition, respectively.

By accepting these checks, you represent that CCNG is entitled to these sums as alleged in Plaintiff's First Amended Petition, and has not assigned its rights to such reimbursement to any other party. Alternatively, if CCNG has assigned its rights to reimbursement to another party, by accepting these checks you agree that CCNG will indemnify and hold harmless WTCPUA for any claims and causes of action brought against it by such assignee for payment of the reimbursements paid herewith.

If you have any questions, please feel free to contact me at your convenience.

Sincerely,

James F. Parker, III

JFP:cd
Enclosure

7142904.1

Lloyd Gosselink Rochelle & Townsend, P.C.

West Travis County Public Utility Agent
Facility Fund

CCNG Development Co, LP

| | Date | Reference | Payment |
|---|---|---|---|
| | 8/3/2016 | | 582,625.00 |

08/03/2016    **1155**

CCNG Development Co, LP

,

$582,625.00

THE FACE OF THIS CHECK IS PRINTED GREEN - THE BACK CONTAINS A SIMULATED WATERMARK

West Travis County Public Utility Agent
Facility Fund

c/o Municipal Accounts & Consulting, L.P.
6500 River Place Blvd, Building 4 Suite 104
Austin, TX 78730
512-782-2400

BB&T
Austin, TX 78746

**1155**

08/03/2016

Pay to the
Order of:      CCNG Development Co, LP

$582,625.00

In the
Amount of:   Five Hundred Eighty-Two Thousand Six Hundred Twenty-Five Dollars and No Cents

CCNG Development Co, LP

,

Memo:     .

Larry Fox

Void after six months

West Travis County Public Utility Agent
Facility Fund

CCNG Development Co, LP

| | 08/03/2016 | **1154** |
|---|---|---|
| **Date** | **Reference** | **Payment** |
| 8/3/2016 | | 552,983.00 |

CCNG Development Co, LP

,

$552,983.00

THE FACE OF THIS CHECK IS PRINTED GREEN - THE BACK CONTAINS A SIMULATED WATERMARK

West Travis County Public Utility Agent
Facility Fund

c/o Municipal Accounts & Consulting, L.P.
6500 River Place Blvd, Building 4 Suite 104
Austin, TX 78730
512-782-2400

BB&T
Austin, TX  78746

**1154**

08/03/2016

Pay to the
Order of:       CCNG Development Co, LP

$552,983.00

In the
Amount of:   Five Hundred Fifty-Two Thousand Nine Hundred Eighty-Three Dollars and No Cents

CCNG Development Co, LP

,

Memo:        .

Void after six months



# MESSENGER REQUEST

Time Requested: _12:17_          Time Needed: _ASAP_

Date: August 4, 2016

**Delivery**          Pick-up          Deliver and Pick-up

Name:     Doug Kilday
          GRAVES DOUGHERTY HEARON & MOODY

Address:  401 Congress Avenue, Suite 2200
          Austin, TX  78701

Special Instructions: Please deliver to Mr. Kilday's office, return signed copy of this slip to Cathy Daniels.

Requested by: CAD                          User #

Client Name:

Client Number: 3319-10 / CCNG v. WTCPUA

## TO BE FILLED OUT BY OFFICE SERVICES

Messenger: _Joaquin Najar_

Received by: _S. Gibbs_

Date: _8/4_     Time: _12:49_     AM     (PM)

If problems, Contact at Lloyd Gosselink:     Cathy Daniels
                                             (512) 322-5854

7142515.1

# EXHIBIT B

| | | |
|---|---|---|
| CCNG DEVELOPMENT CO., L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | IN THE DISTRICT COURT |
| | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, LOWER | § | |
| COLORADO RIVER AUTHORITY, and | § | FOR THE 345th JUDICIAL DISTRICT |
| LARRY FOX, MICHAEL MURPHY, | § | |
| RAY WHISENANT, BILL GOODWIN, | § | |
| and SCOTT ROBERTS, each in his | § | |
| official capacity as a director of the | § | TRAVIS COUNTY, TEXAS |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF CURTIS D. WILSON

BEFORE ME, the undersigned authority, came on this day Curtis Wilson, who, being personally known to me, was placed under oath and testified as follows:

1.      "My name is Curtis D. Wilson. I am over the age of eighteen (18) years and am competent in all respects to make the following Affidavit. I am the Acting General Manager of West Travis County Public Utility Agency ('WTCPUA'), and the following facts are true and correct and within my personal knowledge as WTCPUA's Acting General Manager.

2.      "WTCPUA is a retail and wholesale provider of water and wastewater services to and within the West Travis County Water System created pursuant to Chapter 572 of the Texas Local Government Code. Through a contract with the Lower Colorado River Authority, WTCPUA operates and maintains a water production and distribution system and a sanitary wastewater collection, transportation, and treatment system (collectively, the 'System') in Travis and Hays Counties, Texas.

3.      "CCNG Development Co., L.P. ('CCNG') submitted a service request to WTCPUA requesting wastewater service for an expansion of CCNG office space ('office expansion'). In its First Amended Petition filed on April 8, 2014, CCNG alleges that WTCPUA, acting through its board, denied service to CCNG at its board meeting on or about March 20, 2014, in violation of the Utility Facilities Acquisition Agreement between Lower Colorado River Authority and CCNG Development Co., L.P. ('Utility Agreement').

4.      "However, at WTCPUA's next board meeting on April 17, 2014, the WTCPUA Board approved CCNG's service request for the office expansion. Since April 17, 2014, WTCPUA has

provided, and continues to provide, service to CCNG's office expansion in the amount requested by CCNG and in accordance with the Utility Agreement.

5.      "I am the custodian of records of WTCPUA. Attached hereto are records of WTCPUA, which are kept by WTCPUA in the regular course of business. It was the regular course of business of WTCPUA for an employee or representative of WTCPUA that is under my direct supervision, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original:

**Exhibit 1:**    A true and correct copy of the Utility Facilities Acquisition Agreement Between Lower Colorado River Authority and CCNG Development Company, L.P.

6.      "Attached hereto are copies of official public records that I, as the custodian of records of WTCPUA, certify as correct. The records attached hereto are the original or exact duplicates of the original:

**Exhibit 2:**    A true and correct copy of the April 17, 2014 Minutes of Meeting of the Board of Directors of the West Travis County Public Utility Agency."

THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK

Sworn to and subscribed before me the undersigned authority on this the 4th day of August, 2016.



JENNIFER RIECHERS
Notary Public, State of Texas
Comm Expires 03-26-2020
Notary ID 124872432

_Jennifer Riechers_

Notary Public, State of Texas

# EXHIBIT 1

# ARMBRUST BROWN & DAVIS, L.L.P.

ATTORNEYS AND COUNSELORS

100 CONGRESS AVENUE, SUITE 1300
AUSTIN, TEXAS 78701-4042
(512) 435-2300

TELECOPIER (512) 435-2360

DAVID B. ARMBRUST
512-435-2301

November 30, 1999

**VIA HAND DELIVERY**

Mr. Madison Jechow
Lower Colorado River Authority
3700 Lake Austin Blvd.
Austin, TX 78703

Dear Madison:

Enclosed for your records is one of the duplicate original versions of the Utility Facilities Acquisition Agreement between the Lower Colorado River Authority and CCNG Development Company, L.P. I have forwarded the other duplicate original to CCNG.

It has been a pleasure working with you and other members of the LCRA staff. We appreciate your professionalism and cooperation in working through all of the different issues involved in this matter.

Best wishes.

Very truly yours,

David B. Armbrust

DBA/kss
Enclosure

cc:    Ron Freeman
       Matt Whelan
       Daniel Porter
       (all w/o encl.)

70392.1/113099

# UTILITY FACILITIES ACQUISITION AGREEMENT

## BETWEEN

## LOWER COLORADO RIVER AUTHORITY

## AND

## CCNG DEVELOPMENT COMPANY, L.P.

THIS AGREEMENT is made and entered into as of this __19th__ day of __November__, 1999, by and between the Lower Colorado River Authority ("LCRA"), a conservation and reclamation district created and functioning under Article 16, Section 59 of the Texas Constitution and pursuant to Chapter 74, Acts of the Texas Legislature, Regular Session, 1975, as amended, with its principal place of business in the City of Austin, Travis County, Texas, its successors and assigns, and CCNG Development Company, LP, ("CCNG"), a Texas limited partnership with its principal place of business in the City of Austin, Travis County, Texas, its successors and assigns.

### RECITALS

**WHEREAS**, CCNG intends to develop approximately 983 acres of land in Travis County, Texas known as the "CCNG Tract." Portions of the CCNG Tract are currently located within the corporate limits and the extraterritorial jurisdiction ("ETJ") of the Village of Bee Cave and the ETJ of the City of Austin; and

**WHEREAS**, LCRA is a regional provider of treated water service that owns and operates water treatment and distribution facilities and sells treated water on a wholesale and retail basis, and LCRA desires to be the regional provider of retail treated water service to the CCNG Tract and the area in and around the CCNG Tract; and

**WHEREAS**, LCRA desires to be the regional provider of retail wastewater service to customers on the CCNG Tract and the area in and around the CCNG Tract; and

**WHEREAS**, LCRA desires to provide treated effluent for irrigation purposes to the customers on the CCNG Tract and the area in and around the CCNG Tract; and

#13948v9

1

**WHERAS**, the opportunity exists for LCRA to locate certain components of a regional water, wastewater, and treated effluent distribution system at sites on the CCNG Tract that are well-suited from environmental, engineering, and safety perspective; and

**WHEREAS**, LCRA desires to provide raw water to customers on the CCNG Tract and the area in and around the CCNG Tract; and

**WHEREAS**, CCNG desires to obtain for the CCNG Tract services and facilities related to the provision of treated water, wastewater collection and treatment, raw water, effluent for land application, drainage, and water quality control;

## WITNESSETH:

**FOR VALUABLE CONSIDERATION** passing from LCRA to CCNG and from CCNG to LCRA, receipt of which is hereby acknowledged, and in consideration of the mutual covenants and agreements, CCNG and LCRA covenant and agree as follows:

## ARTICLE I

## DEFINITIONS

In addition to any terms expressly defined elsewhere in this Agreement or its Exhibits, the following words and terms shall have the following meanings respectively whenever they are used:

**1.01.** "Agreement" shall mean this Agreement.

**1.02.** "Advisory Committee" means the customer advisory committee to be appointed by the Board of Aldermen for the Village of Bee Cave.

**1.03.** "Boothe Tract" shall mean the tract owned by the Nellie Hampe Partnership I, Ltd., that is located between, and adjoining both, State Highway 71 and the CCNG Tract and that is presently projected for commercial development, and which is more fully identified on "**Exhibit 1.03.**"

**1.04.** "CCNG" shall mean CCNG Development Company, L.P., a Texas limited partnership with its principal place of business in the City of Austin, Travis County, Texas, its successors and assigns.

**1.05.** "CCNG Tract" shall mean the real property described on "**Exhibit 1.05-A**" and any other real property acquired owned or controlled by CCNG or affiliates of CCNG that i) is located within the area described on "**Exhibit 1.05-B**" and ii) is subsequently designated as part of the CCNG Tract pursuant to a written notice from CCNG to LCRA.

**1.06.** "Closing" shall mean any event of execution and delivery by LCRA and CCNG of all

documents necessary to convey, sell, transfer, or assign the interests and property of CCNG constituting all or any portion of the Interests to be Acquired, including any phase of the Regional Facilities or the Internal Facilities, to LCRA and the performance of all acts necessary to complete such execution and delivery.

**1.07.** "Closing Date" shall be any date of Closing.

**1.08.** "Commission" shall mean the Texas Natural Resource Conservation Commission or any successor agency.

**1.09.** "Contracts" shall mean all of the contracts, leases, permits, franchises, and licenses in the possession of CCNG connected with and arising out of the acquisition, construction and operation of the Interests to be Acquired.

**1.10.** "Effective Date" shall mean the date referenced on the first page of this Agreement.

**1.11.** "Effluent Pipelines" shall mean those pipelines and related equipment and improvements that convey effluent between the Effluent Pond(s), the Regional Wastewater Treatment Plant and the Irrigation Easement.

**1.12.** "Effluent Ponds" means those ponds that accept effluent from the Regional Wastewater Treatment Plant and store the effluent prior to conveyance to the delivery point(s) for irrigation land described in the Irrigation Easement and to the extent located on the CCNG Tract shall be limited to a maximum storage capacity sufficient to accommodate an average flow of 400,000 gallons per day.

**1.13.** "Golf Course Envelope" shall mean those portions of the CCNG Tract which are to be developed as a golf course and conveyed to a golf course operating company.

**1.14.** "Initial Closing" shall mean the first Closing, at which CCNG, or affiliates of CCNG, shall dedicate, transfer or assign to LCRA those Interests to be Acquired specified in section **3.01.**

**1.15.** "Insured Property" has the meaning provided in section 7.04.

**1.16.** "Internal Facilities" shall mean those water and wastewater facilities constituting improvements and/or expansions to the System to be constructed inside the CCNG Tract or Boothe Tract pursuant to Article V of this Agreement, and which are necessary for providing retail water and for wastewater service to customers on the CCNG or Boothe Tract only. The "Internal Facilities" shall include the following: the Treated Water Distribution System, the Wastewater Collection Facilities, and all necessary appurtenances thereto.

**1.17.** "Interests to be Acquired" shall mean the Regional Facilities, the Internal Facilities, and all other interests, including Contracts and the Irrigation Easement, that CCNG agrees to dedicate, grant, sell, transfer, assign or otherwise convey to LCRA as provided in Article II of this Agreement.

**1.18.** "Irrigation Easement" shall mean the easement for the disposal of effluent on the Golf Course Envelope or other areas designated by CCNG, as depicted in "**Exhibit 2.01(f)**". To the extent CCNG agrees to accept effluent on any other area of the CCNG Tract, such area shall be included in the Irrigation Easement.

**1.19.** "LCRA" shall mean the Lower Colorado River Authority.

**1.20.** "MUDs" shall mean municipal utility districts or similar districts created by CCNG over all or any part of the CCNG Tract or the Boothe Tract.

**1.21.** "Officer" shall mean any person having authority to perform management functions and execute legal agreements for LCRA or CCNG.

**1.22.** "Party" or "Parties" shall mean LCRA, CCNG and their respective successors and assigns.

**1.23.** "Permitted Exceptions" has the meaning provided in section 7.04.

**1.24.** "Raw Water/Effluent Agreement" shall mean the agreement dated **11-19-99** between LCRA and CCNG for LCRA to provide raw water and/or effluent for operation of a Golf Course or any other lawful purpose, and such other portions of the CCNG Tract as may be requested by CCNG or its designee.

**1.25.** "Regional Effluent Pipeline" shall mean the effluent pipeline(s) to extend from the Regional Wastewater Treatment Plant, the Effluent Pond(s) and/or the irrigation delivery point(s) on the Irrigation Easement to irrigation sites off of the CCNG Tract.

**1.26.** "Regional Facilities" shall mean any facilities, equipment, contract rights, or similar property utilized by LCRA to provide water or wastewater services to the CCNG Tract, including, without limitation, the Regional Effluent Pipeline, the Regional Raw Water Pipeline, the Regional Wastewater Interceptor, the Regional Wastewater Treatment Plant, the Treated Water Pipeline Extension, the Treated Water Transmission Line, the Regional Lift Station, the Effluent Ponds, the Effluent Pipelines and all related facilities and appurtenances.

**1.27.** "Regional Lift Station" shall mean the lift station to pump wastewater from the Regional Wastewater Interceptor to the Regional Wastewater Treatment Plant.

**1.28.** "Regional Raw Water Pipeline" shall mean the raw water pipeline to extend from the LCRA water treatment plant in the Village of Bee Cave to the CCNG Tract and beyond.

**1.29.** "Regional Treated Water Pipeline" shall mean the existing West Travis County Regional Water System transmission main.

**1.30.** "Regional Wastewater Interceptor" shall mean the interceptor line(s) and associated lateral interceptor lines to extend to the Regional Wastewater Treatment Plant from the CCNG Tract, the Village of Bee Cave's service area and ETJ, and beyond.

**1.31.** "Regional Wastewater Treatment Plant" shall mean the wastewater treatment plant that will treat wastewater generated by the System to serve the Bee Cave area and portions of the Lakeway area having an initial phase of approximately 400,000 gallons per day of treatment capacity with a maximum ultimate size if located on the CCNG Tract of 2.0 million gallons per day.

**1.32.** "Reimbursable Costs" shall mean all planning, design, engineering, construction, permitting, legal, engineering, interest, and other costs and fees reasonably incurred and related to the construction of the Internal Facilities and to the extent permitted according to Commission regulations for municipal utility district financing of similar facilities (*see* Texas Administrative Code, title 30, chapter 293).

**1.33.** "Reporting Person" has the meaning as provided in section 8.06.

**1.34.** "Review Committee" means a committee to be created by CCNG and LCRA to negotiate and agree upon the design criteria for the Regional Facilities and for which CCNG and LCRA shall select up to three representatives each.

**1.35.** "Survey" has the meaning provided in section 7.04.

**1.36.** "Title Commitment" has the meaning provided in section 7.04.

**1.37.** "Title Company" has the meaning provided in section 7.04.

**1.38.** "System" or "LCRA System" shall mean the regional water and wastewater system of the LCRA to serve the Bee Cave area and other communities in western Travis and northern Hays counties, and any expansions, improvements, enlargements, additions and replacements, including the Regional Facilities and the Internal Facilities subject to the limitations of this Agreement.

**1.39.** "Treated Water Distribution System" shall mean those distribution lines, pressure boosting or reducing facilities, and related equipment and improvements, including meters, necessary for LCRA to distribute water from the Treated Water Transmission Line to the retail customers located on the CCNG



Tract and Boothe Tract. "Treated Water Distribution System" shall not include customer-owned service lines located on individual lots of retail customers. The Treated Water Distribution System shall be constructed in phases.

1.40. "Treated Water Pipeline Extension" shall mean the portion of the Regional Treated Water Pipeline to extend from Bee Cave Road to the CCNG Tract.

1.41. "Treated Water Transmission Line" shall mean the main transmission line(s) and related equipment and improvements necessary for LCRA to transmit water from the Regional Treated Water Pipeline to the Treated Water Distribution System. The Treated Water Transmission Line will be constructed in phases.

1.42. "Wastewater Collection Facilities" shall mean those collection lines and related equipment and improvements necessary for LCRA to collect and convey wastewater from the customer-owned sewer service lines to the Regional Wastewater Interceptor. The term "Wastewater Collection Facilities" shall not include customer-owned sewer service lines located on individual lots of retail customers. The Wastewater Collection Facilities shall be constructed in phases.

## ARTICLE II

## INTERESTS TO BE ACQUIRED

2.01. Subject to the conditions set out in this Agreement, CCNG agrees to convey to LCRA the following, which are collectively referred to as the "Interests to be Acquired":

(a) the Internal Facilities as they are finally constructed;

(b) all easements necessary for the operation of the Regional Facilities or the Internal Facilities, including access easements from public roads and buffer zone requirements from treatment units. Such easements shall be at locations approved by CCNG and in the form of attached "**Exhibit 2.01(b)**";

(c) good and indefeasible fee title to portions of the CCNG Tract mutually agreeable to the Parties for lift station site(s), subject only to the conditions, restrictions or interests specified in section 3.01 below;

(d) unless the parties agree otherwise, good and indefeasible fee title to the Regional Wastewater Treatment Plant currently proposed site to be located on the site described on "**Exhibit 2.01(d)**", which site is of sufficient size to accommodate a plant capable of treating two million gallons per day (2 mgd) of wastewater in accordance with all Commission requirements for a similar plant of the same size, subject



only to the conditions, restrictions or interests specified in section 3.01 below (it being acknowledged that the parties are looking for an alternate location);

(e) good and indefeasible fee title to the Effluent Pond(s) site(s), which will be of sufficient size to store an average of 400,000 gallons per day of treated effluent for a period of days in accordance with Commission rules and permit requirements, subject only to the conditions, restrictions or interests specified in section 3.01 below. The Effluent Pond(s) may be incorporated into CCNG's golf course design and will be located and operated pursuant to the Raw Water/Effluent Agreement.

(f) an irrigation easement ("Irrigation Easement") in the form of attached "**Exhibit 2.01(f)**" for the disposal of effluent on those portions of the CCNG Tract to be developed as a golf course and which may be conveyed to a golf course operating company (the "Golf Course Envelope"), and other lawful areas on the CCNG Tract or Boothe Tract designated by CCNG, including:

(i) the Irrigation Easement, which will be sufficient for a maximum effluent disposal amount of 400,000 gallons per day, as averaged in accordance with any applicable Permits with up to five interim capacity phases; and,

(ii) should the effluent produced from the wastewater generated on both the CCNG Tract and the Boothe Tract exceed an average of 400,000 gallons per day for more than three consecutive months, CCNG shall provide LCRA with an additional irrigation easement on property of sufficient size to allow disposal by irrigation of all effluent produced from wastewater generated on both the CCNG Tract and the Boothe Tract in excess of 400,000 gallons per day. CCNG and LCRA shall negotiate in good faith to reach agreement on the methodology for measuring the amount of wastewater, and effluent produced therefrom, attributable to the CCNG Tract and the Boothe Tract;

(g) all maps, drawings, engineering records, and office records in the possession of CCNG relating to the Regional Facilities or the Internal Facilities; and,

(h) all of the contracts, leases, permits, franchises, and licenses in the possession of CCNG connected with and arising out of the acquisition, construction and operation of the Interests to be Acquired (the "Contracts"). The Contracts shall be assigned and transferred to LCRA subject to the terms and conditions upon which they were acquired and are now held. LCRA, as assignee of the Contracts, agrees that upon said assignment being made to it, it will assume, as of the Closing Date, all obligations imposed upon CCNG by reason of the Contracts.



## ARTICLE III

## INITIAL CLOSING

**3.01.** LCRA and CCNG shall conduct an initial Closing ("Initial Closing") at which the following interests shall be conveyed from CCNG to LCRA:

(a) good and indefeasible fee title to portions of the CCNG Tract comprising the Regional Wastewater Treatment Plant site, lift station site(s), and Effluent Pond site(s), subject only to:

i) matters currently of record as identified in **"Exhibit 3.01(a)"**;

ii) CCNG's right to landscape, fence or otherwise improve the aesthetic appearance of the site;

iii) CCNG's right to adopt reasonable deed restrictions on the CCNG Tract and Boothe Tract to enhance and protect development on those tracts or to comply with CCNG's development agreement with the Village of Bee Cave, provided, however, that such restrictions shall not unreasonably interfere with LCRA's obligations under this Agreement; and

iv) a reversionary interest in favor of CCNG or its designee in the event:

(A) the same property ceases to be used for either the Regional Wastewater Treatment Plant site, lift station(s), or Effluent Pond(s) for a period of six (6) consecutive months, not including any period of force majeure as provided in section 16.08, after operation of such facilities; or,

(B) CCNG and the LCRA agree on an alternative site for the Regional Wastewater Treatment Plant, and CCNG refunds to LCRA any money paid by LCRA to CCNG for the acquisition of the Regional Wastewater Treatment Plant site.

Prior to any such reversion to CCNG, LCRA shall return the site that is the subject of the reversion to substantially the same condition as it was on the date of its conveyance to the LCRA.

(b) the Irrigation Easement; and,

(c) all easements necessary to the operation of the Regional Facilities, including access easements from public roads, in the form of Exhibit 2.01(b).

**3.02.** At the Initial Closing, LCRA shall make payment for the portions of the CCNG Tract, including all associated costs eligible for reimbursement in accordance with Commission rules, comprising the Regional Wastewater Treatment Plant site, Regional Lift Station site(s), and Effluent Pond site(s). Furthermore, at the Initial Closing, LCRA shall reimburse CCNG for all of CCNG's expenditures made prior to the Initial Closing related to the planning, design, and permitting of the

Regional Facilities, including the Raw Water Pipeline, that would be reimbursable according to the rules of the Commission, which shall include but not be limited to engineering fees and attorney's fees.

**3.03.** The Initial Closing shall take place at LCRA's offices located at 3700 Lake Austin Boulevard, Austin, Texas, or at such other place as may be mutually agreed upon by the Parties. Time is of the essence as to the Initial Closing. The Closing Date for the Initial Closing shall be not later than December 31, 1999, unless the Parties otherwise agree in writing.

**ARTICLE IV**

**CONSTRUCTION OF REGIONAL FACILITIES**

**4.01. Regional Facilities to be Constructed.** The Regional Facilities to be constructed and paid for by LCRA shall be contracted for and constructed in LCRA's name and shall include the following:

(a) the Treated Water Pipeline Extension;

(b) the Treated Water Transmission Line;

(c) the Regional Wastewater Treatment Plant;

(d) the Regional Wastewater Interceptor;

(e) the Regional Effluent Pipeline;

(f) the Regional Raw Water Pipeline;

(g) the Regional Lift Station(s);

(h) the Effluent Pipeline(s);

(i) the Effluent Pond(s);

(j) the Irrigation Easement; and

(k) other facilities (other than Internal Facilities) which are necessary to provide water and wastewater service to the CCNG Tract.

**4.02. Construction Manager.** LCRA shall retain CCNG, or a designee of CCNG reasonably acceptable to LCRA, to serve as construction manager for the construction and acquisition of the Regional Facilities on the terms and conditions set forth in the agreement attached as "**Exhibit 4.02.**"

**4.03. Design of the Regional Facilities.** All physical facilities to be constructed or acquired pursuant to this Agreement as a part of the Regional Facilities shall be designed by CCNG's engineer, Murfee Engineering, or another ~~duly~~ qualified engineer selected by CCNG, and subject to the

reasonable approval of LCRA. Such design shall be subject to the approval of LCRA as well as all governmental agencies with jurisdiction, including, without limitation, the Texas Department of Health, the Commission and the County of Travis. CCNG and LCRA shall create a technical review committee ("Review Committee") and select up to three representatives each to negotiate and agree upon the design criteria for the Regional Facilities. At CCNG's request, the design for the Regional Facilities shall incorporate screening and aesthetic features beyond those agreed upon by the technical review committee, but CCNG shall be responsible for all costs related to such screening and aesthetic features, and the Parties shall negotiate in good faith to determine the costs related to such screening and aesthetic features notwithstanding, the foregoing to the contrary, at a minimum and as a project cost, the design shall incorporate the screening and aesthetic features identified on "**Exhibit 4.03**".

**4.04. Construction and Acquisition of the Regional Facilities.**

(a) The Regional Facilities shall be constructed, and all easements, equipment, materials and supplies shall be acquired, in the name of the LCRA.

(b) All plans, specifications, construction contracts and change orders for the Regional Facilities shall be subject to review and approval by LCRA, which approval shall not be unreasonably withheld. All construction contracts shall be awarded in the manner provided by applicable LCRA policies and in compliance with any applicable rules and regulations of the Commission or other governmental authority.

(c) The Regional Facilities shall be constructed in a good and workmanlike manner and all material used in such construction shall be substantially free from defects and fit for their intended purpose.

**4.05. Costs of Regional Facilities to be Funded by LCRA.** LCRA shall promptly pay the costs of the Regional Facilities on or before the date the same become due, including, without limitation, all costs of design, engineering, materials, labor, construction and inspection arising in connection with the Regional Facilities; all payments arising under any contracts entered into for the construction of the Regional Facilities; and, all costs incurred in connection with obtaining governmental approvals, certificates, permits, easements, rights-of-way, or sites required as a part of the construction of the Regional Facilities. LCRA shall use its powers of eminent domain as necessary to acquire easements for the Regional Facilities.

**4.06.** The Parties may agree that LCRA may, in its sole discretion, make such changes to the Regional Facilities prior to and during construction as LCRA may deem appropriate for providing



efficient water and wastewater service to the CCNG Tract, the Boothe Tract, and other areas proposed to be served by the Regional Facilities; provided, however, that such changes shall not materially change either Party's obligations under this Agreement without CCNG's consent.

4.07. **CCNG Ability to Construct Regional Facilities**. Provided that CCNG is not in default under this Agreement, in the event LCRA is unable or unwilling to construct Regional Facilities in a timely manner which are reasonably necessary for the efficient operation of the System in order to provide water and wastewater services to the CCNG Tract, then CCNG may, but is not obligated to, proceed with construction and installation of Regional Facilities at its own expense; provided, however, CCNG has notified LCRA in writing of LCRA's failure to timely commence construction of necessary Regional Facilities and, within three months after LCRA's receipt of such notice, LCRA has not commenced the construction of such Regional Facilities. All plans, specifications, construction contracts and change orders for the Regional Facilities are subject to review by LCRA. CCNG shall design, advertise, bid and construct the Regional Facilities in compliance with all statutes, rules and regulations applicable to water districts. Subject to the foregoing, if CCNG proceeds with the construction and installation of the Regional Facilities at its own expense, LCRA shall take no action that will prevent or interfere with CCNG constructing the Regional Facilities. Subject to the foregoing, LCRA shall pay to CCNG all Reimbursable Costs associated with the construction of the Regional Facilities. CCNG shall submit to LCRA monthly invoices itemizing Reimbursable Costs incurred and LCRA shall pay such invoices within thirty (30) days of receipt. Upon completion of construction by CCNG of any such Regional Facilities, CCNG shall convey the Regional Facilities to LCRA at a Closing in the same manner as provided in Article VI for Internal Facilities.

## ARTICLE V

## CONSTRUCTION OF INTERNAL FACILITIES

5.01. **Internal Facilities to be Constructed.** The Internal Facilities shall be constructed by CCNG and shall include the following:

(a) the Treated Water Distribution System; and

(b) the Wastewater Collection Facilities.

5.02. **Design of the Internal Facilities.** All physical facilities to be constructed or acquired as a part of the Internal Facilities shall be designed by CCNG's engineer, Murfee Engineering, or another duly qualified engineer selected by CCNG and approved by LCRA, which approval shall not be



unreasonably withheld or delayed. Such design shall be subject to the approval of LCRA and all governmental agencies with jurisdiction, including, without limitation, the Texas Department of Health, the Commission and the County of Travis. The Review Committee shall negotiate and agree upon the design criteria for the Internal Facilities.

### 5.03. Construction and Acquisition of Internal Facilities.

(a) CCNG shall be responsible for the construction or acquisition of the Internal Facilities and all easements, equipment, materials and supplies.

(b) All plans, specifications, construction contracts and change orders for the Internal Facilities are subject to review and approval by LCRA; provided, however, that CCNG shall be responsible for ensuring that all plans, specifications, construction contracts and change orders comply with any applicable rules and regulations of the Commission or other governmental authority. All construction contracts shall be awarded in the manner provided by the laws and Commission rules and regulations applicable to water districts.

(c) The Internal Facilities shall be constructed in a good and workmanlike manner and all material used in such construction shall be substantially free from defects and fit for their intended purpose. LCRA shall be entitled to have an on-site inspector at LCRA's cost to inspect and reasonably approve the construction of the Internal Facilities. Such inspections shall be conducted in a timely manner, at least weekly, and shall not unreasonably delay construction. Furthermore, within one working day of discovery, LCRA shall notify CCNG of any construction defects. LCRA shall provide to CCNG a written description of any such defects within 5 working days.

### 5.04. Cost of Improvements to be Funded by CCNG.

(a) CCNG shall advance and, pay the costs of the Internal Facilities as the same become due, including, without limitation, all costs of design, engineering, materials, labor, construction and inspection arising in connection with the Internal Facilities; all payments arising under any contracts entered into for the construction of the Internal Facilities; all costs incurred in connection with obtaining governmental approvals, certificates, permits, easements, rights-of-way, or sites required as a part of the construction of the Internal Facilities; and all out-of-pocket expenses incurred in connection with the construction of the Internal Facilities.

(b) LCRA shall not be liable to any contractor, engineer, attorney, materialman or other party employed or contracted with in connection with the construction of the Internal Facilities, but shall only be obligated to reimburse CCNG in the manner and to the extent provided in this Agreement. All

construction contracts and other agreements entered into by CCNG pertaining to the acquisition or construction of the Internal Facilities shall contain provisions, in a the form described on "**Exhibit 5.04(b)**", to the effect that any contractor, materialman or other party thereto shall look solely to CCNG for payment of all sums coming due thereunder and that the LCRA shall have no obligation whatsoever to any such party.

**5.05.    LCRA Ability to Construct Internal Facilities.**  Provided that LCRA is not in material default under this Agreement, in the event CCNG is unable or unwilling to construct Internal Facilities in a timely manner which are reasonably necessary for the efficient operation of the System in order to provide wastewater services to the CCNG Tract, then LCRA may, but is not obligated to, proceed with construction and installation of Internal Facilities at its own expense; provided, however, LCRA has notified CCNG in writing of CCNG's failure to timely commence construction of necessary Internal Facilities and, within six months after CCNG's receipt of such notice CCNG has not commenced the construction of such Internal Facilities.  All plans, specifications, construction contracts and change orders for the Internal Facilities are subject to review and approval by CCNG.  Subject to the foregoing, if LCRA proceeds with the construction and installation of the Internal Facilities at its own expense, CCNG shall take no action that will prevent or interfere with LCRA providing wastewater utility services to the CCNG or the Boothe Tract.  Subject to the foregoing, LCRA shall be entitled to offset thirty percent (30%) of the design, engineering, construction and installation costs reasonably related to the Internal Facilities constructed by LCRA pursuant to this section against any reimbursement otherwise due to CCNG pursuant to this Agreement.

**ARTICLE VI**

**CONVEYANCE OF FACILITIES TO LCRA**

**AND COMMENCEMENT OF SERVICE**

**6.01.**    Subject to reimbursement for its costs, CCNG shall convey the Internal Facilities to LCRA at Closings to be held from time to time as construction on phases of the Internal Facilities is completed.

**6.02.**    Upon completion of construction of a phase of the Internal Facilities, CCNG shall provide the LCRA with a concurrence letter from CCNG's engineers certifying that the construction of the Internal Facilities has been completed substantially in accordance with the plans, specifications and change orders approved by the LCRA and that the phase of Internal Facilities has been tested and



approved for use in accordance with the approved contract documents and Commission rules. At the same time, CCNG shall provide LCRA with a copy of the final "record" drawings of the completed Internal Facilities. LCRA shall complete its review of the completed phase of the Internal Facilities within fifteen (15) working days after receipt of the engineer's concurrence letter. Thereafter, LCRA shall operate, maintain, and provide water and wastewater service through the completed phase of the Internal Facilities.

    **6.03.** LCRA shall accept conveyance of, and reimburse any amount then due CCNG for, the completed phase of the Internal Facilities as evidenced by the engineer's letter from CCNG's engineer and approved by LCRA which approval will not be unreasonably withheld or delayed. The Parties shall agree on a Closing Date, which shall be within thirty (30) days of such determination by LCRA, for conveyance to LCRA of the completed phase of the Internal Facilities, along with all easements necessary or convenient to the operation of the Internal Facilities, including access easements from public roads, not already conveyed; provided, however, the size and location of such easements are subject to approval of CCNG.

**ARTICLE VII**

**TITLE MATTERS AND REVIEW PERIOD**

    **7.01.** Prior to any Closing, CCNG shall provide LCRA with a legal description and survey of all interests in real property to be transferred at the Closing to LCRA by virtue of this Agreement, including all fee title in property and all easements and rights of way which provide access to the Interests to be Acquired.

    **7.02.** Any personal property to be transferred shall be transferred by Bill of Sale and Assignment free of liens and encumbrances other than those which do not materially impair the value of the Interests to be Acquired, or LCRA's intended use, with a covenant on the part of CCNG that it is the lawful owner and has a lawful right to transfer and deliver such property.

    **7.03.** The Contracts included within or pertaining to the Interests to be Acquired shall be transferred subject to the terms and conditions upon which they were acquired and are now held by CCNG.

    **7.04. Title Commitment Review.** At least forty (40) days prior to any Closing Date, CCNG, at LCRA's sole cost and expense, shall furnish to LCRA and LCRA's counsel a current commitment ("Title Commitment") for the issuance of an Owner's Policy of Title Insurance to LCRA from a title company approved by LCRA (the "Title Company"), insuring such portions of the Interests to be



Acquired as may be real property or interests (collectively, the "Insured Property") for an amount equal to the portion of the reimbursement related to the Insured Property together with good legible copies of all documents constituting exceptions to CCNG's title as reflected in the Title Commitment and a current survey of the Insured Property (the "Survey"). LCRA shall have until thirty (30) days after receipt of the Title Commitment and Survey to review the Title Commitment and Survey and to deliver to CCNG in writing such objections as LCRA may have to anything contained or set forth in the Title Commitment and Survey, provided, however, LCRA shall not have the right to object to those easements, restrictive covenants or other exceptions reflected in "**Exhibit 7.04,**" attached hereto, that were of record as of the date of this Agreement, or other easements, restrictive covenants or other exceptions that do not materially interfere with LCRA's use of the Interests to be Acquired as contemplated by this Agreement. Any items to which LCRA does not have the right to object and any other items to which LCRA does not object by the end of said thirty (30) days shall be deemed to be "Permitted Exceptions" (herein so called). As to items to which LCRA makes objections, CCNG shall have an obligation to cooperate with LCRA to effectuate the cure of such objections. In the event such matters are not cured prior to the Closing Date, LCRA shall have the right to either (1) enforce this Agreement by specific performance, injunction, or similar remedy; or (2) waive such title matters and proceed to Closing, whereupon such waived title matters shall also be deemed "Permitted Exceptions." LCRA may exercise its powers of eminent domain to correct any Permitted Exceptions.

7.05. **Title Policy.** As soon as reasonably practical after Closing, CCNG shall furnish LCRA, at LCRA's sole cost and expense, with an Owner's Policy of Title Insurance issued by the Title Company on the standard form in use in the State of Texas, insuring good and indefeasible title to the Insured Property in the LCRA, subject only to the Permitted Exceptions and the standard printed exceptions, except at LCRA's sole cost, expense, and option, the exception relating to discrepancies, conflicts or shortages in area or boundary lines, or any encroachments or protrusions or any overlapping of improvements shall be modified to delete such exception. All exceptions, conditions or requirements described in Schedule C of the Title Commitment shall be released and/or satisfied prior to or at Closing and such items and requirements shall not be exceptions to the Owner's Policy of Title Insurance to be provided by CCNG.

7.06. **Review Items.** On or prior to the thirtieth (30th) day before any Closing Date, CCNG shall make available for reasonable inspection and copying (at LCRA's expense) by LCRA during normal



working hours in Austin, Texas, the following (the "Review Items"):

(a) to the extent same are reasonably available or in CCNG's possession, copies of all non-attorney client privileged construction records, subcontractor and vendor records, manufacturer records, maintenance records, deeds, easements, licenses, permits, certificates, soil reports, and engineering reports (including, without limitation, endangered species, environmental and governmental inspection reports) of CCNG related to the construction, ownership or operation of the Interests to be Acquired; and

(b) to the extent same are reasonably available or in CCNG's possession, a list of all insurance policies covering or affecting the Interests to be Acquired, both casualty and liability, together with copies of such policies;

(c) environmental assessments, to the extent any have been performed, pertaining to the Interests to be Acquired;

(d) certified copies of all permits from the Commission, Travis County, or any other governmental agency with regulatory authority over the Subdivision and/or the Interests to be Acquired, together with valid assignments from the current holders to LCRA to the extent reasonably required;

(e) copies of all Contracts related to the Closing; and,

(f) such other relevant matters as LCRA may reasonably request.

**7.07. Representations and Warranties.**

(a) CCNG's Representations. By the execution of this Agreement and again by execution of any instruments of conveyance, transfer or assignment at any Closing, CCNG, except to the extent specifically disclosed at time of Closing, represents and warrants to LCRA that:

(1) The execution, delivery and performance of this Agreement has been (or by Closing Date will have been) duly authorized by all necessary action on the part of CCNG, and the person executing this Agreement on behalf of CCNG has the full authority to do so;

(2) This Agreement does not contravene any law or any governmental rule, regulation or order applicable to CCNG;

(3) The execution, delivery and performance of this Agreement does not contravene the provision of or constitute a default under the terms of any indenture, mortgage, contract, resolution or other instrument to which CCNG is a party or by which CCNG is bound; and,

(4) Except as previously made known to LCRA in writing prior to Closing, and to the best of CCNG's knowledge after due inquiry, there are no actions, suits, inquiries, or

proceedings pending or to the knowledge of officials of CCNG threatened against or affecting CCNG before any court or administrative body or agency which would materially adversely affect the execution, delivery, or performance by CCNG of this Agreement.

(b) CCNG's Representations for the Interests to be Acquired. In the execution of any instruments of conveyance, transfer or assignment of the Interests to be Acquired at any Closing, CCNG, except to the extent specifically set forth in written appendices to such instruments of conveyance, transfer or assignment, shall represent and warrant to the LCRA that, to the best of CCNG's knowledge:

(1) there are no defects, impairments, impediments, defaults, breaches, encumbrances or other similar problems with respect to (i) the quality, layout or physical condition or state of repair of the Interests to be Acquired, (ii) the location of the Interests to be Acquired in any flood plain, flood way or special flood hazard area, (iii) compliance by CCNG and/or other parties in relation to the Interests to be Acquired with any laws, rules, ordinances, or regulations of any applicable governmental authority, including zoning and other land use regulations, (iv) CCNG's compliance with any environmental protection, pollution or related land use laws, rules, regulations, orders or requirements, including, but not limited to, those pertaining to the use, handling, generating, treating, storing or disposing of any hazardous waste, hazardous substances, petroleum product storage tanks or asbestos, those pertaining to public drinking water systems or utilities and those pertaining to protection of endangered or threatened species; and (v) there are no liens, claims or encumbrances affecting the real or personal property or interests therein comprising any portion of the Interests to be Acquired that would materially impair the value of the property or LCRA's intended use of the property; and,

(2) CCNG at its own expense has obtained all necessary governmental authorizations to convey, transfer or assign the Interests to be Acquired, including, but not limited to, transfer of any permits or Contracts currently held by CCNG to LCRA.

The provisions contained in this paragraph shall be contained in any instruments of conveyance, transfer or assignment at Closing, and shall survive delivery of this Agreement and delivery of any instruments of conveyance, transfer or assignment at Closing.

(c) LCRA's Representations. LCRA represents and warrants to CCNG as follows:

(1) LCRA is a political subdivision of the State of Texas duly created by and validly operating under and pursuant to the provisions of Chapter 74, Acts of the Texas Legislature, Regular Session, 1975, as amended, and has the requisite power and authority to take all

#13948v9                                      17



necessary action to authorize the purchase of the Interests to be Acquired from CCNG and to execute and deliver this Agreement and to perform all obligations;

(2) the execution, delivery and performance of this Agreement has been (or by the Closing Date will have been) duly authorized by all necessary action on the part of LCRA;

(3) this Agreement does not contravene any law or any governmental rule, regulation or order applicable to LCRA;

(4) the execution, delivery and performance of this Agreement does not contravene the provisions of, or constitute a default under, the terms of any indenture, mortgage, contract, resolution, or other instrument to which LCRA is a party or by which LCRA is bound.

## ARTICLE VIII

## CLOSINGS

**8.01.** All Closings contemplated by this Agreement shall take place at such locations to be mutually agreed upon by the Parties.

**8.02.** The obligation of CCNG to convey the Interests to be Acquired to LCRA is subject to the fulfillment, prior to or at Closing, of each of the following conditions or the waiver of such conditions by CCNG:

(a) CCNG shall not have discovered any material error or omission in the representations or warranties made by LCRA;

(b) LCRA shall have delivered to CCNG a certificate, dated the Closing Date, of an Officer of LCRA, confirming the accuracy in all material respects and as of the Closing Date, of all the representations and warranties made by LCRA in this Agreement; provided that to the extent applicable, such certificate may include therein any exceptions or qualifications necessary to make such representations and warranties accurate in all material respects as of the Closing Date; provided further, however, that in the event such certificate sets forth any such exception or qualification materially affecting the rights of CCNG under this Agreement in respect of the Interests to be Acquired at the Closing, including, without limitation, any qualification or limitation arising out of or related to any action, suit, inquiry or proceeding affecting the System not previously disclosed to CCNG, this condition to Closing shall not be deemed to have been fulfilled, unless waived by CCNG at or prior to Closing; and

(c) LCRA shall have performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed or complied with by it prior to or at Closing.

**8.03.** The obligation of LCRA to make the payments to CCNG required to be made pursuant to Article X of this Agreement is subject to the fulfillment, prior to or at Closing, of each of the following conditions, or the waiver of such conditions by LCRA:

(a) There shall not be any material error or omission in the representations or warranties made by CCNG;

(b) CCNG shall have delivered to LCRA a certificate, dated as of the Closing Date, of an officer of CCNG, confirming the accuracy in all material respects and as of the Closing Date, of all the representations and warranties made by CCNG in this Agreement; provided that to the extent applicable, such certificate may include any exceptions or qualifications necessary to make such representations and warranties accurate in all material respects as of the Closing Date; provided further, however, that in the event such certificate sets forth any such exception or qualification affecting the Interests to be Acquired, including, without limitation, any qualification or limitation arising out of or related to any action, suit, inquiry or proceeding affecting the System not previously disclosed to LCRA, this condition to Closing shall not be deemed to have been fulfilled, unless waived by LCRA at or prior to Closing;

(c) CCNG shall have performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or at Closing.

(d) a bill of sale for personal property in accordance with Section 7.02; and,

(e) a general warranty deed, subject to the Permitted Exceptions, conveying all real property and interests therein to be conveyed under this Agreement.

**8.04. Adjustments and Prorations.** At Closing, the following items shall be adjusted or prorated between CCNG and LCRA:

(a) CCNG shall pay to LCRA, in cash at Closing, the amount of any sums, if any, prepaid by third parties to CCNG and held by CCNG pursuant to the provisions of any transferred Contracts, and LCRA assumes all liabilities and obligations for such amounts and will execute and deliver notices of transfer and assumption to all such third parties. LCRA shall pay CCNG, in cash at Closing, the amount of any sums, if any, prepaid by CCNG to third parties pursuant to the provisions of any of the transferred contracts.

(b) If any adjustments pursuant to this Section are, subsequent to Closing, found to be erroneous, then either Party who is entitled to additional monies shall invoice the other Party for such additional amounts as may be owing, and such amount shall be paid within ten (10) days from receipt of the invoice. This covenant shall not merge with the instruments of conveyance, transfer or assignment to be



delivered hereunder but shall survive the Closing.

**8.05.    Possession.**    Possession of the Interests to be Acquired at a particular Closing shall be delivered to LCRA by CCNG at the Closing.

**8.06.    Reporting Person.**    Each of CCNG and LCRA hereby designates the Title Company as the "Reporting Person" as such term is utilized in Section 6045 of the Code and regulations thereunder. CCNG agrees to provide the Title Company with such information as may be required for the Title Company to file a Form 1099 or other required form relative to the Closing with the Internal Revenue Service.    A copy of the filed Form 1099 or other filed form shall be provided to CCNG and LCRA simultaneously with its being provided to the Internal Revenue Service.

**8.07.    Costs and Expenses.**    All costs and expenses in connection with this Agreement shall, except as otherwise expressly provided, be borne by CCNG and LCRA in the manner in which such costs and expenses are customarily allocated between the parties at closings of the purchase or sale of real property in the Austin, Texas area.

## ARTICLE IX

## CLOSING DATE AND RISKS PENDING CLOSING

**9.01.**    CCNG agrees that from the date of this Agreement to the final Closing Date under this Agreement, CCNG will not enter into contracts in connection with the construction or operation of the Interests to be Acquired without the approval of LCRA, or which can be terminated upon not more than thirty (30) days written notice, unless LCRA is in default under this Agreement.

**9.02.**    If at any Closing Date there is pending before any court or administrative agency of competent jurisdiction, any proceeding challenging the legal right of either CCNG or LCRA to make and perform this Agreement, CCNG and LCRA respectively, shall have the right, at any time prior to the Closing Date, to suspend and postpone the consummation of this Agreement until such right shall have been sustained by a final judgment of a court of competent jurisdiction.

**9.03.**    CCNG agrees that until Closing on the Interests to be Acquired, CCNG will maintain insurance on those Interests to be Acquired that have not already been conveyed to LCRA. In the event that between the date hereof and the Closing any part, whether substantial or minor, of the Interests to be Acquired shall be destroyed or rendered useless by fire, flood, wind, or other casualty, LCRA shall not be released from its obligations hereunder; provided, however, that as to any such portion of the Interests to be Acquired so damaged or destroyed, which loss is not fully covered by insurance proceeds, which

proceeds shall be used to make repairs and replacements for such damaged or destroyed facilities, CCNG shall make repairs and replacements to restore the Interests to be Acquired to their prior condition.

## ARTICLE X
### LCRA'S AGREEMENT TO PAY FOR FACILITIES

**10.01. Regional Facilities.** LCRA shall fund the costs of the Regional Facilities as set forth in section 4.05.

**10.02. Internal Facilities.** LCRA shall reimburse CCNG for its "Reimbursable Costs" – which term means all planning, design, engineering, construction, permitting, legal, engineering, interest, and other costs and fees reasonably incurred and related to the construction of the facilities and to the extent permitted according to Commission regulations for municipal utility district financing of similar facilities (*see* Texas Administrative Code, title 30, chapter 293) – in accordance with the following schedules:

(a) the LCRA will reimburse CCNG for seventy percent (70%) of CCNG's Reimbursable Costs related to a particular phase of the Internal Facilities on the Closing Date on which such Internal Facilities are conveyed, transferred and/or assigned to the LCRA; and,

(b) LCRA will reimburse CCNG for the remaining thirty percent (30%) of CCNG's Reimbursable Costs related to the same phase of the Internal Facilities within thirty (30) days, following an annual review of final tax appraisal values when both of the following have occurred:

    (i) the CCNG Tract has an appraised value of land and improvements thereon equal to at least ten times the amount of capital expenditures made by LCRA for the design, engineering, permitting, construction and/or acquisition of those portions on a prorata basis of the Regional Facilities and the Internal Facilities necessary to serve the CCNG Tract (this appraised value to capital expenditures ratio is intended to correlate to the ten-to-one assessed value to debt ratio contemplated by the Texas Administrative Code, title 30, section 293.47(a)(1)); and,

    (ii) eighty percent (80%) of all living unit equivalents ("LUEs") projected to be served by any previously constructed phases of the Treated Water Distribution System and the Wastewater Collection Facilities, purchased from CCNG by the LCRA, have connected to the System and are receiving retail water and wastewater service from the LCRA.

For purposes of determining the appraised value of the land and improvements on the CCNG Tract, the LCRA will review annually the final tax appraisal values issued for the CCNG Tract by the tax appraisal authority with jurisdiction over the CCNG Tract. Subject to the foregoing, LCRA also will pay to CCNG interest that accrues on the remaining thirty percent (30%) of CCNG's Reimbursable Costs



relating to the Internal Facilities between the date of payment by CCNG for the same Internal Facilities and the date of LCRA's final reimbursement to CCNG. Such interest shall not accrue for more than two years and will be set at a percentage rate determined in accordance with the Texas Administrative Code, title 30, Section 293.50, using as a standard for determining an interest rate, the lower of LCRA's borrowing costs on its most recent issuance of long-term debt for its system or a rate established in connection with the most recent sale of district bonds for comparable facilities by a comparably developed district in Travis County, Texas as of the date of such reimbursement.

## ARTICLE XI

## UTILITY SERVICES TO THE CCNG TRACT

**11.01. Retail Treated Water and Wastewater Services.** Following the completion of construction on and, if appropriate, the conveyance by CCNG of the Regional Facilities and the Internal Facilities to LCRA, LCRA shall use the Regional Facilities and Internal Facilities to provide retail treated water and wastewater services to customers on the CCNG Tract.

(a) Permitting. As described in Section 11.01(b) below, LCRA shall seek all necessary permits from governmental authorities to provide retail treated water and wastewater services to customers located on the CCNG Tract, and CCNG and LCRA will cooperate with one another as necessary for LCRA to secure such permits. CCNG's designated engineer shall prepare all necessary engineering information to allow LCRA to file an application with the Commission for a no-discharge permit for operation of the Regional Wastewater Treatment Plant and the Effluent Pond(s), and LCRA shall file such application for a no-discharge permit within ten (10) business days of the receipt of all necessary engineering information from CCNG's designated engineer. LCRA shall diligently take all necessary steps within its power to ensure that the application for a no-discharge permit is administratively complete within five months of the initial filing. LCRA, CCNG, and their designees will coordinate in good faith to diligently pursue the no-discharge permit and to meet any deadlines related thereto that may be set by the Commission. LCRA acknowledges that CCNG has previously entered into a letter agreement with the City of Austin concerning permit conditions (City Letter), a copy of which is attached as Exhibit 11.01(a). LCRA shall incorporate the provisions of the City Letter into the permit application.

(b) Certificates. LCRA will seek certificates of convenience and necessity ("CCNs") from the Commission to provide retail treated water and wastewater services to the CCNG Tract, the Boothe Tract, and the Village of Bee Cave. CCNG and LCRA shall cooperate with one another as necessary for



LCRA to secure such CCNs. So long as LCRA is not in material breach of this Agreement, neither CCNG nor the municipal utility districts ("MUDs") created on the CCNG Tract or Boothe Tract shall provide retail water or wastewater services; provided, however CCNG may pursue the creation of and use of one or more MUDs for the purpose of financing drainage, water quality, endangered species costs or any other costs allowed by the Commission. In addition to the foregoing purpose, the MUDs shall have the right to vote bonds to issue debt for water and wastewater improvements but shall provide such services only on the conditions set forth in Section 11.01(c) below.

(c) CCNG and/or MUDs Authority to Cure. If LCRA is in default of this Agreement by (i) failing to timely and fully pay for, or reimburse the cost of, the construction or acquisition of any Regional Facilities or Internal Facilities, (ii) failing to provide water or wastewater service to the CCNG Tract or the Boothe Tract, or (iii) failing to perform any other obligation or condition, then CCNG may provide written notice of such default to LCRA specifying the particular facts demonstrating the default. LCRA shall have thirty (30) days after receiving such notice to advise CCNG of LCRA's proposed actions, consistent with LCRA's obligations under this Agreement, to cure the default and to initiate action. LCRA shall have a period of sixty (60) days to cure the default. If LCRA does not cure the default within that time period, then CCNG or the MUDs may undertake any curative actions on behalf of LCRA. Any costs incurred by CCNG or the MUDs, including but not limited to engineering fees, construction costs, attorney's fees or other legal or administrative fees, in implementing such curative actions shall be fully reimbursed by LCRA within thirty (30) days after notice from CCNG or the MUDs; LCRA shall pay CCNG interest at a rate determined in accordance with section 10.02(b) on any such reimbursement amounts that it fails to pay CCNG within thirty (30) days after notice from CCNG or the MUDs. If LCRA's default relates to the provision of water or wastewater service to the CCNG Tract or the Boothe Tract, and LCRA fails following notice to cure the default CCNG or the MUDs may undertake the actions reasonably necessary to cure the default and enable the MUDs to provide water or wastewater services to the CCNG Tract and Boothe Tract on behalf of LCRA. LCRA shall cooperate with CCNG or the MUDs to obtain all necessary permits or rights to allow CCNG or the MUDs to undertake the actions necessary to cure the default, and provide water and/or wastewater service if necessary to cure the default. In addition, LCRA shall at all times cooperate in good faith with CCNG and/or the MUDs to ensure that uninterrupted service is provided in a cost-effective manner. Except as provided in this section 11.01(c), the MUDs shall not provide water or wastewater service, provided, however, the MUDs may be created with appropriate powers and may conduct elections for the purpose



of obtaining approval for the issuance of bonds by the MUDs to allow the MUDs to construct, acquire or operate water or wastewater facilities in the event this Agreement is terminated in accordance with its terms or by the operation of law or LCRA defaults as contemplated by this paragraph.

(d) Approval by MUDs. CCNG will use reasonable efforts to obtain the approval of this Agreement by any MUDs created by CCNG over all or any part of the CCNG Tract or the Boothe Tract. Such approval shall include agreement by the MUDs to not engage in any water and wastewater activities except to cure uncured material defaults by LCRA as permitted by, and in accordance with, section 11.01(c) of this Agreement.

**11.02. Rates for Treated Water and Wastewater Services.** LCRA, through its Board of Directors, will set rates for treated water and wastewater services from the System.

(a) Rate Methodology: All rates will be based on costs of providing the service. The components of LCRA's costs are the operating and maintenance expenses of owning, operating and administering the System, the debt repayment for the capital expenditures incurred by LCRA to build or acquire the System, and adequate coverage of that debt service to maintain access to capital markets at favorable interest rates in the future. An initial rate schedule for water rates is attached as Exhibit 11.02(a). LCRA will limit, until such time as all Reimbursable Costs have been paid to CCNG or its assigns but not to exceed ten years following execution of this Agreement, any proposed increase in the general and administrative expense component of its cost of service, for both its water and wastewater services, to an amount not to exceed ten percent of the capital costs (Reimbursable Costs associated with construction of the System) and direct operating and maintenance expenses related to the regional water and wastewater system.

(b) Advisory Committee: Through agreements with the Village of Bee Cave, LCRA shall establish a customer advisory committee ("Advisory Committee") to be appointed by the Board of Aldermen for the Village of Bee Cave. The Advisory Committee shall receive notice of, and provide input to LCRA regarding, (i) retail rates and rate structures including timing and amortization of capital expenses proposed and adopted by LCRA for treated water and wastewater service from the System; and, (ii) LCRA regulations relating to the manner of providing treated water and wastewater service. The Advisory Committee shall meet at regular intervals with a project official designated by the LCRA ("Project Official") to review the operation of the System. Further, the Advisory Committee shall be provided with a draft of each annual budget for the System on or about April 1 of each year (approximately 45 days prior to consideration of the budget for approval by the LCRA Board of



Directors). During the period prior to submission of the budget to the LCRA Board of Directors, the Advisory Committee and the LCRA Project Official shall meet in order to discuss and comment upon the proposed budget. In connection with the preparation of the annual budget described above, and at the same time, LCRA shall provide to the Advisory Committee each year a detailed summary of the proposed operations and maintenance plan for the System for the next year, together with a detailed listing of the expected costs for providing such operations and maintenance.

**11.03. Raw Water and Effluent Services.** LCRA will provide raw water and effluent services to CCNG, its successors and assigns, pursuant to the terms of the Raw Water/Effluent Agreement, which is attached hereto as "**Exhibit 11.03.**"

**11.04. Drainage and Other Services.** Without limiting its rights under Section 11.01(b), CCNG may create one or more municipal utility districts ("MUDs") on the CCNG Tract or Boothe Tract for the purposes of financing drainage facilities, costs related to endangered species protection, parks, street lighting, water quality facilities and operating and maintaining those facilities, as well as for any other purpose allowed by the Commission, provided, however, that the MUDs shall have the voted authority to issue debt for water and wastewater improvements and engage in water and wastewater activities only under the conditions set forth in section 11.01 above. LCRA shall have no obligation with regard to such MUDs or the operation or maintenance of drainage, water quality or other MUD facilities except that LCRA shall coordinate in good faith with CCNG and the MUDs with regard to the location and planning for the drainage, water quality and other MUD facilities.

**11.05. Survival of Covenants.** The covenants contained in this Article shall survive the conveyance, transfer and assignment of the Regional Facilities and Internal Facilities at all Closings and shall continue to bind the LCRA and CCNG.

## ARTICLE XII

## REMEDIES

**12.01. LCRA's Remedies.** In the event CCNG fails or refuses to timely comply with CCNG's obligations or prior to Closing any of CCNG's representations, warranties or covenants contained herein are not true or have been breached, LCRA shall have the following remedies: (i) to enforce this Agreement by specific performance, injunction, or similar remedy, (ii) to exercise its rights under this Agreement to proceed with construction and installation of the Internal Facilities at its own expense; and/or (iii) to waive prior to or at Closing as applicable, the applicable objection or condition and to

proceed to close their transaction in accordance with the remaining terms.

If, after Closing, LCRA determines that any of CCNG's representations, warranties or covenants which applied to and survived the Closing are not true, then LCRA may avail itself of any remedy at law or in equity to which it may be entitled.

**12.02. CCNG's Remedies.** In the event LCRA fails or refuses to timely comply with LCRA's obligations or is unable to do so as a result of LCRA's acts or failure to act, CCNG shall have the following remedies: (i) to enforce this Agreement by writ of mandamus, specific performance, injunction, or any other remedy available at law or in equity in a court of competent jurisdiction including but not limited to an action for damages, or (ii) to waive prior to or at Closing as applicable, the applicable objection or condition and proceed to carry out this transaction in accordance with the remaining terms.

## ARTICLE XIII
## APPROVALS

**13.01.** Whenever the term "approve" or "approval" is used in this Agreement, the party whose approval is required will not unreasonably withhold or delay it. Where approval is necessary, the party seeking approval may request approval in writing, and the approving party shall have five (5) business days to provide approval or request modification for the matter subject to approval. If the matter has not been approved, or the parties have not agreed on a modification, after the fifth day on which approval is requested, the parties shall mediate resolution of the matter. Mediation shall be conducted within ten (10) business days of the date approval is requested before mediators at the Travis County Dispute Resolution Center (hereinafter referred to as the "DRC") or a similar organization should DRC cease to exist, as though it had been referred through the operation of the Texas Alternative Dispute Resolution Procedures Act, Title 7, Chapter 154, TEX. CIV. PRAC. & REM. ANN., (Vernon's 1986). The parties shall enter an agreement with the DRC to perform mediation services, and the parties shall each be responsible for fifty (50) percent of any costs and fees associated with the mediation agreement and any mediation thereunder. If the parties fail to agree on resolution following mediation, the dispute shall be settled by binding arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

## ARTICLE XIV

## NOTICES

**14.01.** All notices hereunder from CCNG to LCRA shall be sufficient if sent by certified mail or facsimile transmission with confirmation of delivery, addressed to LCRA to the attention of the Manager of WaterCo at 3700 Lake Austin Boulevard, Austin, Texas 78703; and all notices from LCRA to CCNG shall be sufficiently given if sent by certified mail or facsimile transmission with confirmation of delivery to CCNG at 98 San Jacinto, Suite 1730, Austin, Texas 78701 with copy to David Armbrust, Armbrust, Brown & Davis, L.L.P., 100 Congress Avenue, Suite 1300, Austin, Texas, 78701, and all such notices shall be deemed to have been given on the date of mailing or sending of such notice. Either party can change its address upon five (5) days written notice to the other party.

**14.02. Continuing Securities Disclosure.** CCNG agrees to provide periodic information and notices of material events regarding CCNG and the development of the CCNG Tract in accordance with the Securities and Exchange Commission Rule 15c2-12.

## ARTICLE XV

## ASSIGNABILITY

**15.01** CCNG shall have the right to assign this Agreement in the event it sells or transfers all or a portion of the CCNG Tract or the Boothe Tract. In addition, CCNG shall have the right to assign the Raw Water/Effluent Agreement to the owner of any golf course on the CCNG or Boothe Tract. Provided, however, any such assignments under this section are effective only after notice to LCRA of the assignment and provided that the assignee agrees to assume and be bound by and perform any duties of CCNG under this Agreement with respect to the property being acquired by the assignee. LCRA may require the assignee to execute a document containing reasonably appropriate terms evidencing such assumption.

**15.02.** LCRA shall have the right to assign this Agreement in the event it sells or transfers all or a portion of the Interests to be Acquired to a transferee, provided, however, that any such assignment is effective only after notice to CCNG of the assignment and provided that the assignee agrees to assume and be bound by and perform any duties of LCRA under this Agreement with respect to the property being acquired by the assignee. CCNG may require the assignee to execute a document containing reasonably appropriate terms evidencing such assumption.

# ARTICLE XVI

## MISCELLANEOUS PROVISIONS

16.01. This Agreement may be simultaneously executed in any number of counterparts, each of which shall serve as an original and, shall constitute but one and the same instruments.

16.02. This Agreement shall be governed by the Constitution and laws of the State of Texas, except as to matters exclusively controlled by the Constitution and Statutes of the United States of America.

16.03. All of the respective covenants, undertakings, and obligations of each of the Parties shall bind that Party and shall apply to and bind any successors or assigns of that Party, and further shall bind;

(a) All mortgagees, trustees, and secured parties under all present and future mortgages, indentures, and deeds of trust, security agreements which are or may become a lien upon any of the properties of any Party; provided, however, nothing in this Agreement shall inure to the benefit of or be binding upon or become an obligation of any owner of property within the CCNG Tract or Boothe Tract who acquires such property for the purpose of constructing and occupying improvements on the property.

(b) All receivers, permitted assignees, bankruptcy judges or trustees of, or having control over any Party; and

(c) All successors or assigns, or other persons, firms, partnerships, corporations, or entities claiming by through or under any Party.

16.04. The captions and headings appearing in this Agreement are inserted merely to facilitate reference and shall have no bearing upon its interpretation.

16.05. Except to the extent otherwise provided in this Agreement, each term, covenant and condition of this Agreement is deemed to be an independent term, covenant, and condition, and the obligation of any Party to perform all of the terms, covenants, and conditions to be kept and performed by it is not dependent on its performance by the other Party of any or all of the terms, covenants, and conditions.

16.06. In the event that any of the terms, covenants or conditions of this Agreement, or the application of any such term, covenant, or condition, shall be held invalid as to any person or circumstance by any court having jurisdiction, the remainder of such Agreement, and the application of its terms, covenants, or conditions to such persons or circumstances shall not be affected.

16.07. Any waiver at any time by any Party of its rights with respect to a default or any other

matter arising in connection with this Agreement shall not be deemed a waiver with respect to any subsequent default or matter.

**16.08.** In the event that either CCNG or LCRA is rendered unable, wholly or in part, to perform any of its obligations under this Agreement (by reason of physical inability of LCRA to deliver the purchase money; failure or national moratorium of operation of the banks, transfer agents, brokers, stock exchanges or modes of transportation; or work stoppages or restraint by court order or other public authority; or action or inaction concerning governmental or regulatory authorizations; or transportation delay; or death or personal injury of a representative of either party hereto whose signature is necessary), upon the provision of written notice which fully relates the particulars of the claimed force majeure, including but not limited to the dates on which it commenced and ceased or is expected to cease by the Party claiming force majeure to the other Party as soon as is reasonably practicable after the occurrence of the cause relied upon, the obligations of the Party claiming force majeure, to the extent they are affected by the force majeure, shall be suspended during the continuance of any inability of performance so caused, but in no event for longer than sixty (60) days. This Agreement shall not be terminated by reason of any such cause but shall remain in full force and effect. Either Party rendered unable to fulfill any of its obligations under this Agreement by reason of force majeure shall exercise the utmost diligence to remove such inability. The suspension of obligations of a Party to this Agreement pursuant to this Section shall be added to the time specified in other provisions of this Agreement for the purpose of calculating the date on which certain conditions of this Agreement are to be satisfied when such satisfaction is affected by the intervention of the circumstance causing the force majeure, but in no event shall such additional time extend the satisfaction of an obligation under this Agreement more than sixty (60) days. This provision may only be invoked upon one occasion by each party to this Agreement.

**16.09.** This Agreement may be amended or modified only by written agreement duly authorized by the respective governing bodies of LCRA and CCNG and executed by the duly authorized representative of each.

**16.10.** Each Party agrees to execute and deliver all such other and further instruments and undertake such actions as are or may become necessary or convenient to effectuate the purposes and intent of this Agreement.

**16.11.** All obligations of the Parties are performable in Travis County, Texas and venue for any action arising hereunder shall be in Travis County.



**16.12.** Except as otherwise expressly provided, nothing in this Agreement, express or implied, is intended to confer upon any person, other than the Parties, any rights, benefits, or remedies under or by reason of this Agreement.

**16.13.** Unless otherwise expressly provided, the representations, warranties, covenants, indemnities, and other agreements shall be deemed to be material and continuing, shall not be merged, and shall survive the closing of this transaction and the conveyance and transfer of the Regional Facilities and Internal Facilities to LCRA.

**16.14.** Until Closing on the Interests to be Acquired, all taxes on such Interests to be Acquired or on the acquisition, construction, or use thereof shall be paid by CCNG and the CCNG further agrees to indemnify and hold harmless LCRA against any and all such taxes. LCRA shall cooperate in obtaining any available exemptions from any such taxes.

**16.15.** The terms and provisions of this Agreement contains the entire agreement between the Parties with respect to the Interests to be Acquired and shall supersede all previous communications, representations, or agreement, either verbal or written between CCNG and LCRA with respect to such matters.

**16.16.** The Parties agree to execute and record in the real property records of Travis County, Texas, a memorandum of this agreement in the form attached hereto as "Exhibit 16.16," and to update same as tracts may be added to the CCNG Tract pursuant to this Agreement.



IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be signed, sealed and attested in duplicate by their duly authorized officers, this the _19TH_ day of _NOVEMBER_ , 1999.

**LOWER COLORADO RIVER AUTHORITY**

By: _____
Joseph J. Beal
Manager, WaterCo.

**CCNG DEVELOPMENT COMPANY, L.P.**
**CCNG, Inc, General Partner**

By: _____
Daniel B. Porter
CEO and President

Approved as to form:

By: _____
David Armbrust
Armbrust, Brown & Davis, L.L.P.
100 Congress Avenue, Suite 1300
Austin, Texas 78701
Counsel for CCNG Development Company, L.P.

**EXHIBIT 1.05 - A**



**Exhibit 1.05 - A**
CCNG Tract Description

**EXHIBIT 1.05 - B**



**Exhibit I.05 - B**

Description of Land
That Can Be Added
to the CCNG Tract

**EXHIBIT 2.01 (b)**

Exhibit 2.01(b)

## WATER AND WASTEWATER
## EASEMENT AND RIGHT-OF-WAY

**STATE OF TEXAS** §
§  Project _____
§  Easement No. _____
**COUNTY OF** _____ §

**DATE:** _____ , 1999

**GRANTOR:**

**GRANTOR'S MAILING ADDRESS:**

**GRANTEE:  LOWER COLORADO RIVER AUTHORITY**

**GRANTEE'S MAILING ADDRESS:**  P. O. Box 220
Austin, Texas 78767

**CONSIDERATION:**  Ten and no/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

**EASEMENT PROPERTY:** A tract of land consisting of _____ acres, more or less, more particularly described in the attached Exhibit A, which may include field note description and plat, and which is incorporated herein and made a part hereof for all purposes.

**PROJECT:** Water and wastewater mains and all necessary or desirable appurtenances thereto including, without limitation, cleanouts, valves, meters, and manholes. The Project may also include underground communication lines relating to water and wastewater or public emergency management and all necessary or desirable appurtenances thereto, but shall not include communication lines of a commercial nature.

GRANTOR, for the CONSIDERATION paid to GRANTOR, hereby grants, sells, and conveys to GRANTEE a non-exclusive underground easement and right-of-way in, upon, under, and across the EASEMENT PROPERTY, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold to GRANTEE and GRANTEE'S successors and assigns forever. The easement, right-of-way, rights, and privileges herein granted shall be used for the purposes of excavating for, laying, constructing, placing, operating, maintaining, reconstructing, replacing, rebuilding, upgrading, renewing, removing, inspecting, patrolling, changing, modifying, or repairing the PROJECT, or any part of the PROJECT, and making connections therewith notwithstanding anything herein to the contrary, portions of the Project may be situated on the surface of the EASEMENT PROPERTY. **(Option 1:** *GRANTOR also grants to GRANTEE a temporary workspace easement which shall be _____ feet in width. Said _____ foot wide temporary workspace easement shall be defined as ___ feet on each side of the EASEMENT PROPERTY and shall run parallel and adjacent to the EASEMENT PROPERTY as depicted on EXHIBIT A. The temporary workspace easement shall be in effect only so long as the constructing and laying of the PROJECT is taking place. Upon completion of the initial construction of the PROJECT the temporary workspace easement shall revert to the sole ownership and control of GRANTOR.)* **OR (Option 2:** *GRANTOR also grants to GRANTEE a temporary workspace easement as described in Exhibit A. Upon completion of*

1

#15712



*the initial construction of the PROJECT the temporary workspace easement shall revert to the sole ownership and control of GRANTOR.*

GRANTEE shall have the right of ingress and egress at all times upon and across the EASEMENT PROPERTY for the above stated purposes provided that GRANTEE does not unreasonably interfere with GRANTOR's use of the surface of the EASEMENT PROPERTY. In the event that immediate access to the EASEMENT PROPERTY is not reasonably available over the EASEMENT PROPERTY, and only in that event, then GRANTEE shall have the right of ingress and egress over existing roads across the adjacent or remainder property of GRANTOR for the purpose of obtaining such access. In the event that such access is not reasonably available over the EASEMENT PROPERTY and not available over existing roads, and only in that event, GRANTOR shall make arrangements to provide GRANTEE reasonable access to EASEMENT PROPERTY. GRANTEE shall have the right to install and maintain appropriate gates along and in any fence, as necessary or appropriate for the exercise of GRANTEE'S right of ingress and egress on the EASEMENT PROPERTY or adjacent property of GRANTOR.

GRANTEE shall have the right to license, permit, or otherwise agree to the joint use or occupancy of the EASEMENT PROPERTY by any other person or legal entity for the above stated purposes. GRANTEE shall have the right to conduct archeological, historical, environmental, or other studies on the EASEMENT PROPERTY. GRANTOR, its successors or assigns, shall not place or store any material upon, or cover, bury, pave over, or otherwise obstruct, any clean out, valve, meter, or manhole located within the EASEMENT PROPERTY. GRANTOR shall be permitted to plant trees, shrubs or landscaping within the boundaries of the EASEMENT PROPERTY.

Except as provided in this EASEMENT, GRANTOR agrees that GRANTOR shall not place any permanent structure in or on the EASEMENT PROPERTY that may endanger or may interfere with the safe, efficient, or convenient operation, or maintenance of the PROJECT or the rights of ingress and egress granted herein. In the event that GRANTOR shall place unpermitted materials within the boundaries of the EASEMENT PROPERTY and fails to remove same within three days of receipt of written notice delivered certified mail, return receipt requested by GRANTEE, GRANTEE shall have the right, but not the obligation, to remove such encumbrances and charge GRANTOR for any and all costs connected with such removal including, but not limited to, contractors' fees, equipment costs, and notification costs.

GRANTOR shall have the right to use the surface of the EASEMENT PROPERTY for landscaping, sidewalks, driveways, parking lots and similar uses and shall have the right to construct hard materials such as asphalt, concrete or decorative material on such surface.

GRANTEE agrees that upon completion of construction, all surplus excavation, debris, trash, or litter resulting from construction shall promptly be cleaned up and disposed of off the premises. GRANTEE at all times after completing any work in connection with the construction will restore the surface of the EASEMENT PROPERTY or the temporary workspace easement, as nearly as reasonably possible, to the condition in which it was found immediately before such work was undertaken.

GRANTEE shall conduct all of its activities on the EASEMENT PROPERTY in full compliance with all applicable federal, state, and local laws and ordinances.

It is understood and agreed that the CONSIDERATION herein paid includes payment for all damages for the initial construction and ordinary operation and maintenance of the PROJECT but does not include damages, if any, to GRANTOR'S remainder property which may occur in the future after the original construction of the PROJECT, directly resulting from the reconstruction or repair of the PROJECT. All parts of the PROJECT installed on the EASEMENT PROPERTY shall remain the exclusive property of GRANTEE.

GRANTOR expressly reserves all oil, gas, and other minerals owned by GRANTOR, in, on, and under the EASEMENT PROPERTY, provided that GRANTOR shall not be permitted to drill or excavate for minerals on the surface of the EASEMENT PROPERTY, but GRANTOR may extract oil, gas, or other minerals from and under the EASEMENT PROPERTY by directional drilling or other means which do not unreasonably interfere with or disturb GRANTEE'S use of the EASEMENT PROPERTY.

2

#15712

GRANTOR reserves the right to use the surface, subsurface or aerial rights of the EASEMENT PROPERTY for any purpose that does not unreasonably interfere with GRANTEE's use, including but not limited to water, wastewater, gas, communications or other similar facilities and uses.

The rights granted to GRANTEE in this EASEMENT shall be and are assignable in whole or in part. This instrument, and the terms and conditions contained herein, shall inure to the benefit of and be binding upon GRANTEE and GRANTOR, and their respective heirs, personal representatives, successors, and assigns.

GRANTOR warrants and shall forever defend the Easement to GRANTEE against anyone lawfully claiming or to claim the EASEMENT or any part thereof.

When the context requires, singular nouns and pronouns include the plural. When appropriate, the term "GRANTEE" includes the employees, agents, subsidiaries, officers, servants, contractors, successors and assigns of GRANTEE.

GRANTOR:

Name: _____

## ACKNOWLEDGMENT

**STATE OF TEXAS**      §
                                       §
**COUNTY OF** _____  §

This instrument was acknowledged before me on the _____ day of _____, 1999 by _____, GRANTOR.

_____
Notary Public, State of Texas

AFTER RECORDING RETURN TO:
Real Estate Services H-219
Lower Colorado River Authority
P. O. Box 220
Austin, Texas 78767-0220

3

#15712

# EXHIBIT 2.01 (D)



PROPOSED
W.W.T.P. SITE

PROPOSED
ACCESS
EASEMENT

(SCALE IN FEET)

**mec**

Murfee Engineering Company

EXHIBIT 2.01 (d)

# REGIONAL W.W.T.P. SITE

1101 South Capital of Texas Highway, Building D, Suite 110, Austin, Texas 78746 (512) 327-9204

# EXHIBIT 2.01(f)

# EFFLUENT DISPOSAL UTILITY EASEMENT

STATE OF TEXAS       §
                            §
COUNTY OF TRAVIS    §

CCNG Development Company, L.P., a Texas limited partnership ("Grantor"), for and in consideration of TEN and NO/100 DOLLARS ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby GRANTS and CONVEYS to the Lower Colorado River Authority, a political subdivision of the State of Texas, and its successors and assigns (collectively, "Grantee"), the following easement:

> the right to dispose of treated effluent by irrigation on, over, under, across and through that certain real property more particularly described in Exhibit "A" ("Easement Tract"), in the manner set forth in this easement

(the "Easement"). The Easement is a nonexclusive right and easement on, over, under, across and through the Easement Tract to construct, install, use, maintain, repair, inspect, improve and replace such effluent transportation and disposal lines, pipes, storage tanks, reservoirs and other related facilities, systems and equipment, and all appurtenances thereto, which are reasonably required from time to time, and are to be located on, over, under, across and through the Easement Tract, in order to provide effluent disposal utility services (collectively, the "Facilities"), including, but not limited to, (a) the right of ingress and egress on, over and across the Easement Tract for the purposes contemplated, and (b) the right to place on or below the surface of the Easement Tract any of the Facilities as are necessary or desirable in connection with Grantee's effluent disposal utility services.

Raw Water and Effluent Agreement. The rights and obligations of Grantor and Grantee are subject to the terms and provisions of a Raw Water and Effluent Agreement between Grantor and Grantee of even date (the "Raw Water and Effluent Agreement"). In the event of a conflict, the provisions of the Raw Water and Effluent Agreement shall control over the terms of this Easement.

Term. This Easement shall terminate upon termination of the Raw Water and Effluent Agreement. Upon termination of the Easement, Grantee shall within ninety (90) days remove or cause to be removed from the Easement Tract any facilities located by, for, on behalf of or upon the authority of Grantee on, over, under, through or across the Easement Tract and restore the Easement Tract substantially to its pre-existing condition.

Interference. Grantor expressly reserves the right to the use and enjoyment of the surface of the Easement Tract for any and all purposes which are consistent with Grantee's use of the Easement Tract. Such use shall not unreasonably interfere with or abridge Grantee's rights hereunder so as to prevent Grantee from using the Easement Tract as contemplated hereby. Grantee shall not unreasonably or materially interfere with the use and enjoyment of the Easement Tract by Grantor or any other person or entity granted rights on, over, under, across or through the Easement Tract.

#15707 v2

Third Parties. Grantee may contract with third parties to perform any or all activities related to the Facilities located or to be located within the Easement Tract.

No Waiver. No waiver of any provision shall be deemed to have been made unless expressed in writing and signed by the waiving party. No delay or omission in the exercise of any right or remedy accruing to a party upon any breach under this Easement shall impair such right or remedy or be construed as a waiver of any such breach. The waiver of any breach of any term, covenant or condition shall not be deemed to be a waiver of any other breach, or of a subsequent breach of the same or any other term, covenant or condition. All rights, powers, options or remedies shall be cumulative and not alternative, and the exercise of one right, power, option or remedy shall not bar other rights, powers, options or remedies allowed or by law, unless expressly provided to the contrary.

Assignment. This Easement may be not assigned by Grantee.

Easement Non-Exclusive. It is specifically agreed that the Easement and right to use the Easement Tract as contemplated hereby are non-exclusive, and Grantor expressly reserves the right to grant other easements in, under, over, across and/or through the Easement Tract, provided, however, that such other easements and the use thereof by the grantees or beneficiaries thereof shall not unreasonably prevent Grantee from using and enjoying the Easement for the purposes contemplated hereby.

Grantee recognizes that Grantor intends to utilize the Easement Tract for a golf course and that Grantor also intends to develop property surrounding the Easement Tract. Grantor may need to utilize portions of the Easement Tract for utility purposes and ingress and egress for both of those uses. Accordingly, Grantee agrees to cooperate with Grantor to permit Grantor to utilize the Easement Tract for such other utility, ingress and egress purposes. Grantee, at Grantor's request, shall modify or, if necessary, subordinate its rights under the Easement to any easement required of Grantor by any governmental authority such as, by way of example but not limitation, public utility easements or dedication of right-of-way. Grantee shall execute such documents as may be reasonably required.

Compliance with Permits. Grantee shall at all times be in full compliance with all applicable governmental permits for the effluent disposal contemplated herein.

TO HAVE AND TO HOLD the above-described Easement unto Grantee and Grantee's successors and assigns forever, but subject to the terms and conditions hereof; and Grantor hereby binds itself and its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the Easement unto Grantee and its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, subject, however, to the terms and conditions hereof and to the reservations from and exceptions to this conveyance and warranty as shown on Exhibit _____:

EXECUTED AS OF THE _____ day of _____, 1999.


GRANTOR:                    CCNG, INC., L.P.


                           By:    _____
                           Name:  _____
                           Title: General Partner




STATE OF TEXAS          §
                        §
COUNTY OF TRAVIS        §


This instrument was acknowledged before me, on the _____ day of _____, 1999, by _____, _____ of CCNG, Inc., L.P., a Texas limited partnership, on behalf of said limited partnership.


                           _____
                           Notary Public, State of Texas
                           Printed Name:_____
                           My Commission Expires:_____




AFTER RECORDING, PLEASE RETURN TO:

Madison Jechow
Lower Colorado River Authority
P. O. Box 220
Austin, Texas 78767-0220


#15707 v2                        3

# EXHIBIT A

Property Description



**Exhibit A**

Golf Course Envelope

# EXHIBIT 3.01 (a)

## EXHIBITS 3.01(a) and 7.04

## PERMITTED EXCEPTIONS

### 230.92 Acre Tract

A.  The effect, if any, of the location of overhead electric and telephone lines, power poles and anchors outside of dedicated easements as shown on survey dated May 18, 1998, prepared by George L. Sanders, Registered Professional Land Surveyor No. 1838 ("the Survey").

### CCNG Tracts

A.  The following restrictive covenants of record itemized below (the Company must either insert specific recording date or delete this exception):

TRACT TWO – Parcel One: Those recorded in Volume 79, Page 363, Plat Records, Volume 5989, Page 141 and Volume 6374, Page 1231, Deed Records and in Volume 7615, Page 397 and Volume 13271; Page 1376, Real Property Records, all of Travis County, Texas.

TRACT TWO – Parcel Two: Those recorded in Volume 81, Page 186, Plat Records, Volume 5989, Page 141 and Volume 6374, Page 1231, Deed Records and in Volume 7615, Page 397 and Volume 13271, Page 1376, Real Property Records, all of Travis County, Texas.

TRACT TWO – Parcel Three: Those recorded in Volume 81, Page 188, Plat Records, Volume 6374, Page 1231 and Volume 6889, Page 1641, Deed Records and in Volume 7615, Page 397 and Volume 13271, Page 1376, Real Property Records, all of Travis County, Texas.

TRACT TWO – Parcel Four: Those recorded in Volume 81, Page 191, Plat Records, Volume 6374, Page 1231 and Volume 6889, Page 1641, Deed Records and in Volume 7615, Page 397 and Volume 13271, Page 1376, Real Property Records, all of Travis County, Texas.

TRACT TWO – Parcel Six: Those recorded in Volume 6374, Page 1231 and Volume 6889, Page 1641, Deed Records of Travis County, Texas.

TRACT TWO – Parcel Eight: Those recorded in Volume 6889, Page 1641, Deed Records of Travis County, Texas.

B.  Electric and telephone lines easement granted to the City of Austin, recorded in Volume 2128, Page 5, Deed Records of Travis County, Texas. (Tract 1)

1



C.    Electric transmission and distribution line easement granted to the City of Austin, recorded in Volume 659, Page 555, Deed Records of Travis County, Texas. (Tract 2)

D.    Telephone line easement granted to Southwestern Bell Telephone Company, recorded in Volume 1465, Page 9, Deed Records of Travis County, Texas. (Tracts One and Two)

E.    Electric and telephone line easement granted to the City of Austin, recorded in Volume 4501, Page 2199, Deed Records of Travis County, Texas. (Tract 2)

F.    Electric and telephone line easement granted to the City of Austin, recorded in Volume 8064, Page 394, Real Property Records of Travis County, Texas. (Tract 2)

G.    Electric and telephone line easement granted to the City of Austin, recorded in Volume 8064, Page 396, Real Property Records of Travis County, Texas. (Lot 62 of Tract 2, Parcel 3)

H.    All easements as set out on the plat of record in Volume 79, Page 363, Plat Records of Travis County, Texas. (Tract Two – Parcel 1)

I.    All easements as set out on the plat of record in Volume 81, Page 186, Plat Records of Travis County, Texas. (Tract Two – Parcel 2)

J.    All easements as set out on the plat of record in Volume 81, Page 188, Plat Records of Travis County, Texas. (Tract Two – Parcel 3)

K.    All easements as set out on the plat of record in Volume 81, Page 191, Plat Records of Travis County, Texas. (Tract Two – Parcel 4)

L.    Easement rights as reserved in restrictions of record in Volume 7615, Page 397, Real Property Records of Travis County, Texas. (Tract 2, Parcels 1, 2, 3, and 4)

M.    Non-exclusive access and right of way easement dated May 16, 1993, and recorded in Volume 12016, Page 80, Real Property Records of Travis County, Texas. (Tract 2, Parcel 5)

N.    Access easement dated May 7, 1996 and recorded in Volume 12683, Page 14, Real Property Records of Travis County, Texas. (Tract 2, Lot 54 of Parcel 1, and Parcels 7 and 8)

O.    Water and wastewater mains easement granted to Lower Colorado River Authority, recorded in Volume 13002, Page 174, Real Property Records of Travis County, Texas. (Tract 1)

P.   Any portion of the property herein described which falls within the boundaries of any road or roadway. Including, but not limited to, Old Bee Caves Road. (Tract 1 and Tract 2, parcels 1, 5, 6, 7 and 8)

Q.   One-half (1/2) life estate interest in royalty in minerals as set out in instrument recorded in Volume 2436, Page 525, Deed Records of Travis County, Texas. (Tract 2) Said mineral interest not traced subsequent to the date of the above cited instrument.

R.   One-half (1/2) non-participating interest in royalty in minerals as set out in instrument recorded in Volume 4738, Page 2077, Deed Records of Travis County, Texas. (Tract 2) Said mineral interest not traced subsequent to the date of the above cited instrument.

S.   Covenants, conditions, restrictions, assessments, charges and liens as set forth in that certain Declaration dated November 4, 1981, recorded in Volume 7615, page 397, Real Property Records of Travis County, Texas. Said lien of assessments subordinated to the lien of any first money mortgage. (Tract 2, Parcels 1, 2, 3, and 4)

T.   Unrecorded Lease Contract dated August 22, 1991, by and between NAJD II Corp., as Lessor(s), and Ol Cactus Jack, Inc., as Lessee(s). (Tract 1)

U.   Unrecorded Lease Agreement dated April 1, 1994, by and between NAJD II, Corp., as Lessor and The Backyard Restaurant, Ready to Receive, Inc., and Direct Events, Inc., Lessee(s) as to 0.24 of an acre identified as "0.24 acre lease area" shown on survey prepared by James A. Garon, R.P.L.S., dated July 1, 1998. (Tract 1)

3

# EXHIBIT 4.02 (a)

# PROJECT MANAGEMENT AGREEMENT

This Project Management Agreement (the "Agreement") is entered into as of this *19th* day of *November* , 1999, by and between the LOWER COLORADO RIVER AUTHORITY, a conservation and reclamation district created and funded under Article 16, Section 59 of the Texas Constitution and pursuant to Chapter 74, Acts of the Texas Legislature, Regular Session, 1975, as amended with its principal place of business in the City of Austin, Travis County, Texas, ("Owner"), and CCNG DEVELOPMENT COMPANY, L.P., a Texas limited partnership, as project manager ("Manager"), for services in connection with the design, permitting and construction of a Regional Water and Wastewater System.

## RECITALS:

A. Pursuant to that certain Utility Facilities Acquisition Agreement dated *11-19-99* , 1999 (the "Acquisition Agreement"), Owner has agreed to the construction of certain Regional Facilities described in the Acquisition Agreement ("Project").

B. Owner shall provide all financing for the construction of the Regional Facilities and shall hold/execute all contracts in Owner's name.

C. Manager shall be the project manager for the Project on Owner's behalf and provide the services described in this Agreement.

## AGREEMENT

NOW, THEREFORE, FOR A FULL AND VALUABLE CONSIDERATION in hand paid, the parties agree as follows:

## ARTICLE I

## RELATIONSHIP OF THE PARTIES

1.1 Owner and Manager. Manager shall be Owner's agent for the limited purpose of this Agreement. Manager shall oversee the design, permitting, and construction of the Project in consultation with Owner. Manager is authorized and empowered to make revisions to the Plans as recommended by the Design Professionals in consultation with Owner in order to complete the Project in a timely and cost effective manner.

A. Standard of Care. Manager shall act as an agent of Owner under this Agreement. Manager shall cooperate with all Design Professionals and Contractors and shall exercise reasonable skill and judgment in the same general manner as other project managers in the Central Texas area working on projects of similar design and scope.

11/8/99

1.2     Owner and Design Professionals. Owner has entered or will enter into an agreement with Murfee Engineering, Inc., consulting engineers, for the design of the Project. Upon the recommendation of Manager, Owner may enter into additional agreements with other engineers, and/or other design professionals (Murfee Engineering, Inc., and such other engineers or design professionals are hereafter referred to as "Design Professionals"), to provide engineering, landscaping, design and other services related to the Project. Manager shall advise Owner with respect to the selection of Design Professionals, the services to be performed by various Design Professionals and the quality of services provided by each of the Design Professionals. Manager shall have no authority to engage, alter or terminate the services of any Design Professionals without Owner's prior written consent. The Design Professionals shall have the responsibility to compile, create and file all documents or permits required by governmental entities with respect to the Project.

1.3     Owner and Contractors. Upon the recommendation of Manager, Owner will enter into an agreement with a general contractor(s) for the Project. Owner may enter into separate agreements with other contractors, subcontractors, mechanics, suppliers and/or materialmen (the general contractor and such other contractors, subcontractors, mechanics, suppliers, and materialmen being hereafter collectively referred to as "Contractors") for the construction of the Project. Manager shall advise Owner with respect to the selection of Contractors, the services to be performed by Contractors and the quality of services provided by each of the Contractors. Manager shall have no authority to engage, alter or terminate the services of any Contractor without Owner's express, prior written consent. Contractor shall have the responsibility to compile, create and file any documents or permits required or requested by governmental entities with respect to the Project.

1.4     Manager and Other Project Participants. Manager shall use reasonable efforts to maintain a good and harmonious working relationship with Owner, the Contractors, the Design Professionals and any other persons or entities working on the Project. The Contractors are responsible for construction of the Project, and for the performance of all agreements with Owner. Manager shall use reasonable efforts to keep Owner informed with respect to the timing and sequencing of work by the Contractors.

ARTICLE II

PROJECT DEFINITION

The term "Project," when used in this Agreement, shall mean the total design, permitting, and construction of the Regional Facilities as defined in the Acquisition Agreement. The terms "Work required for the Project" or "Work" used in this Agreement shall mean the various parts of the total construction.

11/8/99

2

# ARTICLE III

## MANAGER'S BASIC SERVICES

3.1     Manager's Basic Services.  Manager shall perform the Services described in Section 3.2 ("Services").

3.2     General.

The Services shall include the following:

A.     Manager shall provide overall supervision and administrative oversight of the Work.

B.     Manager shall prepare and periodically update a construction schedule for review by Owner.

C.     Manager shall consult with Owner and make recommendations whenever design details adversely affect constructibility, cost or schedules.

D.     Manager shall assist Owner in the preparation of construction contracts and provide advice to Owner with respect to Contractors.

E.     Manager shall provide administrative management and related services to coordinate scheduled responsibilities of the Contractors with each other.

F.     Manager shall schedule and coordinate meetings as reasonably necessary to discuss procedures, progress and scheduling.

G.     Manager shall coordinate the sequence of construction among the Contractors.

H.     Manager shall develop cash flow reports and forecasts for the Project and advise Owner as to variances between actual and budgeted costs.

I.     Manager shall review and approve applications for payments from the Contractors and Design Professionals.

J.     Substantial Completion.  Subject to the prior written approval of Owner and the applicable Design Professionals, Manager shall determine when the Project and a Contractor's Work or portion of the Work is substantially complete.  In consultation with the applicable Design Professionals and Owner, Manager shall prepare or have prepared a list of incomplete Work which does not conform to the Contract Documents which will be submitted to Owner for its review.

K.  Final Completion. Subject to the prior written approval of Owner and the applicable Design professionals, Manager shall determine when the Project and any Contractor's Work is finally completed, and shall provide to Owner a written recommendation regarding payment to the applicable Contractors.

L.  Record Documents. Manager shall coordinate and expedite submittals of information from the Contractors for record drawings and specification preparation and shall coordinate and expedite the transmittal of such documents ("Record Documents") to Owner.

M.  Organize and Index Operation and Maintenance Materials. Prior to the final completion of the Project ("Final Completion"), Manager shall compile or have compiled manufacturers' operations and maintenance manuals, warranties and guarantees, shall organize such documents, and shall deliver such documents to Owner on or before the Final Completion.

N.  Status Reports. Manager shall provide periodic written reports to LCRA on the status of the Project and written recommendations concerning change orders.

ARTICLE IV

DURATION OF MANAGER'S SERVICES

4.1  Duration. The duration of Manager's Services under this Agreement shall be the later of (i) eighteen (18) months after the execution of this Agreement, or (ii) one (1) month after Final Completion of the Project.

A.  Commencement. The commencement date for Manager's Services shall be the date of the execution of this Agreement by Owner and Manager.

ARTICLE V

OWNER'S RESPONSIBILITIES

5.1  Project Requirements. Owner shall provide to Manager complete information regarding Owner's requirements for the Project.

5.2  Defects. If Owner observes or otherwise becomes aware of any fault or defect in the Project or any nonconformity with the Contract Documents, Owner shall notify Manager within one (1) working day and provide written notice to Manager within five (5) working days.

11/8/99

4

5.3     Approvals. Owner shall furnish required information and approvals and perform its responsibilities and activities in a reasonably timely manner to facilitate orderly progress of the Work in cooperation with Manager consistent with this Agreement and in accordance with the planning and scheduling requirements and budgetary restraints of the Project. With respect to any change order request, Owner shall approve or disapprove such requests in writing within ten (10) days of receipt.

5.4     Design Professional. Owner shall retain one or more Design Professionals whose services, duties and responsibilities shall be described in written agreements between Owner and the applicable Design Professionals.

5.5     Consistency. Owner shall cause any and all agreements between Owner and the Contractors to be compatible and consistent with this Agreement. Each of the agreements shall recognize Manager as Owner's Agent in providing Manager's Services as outlined in this Agreement.

5.6     Designated Representative. Owner shall designate an officer, employee or other authorized representative to act with respect to the Project. Owner's initial representative for the Project is Karen Bondy. This representative shall have the authority to approve changes in the scope of the Project and shall be available during working hours and as often as may be required to render decisions and to furnish information in a timely manner. Owner may designate other representatives from time to time upon written notice to Manager.

5.7     Payments. Owner shall make payments to Manager, the Contractors and Design Professionals on the basis of their respective contracts.


ARTICLE VI

COMPENSATION FOR MANAGER'S SERVICES AND PAYMENT

6.1     Compensation. Manager shall receive a project management fee for the performance of its Services calculated and payable as follows:

    A.     An amount equal to four percent (4 %) of the cost of construction of the Project, to be payable as follows:

        •   2% of the construction cost due upon award of a construction contract,
        •   1% of the construction cost due following one half construction completion,
        •   1% of the construction cost due upon acceptance of Project by Owner.

        In the event that there are change orders during construction which increase the cost of construction the total project manager fee payable to Manager shall be based on the increased cost. In the event there are change orders during

construction which decrease the cost of construction the total project manager fee payable to Manager shall remain 4% of the bid price.

## ARTICLE VII

## TERMINATION AND SUSPENSION

7.1    Termination.

    A.    For Cause. This Agreement may be terminated by either party hereto upon thirty (30) days written notice should the other party fail substantially to perform its obligations in accordance with the terms through no fault of the other.

    B.    Compensation. In the event of termination under Section 7.1(a), Manager shall be paid its compensation for Services performed to the date of termination in accordance with Article VI.

## ARTICLE VIII

## ADDITIONAL PROVISIONS

8.1    Confidentiality. Manager shall not disclose or permit the disclosure of any confidential information, except to its agents, employees and other consultants who need such confidential information in order to properly perform their duties relative to this Agreement.

8.2    Limitation and Assignment.

    A.    Successors and Assigns. Owner and Manager each bind themselves, their successors, assigns and legal representatives to the terms of this Agreement.

8.3    Governing Law. Unless otherwise provided, this Agreement shall be governed by the laws of Texas.

8.4    Extent of Agreement. This Agreement represents the entire agreement between Owner and Manager relating to project management of the Project and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Manager. Nothing contained in this Agreement is intended to benefit any third party. The Contractors and the Design Professionals are not intended third party beneficiaries of this Agreement.

8.5    Severability. If any portion of this Agreement is held as a matter of law to be unenforceable, the remainder of this Agreement shall be enforceable without such provisions.

11/8/99

6

8.6 Meaning of Terms. References made in the singular shall include the plural and the masculine shall include the feminine or the neuter. Section headings or captions are for reference only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions of this Agreement.

8.7 Notices.

A. Addresses. Any notice, request, demand, consent, approval or other communication (hereafter "notice") required or permitted shall be validly given or made only if in writing and delivered (i) in person to an officer or duly authorized representative of the other party, (ii) by telegram or telecopy, (iii) by express courier services, or (iv) deposited in the United States mail, duly certified or registered (return receipt requested) with the postage prepaid, and addressed to the party for whom intended, as follows:

If to Manager:                CCNG Development Company, L.P.
                              Attn: Daniel Porter
                              98 San Jacinto Blvd., Suite 1730
                              Austin, TX 78701
                              FAX: 512-476-6890

With copies to:               David B. Armbrust
                              Armbrust Brown & Davis, L.L.P.
                              100 Congress Avenue, Suite 1300
                              Austin, TX 78701
                              FAX: 512-435-2360

If to Owner:                  Lower Colorado River Authority
                              Attn: Karen Bondy, WaterCo Chief Engineer
                              3701 Lake Austin Blvd.
                              Austin, TX 78703
                              FAX: 473-6722

With copies to:               Madison Jechow
                              c/o Lower Colorado River Authority
                              FAX: 473-4010

Any party may, from time to time, by written notice to the other, designate a different address which shall be substituted for that specified above.

B. Receipt. All notices shall be deemed effective upon receipt. If personally delivered or by express courier service, notices shall be deemed received upon actual receipt. If any notice is sent by domestic United Sates mail, the same shall be deemed fully delivered and received three (3) business days after the date of the postmark on the certified or registered mail receipt. Rejection or other refusal to accept a notice or the inability to deliver the same because of a change address of which not notice was given shall be deemed to be receipt of the notice sent.

11/8/99

7

8.8 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

8.9 Legal Advice; Natural Interpretation. Each party has received independent legal advice from its attorneys with respect to the advisabilility of executing this Agreement. The provisions of this Agreement shall be construed as to their fair meaning, and not for or against any party based upon any attribution to such party as the source of the language in question.

8.10 Relationship of Parties. The parties agree that their relationship is that of project manager and owner and that, except as expressly provided, nothing shall constitute either party the agent or legal representative of the other for any purpose whatsoever, nor shall this Agreement be deemed to create any form of business organization between the parties, nor is either party granted any right or authority to assume or create any obligation or responsibility on behalf of the other party, nor shall either party be in any way liable for any debt of the other.

8.11 Exhibits. All references to exhibits or external documents made in this Agreement are deemed incorporated in this Agreement, whether or not actually attached.

8.12 Waiver of Breach. The consent by one party to any act by the other for which such consent was required shall not be deemed to imply consent for the same or any similar acts in the future. No waiver or consent shall be implied from silence or any failure of a party to act, except as otherwise specified in this Agreement. All rights, remedies, undertakings, obligations, options, covenants, conditions and agreements contained in this Agreement shall be cumulative and no one of them shall be exclusive of any other.

8.13 Manager's Designation of Agent. Manager, upon written notice to Owner, may designate an agent to carry out Manager's duties under this Agreement.

This Agreement is executed as of the day and year first written above.

MANAGER

CCNG DEVELOPMENT COMPANY, L.P.
a Texas limited partnership

By: CCNG, Inc., General Partner

_____    11·19·99
Daniel B. Porter                                    Date

11/8/99

8

President and CEO

OWNER

THE LOWER COLORADO RIVER AUTHORITY
By: _____  22 Nov 99
Joseph J. Beal                          Date
Manager, WaterCo.

11/8/99

9

**EXHIBIT 4.03**

**EXHIBIT 4.03**

November 11, 1999

- All treatment basins, tanks, and units will constructed below natural grade to the extent reasonable and good faith efforts will be made to limit the top of the treatment units to three (3) feet about natural ground.
- Mechanical equipment will be fully enclosed or submerged and all reasonable methods to suppress plant noise will be incorporated into the plant design.
- LCRA will cooperate with the golf course operator in an effort to ensure that sludge hauling activities will be accomplished during off-peak hours of course operation. Access for sludge hauling shall be provided in a way to minimize its impact upon the golf course and surrounding areas.
- The plant design will incorporate state of the art odor control methods that include chemical additions at lift stations and or carbon absorption, bio filters or scrubbers at the head works of the plant.
- CCNG shall have the right to request and fund the construction of a cover and vent system for the aeration basins. LCRA shall cooperate with the design of the cover and at CCNGs request shall include the construction of the cover as an alternate bid item.
- The plant headworks shall be enclosed in a vented structure designed for odor control.
- Strict construction limits will be established to limit site disturbance. Construction activities will be diligently pursued to completion. A temporary fence, of reasonably acceptable appearance, will be erected and access to the site for construction and maintenance will be limited to one point of ingress and egress. An existing plant site material survey will be conducted prior to the disturbance of any ground and to the extent reasonably practical existing vegetation shall be transplanted to the perimeter of the site for screening purposes.
- The plant site design shall strive to maximize the use of existing vegetation for screening purposes.
- LCRA and CCNG shall cooperate with one another to develop a landscaping/screening plan which will be implemented upon completion of the facilities.



# EXHIBIT 5.04 (b)

# Exhibit 5.04(b)

_____.  Contractor shall look solely to CCNG Development Company, L.P., for payment of all sums due under this agreement. Nothing in this agreement shall create any relationship between Contractor and the Lower Colorado River Authority, and the Lower Colorado River Authority shall have no obligation to Contractor for any sums due under this agreement.

**EXHIBIT 7.04**

# EXHIBITS 3.01(a) and 7.04

## PERMITTED EXCEPTIONS

### 230.92 Acre Tract

A.  The effect, if any, of the location of overhead electric and telephone lines, power poles and anchors outside of dedicated easements as shown on survey dated May 18, 1998, prepared by George L. Sanders, Registered Professional Land Surveyor No. 1838 ("the Survey").

### CCNG Tracts

A.  The following restrictive covenants of record itemized below (the Company must either insert specific recording date or delete this exception):

TRACT TWO – Parcel One: Those recorded in Volume 79, Page 363, Plat Records, Volume 5989, Page 141 and Volume 6374, Page 1231, Deed Records and in Volume 7615, Page 397 and Volume 13271, Page 1376, Real Property Records, all of Travis County, Texas.

TRACT TWO – Parcel Two: Those recorded in Volume 81, Page 186, Plat Records, Volume 5989, Page 141 and Volume 6374, Page 1231, Deed Records and in Volume 7615, Page 397 and Volume 13271, Page 1376, Real Property Records, all of Travis County, Texas.

TRACT TWO – Parcel Three: Those recorded in Volume 81, Page 188, Plat Records, Volume 6374, Page 1231 and Volume 6889, Page 1641, Deed Records and in Volume 7615, Page 397 and Volume 13271, Page 1376, Real Property Records, all of Travis County, Texas.

TRACT TWO – Parcel Four: Those recorded in Volume 81, Page 191, Plat Records, Volume 6374, Page 1231 and Volume 6889, Page 1641, Deed Records and in Volume 7615, Page 397 and Volume 13271, Page 1376, Real Property Records, all of Travis County, Texas.

TRACT TWO – Parcel Six: Those recorded in Volume 6374, Page 1231 and Volume 6889, Page 1641, Deed Records of Travis County, Texas.

TRACT TWO – Parcel Eight: Those recorded in Volume 6889, Page 1641, Deed Records of Travis County, Texas.

B.  Electric and telephone lines easement granted to the City of Austin, recorded in Volume 2128, Page 5, Deed Records of Travis County, Texas. (Tract 1)

1



C. Electric transmission and distribution line easement granted to the City of Austin, recorded in Volume 659, Page 555, Deed Records of Travis County, Texas. (Tract 2)

D. Telephone line easement granted to Southwestern Bell Telephone Company, recorded in Volume 1465, Page 9, Deed Records of Travis County, Texas. (Tracts One and Two)

E. Electric and telephone line easement granted to the City of Austin, recorded in Volume 4501, Page 2199, Deed Records of Travis County, Texas. (Tract 2)

F. Electric and telephone line easement granted to the City of Austin, recorded in Volume 8064, Page 394, Real Property Records of Travis County, Texas. (Tract 2)

G. Electric and telephone line easement granted to the City of Austin, recorded in Volume 8064, Page 396, Real Property Records of Travis County, Texas. (Lot 62 of Tract 2, Parcel 3)

H. All easements as set out on the plat of record in Volume 79, Page 363, Plat Records of Travis County, Texas. (Tract Two – Parcel 1)

I. All easements as set out on the plat of record in Volume 81, Page 186, Plat Records of Travis County, Texas. (Tract Two – Parcel 2)

J. All easements as set out on the plat of record in Volume 81, Page 188, Plat Records of Travis County, Texas. (Tract Two – Parcel 3)

K. All easements as set out on the plat of record in Volume 81, Page 191, Plat Records of Travis County, Texas. (Tract Two – Parcel 4)

L. Easement rights as reserved in restrictions of record in Volume 7615, Page 397, Real Property Records of Travis County, Texas. (Tract 2, Parcels 1, 2, 3, and 4)

M. Non-exclusive access and right of way easement dated May 16, 1993, and recorded in Volume 12016, Page 80, Real Property Records of Travis County, Texas. (Tract 2, Parcel 5)

N. Access easement dated May 7, 1996 and recorded in Volume 12683, Page 14, Real Property Records of Travis County, Texas. (Tract 2, Lot 54 of Parcel 1, and Parcels 7 and 8)

O. Water and wastewater mains easement granted to Lower Colorado River Authority, recorded in Volume 13002, Page 174, Real Property Records of Travis County, Texas. (Tract 1)

P.  Any portion of the property herein described which falls within the boundaries of any road or roadway. Including, but not limited to, Old Bee Caves Road. (Tract 1 and Tract 2, parcels 1, 5, 6, 7 and 8)

Q.  One-half (1/2) life estate interest in royalty in minerals as set out in instrument recorded in Volume 2436, Page 525, Deed Records of Travis County, Texas. (Tract 2) Said mineral interest not traced subsequent to the date of the above cited instrument.

R.  One-half (1/2) non-participating interest in royalty in minerals as set out in instrument recorded in Volume 4738, Page 2077, Deed Records of Travis County, Texas. (Tract 2) Said mineral interest not traced subsequent to the date of the above cited instrument.

S.  Covenants, conditions, restrictions, assessments, charges and liens as set forth in that certain Declaration dated November 4, 1981, recorded in Volume 7615, page 397, Real Property Records of Travis County, Texas. Said lien of assessments subordinated to the lien of any first money mortgage. (Tract 2, Parcels 1, 2, 3, and 4)

T.  Unrecorded Lease Contract dated August 22, 1991, by and between NAJD II Corp., as Lessor(s), and Ol Cactus Jack, Inc., as Lessee(s). (Tract 1)

U.  Unrecorded Lease Agreement dated April 1, 1994, by and between NAJD II, Corp., as Lessor and The Backyard Restaurant, Ready to Receive, Inc., and Direct Events, Inc., Lessee(s) as to 0.24 of an acre identified as "0.24 acre lease area" shown on survey prepared by James A. Garon, R.P.L.S., dated July 1, 1998. (Tract 1)

3

**EXHIBIT 11.01 (a)**



# City of Austin

Founded by Congress. Republic of Texas. 1839
Municipal Building. Eighth at Colorado. P.O. Box 1088. Austin. Texas 78767  Telephone 512/499-2000

July 7, 1999

Mr. Daniel B. Porter
CCNG Development Company, L.P.
98 San Jacinto Blvd., #1730
Austin, Texas 78701

Re:    Agreement between the City of Austin and CCNG Development Company, L.P.

Dear Mr. Porter:

You have advised the City of Austin (City) that either CCNG Development Company, L.P. (CCNG) or possibly the Lower Colorado River Authority (LCRA), or CCNG's or LCRA's successors in interest, intend to file an application with TNRCC for approval of a no-discharge permit to operate a wastewater treatment plant and to irrigate effluent (Permit).  It is our understanding that the wastewater treatment plant and the initial disposal site will be on a 983 acre tract currently owned by CCNG's affiliate, CCNG Properties L.P. and located partially within the extraterritorial jurisdiction (ETJ) of the Village of Bee Cave, partially within the corporate limits of the Village of Bee Cave, and partially within the ETJ of the City of Austin (Property).  CCNG has the right to purchase the Property from CCNG Properties L.P. and to develop the Property.  The location of the Property is shown on the drawing attached as Exhibit A to this Letter Agreement which is incorporated in this Letter Agreement by reference for all purposes.

Let me take this opportunity to express the City's appreciation for the opportunity to work with you during the planning stages of the development of your Property and to open a dialogue concerning sensitive environmental issues that are of mutual concern.

You and your consultants have met with representatives of the City in an effort to address the City's concerns regarding the terms of the proposed Permit prior to the filing of the application for that Permit with TNRCC.  As you are aware, the City is vitally concerned about the potential impact of the operation of these proposed facilities on water quality in the area.  To this end, we have agreed upon certain conditions, which, if incorporated in the application for the Permit and ultimately included as special conditions in the Final Draft Permit approved by TNRCC, will sufficiently address the City's concerns.  In return, the City of Austin will not object to the issuance of the Final Draft Permit as the Permit pertains to this specific Property if it contains the special conditions set forth in Exhibit B, or if CCNG agrees on behalf of itself and its successors and assigns to operate and maintain the irrigation disposal system for the Property in accordance with the conditions set forth in Exhibit B, notwithstanding the fact that such conditions are not contained in the special conditions of the Final Draft Permit.

*huP*

This Letter Agreement constitutes the agreement between CCNG and the City regarding the inclusion of those conditions as special conditions in the terms of the Permit and the operation and maintenance of the irrigation disposal system in accordance with those conditions. The conditions are set forth in Exhibit B attached to this Letter Agreement and are incorporated in this Letter Agreement by reference for all purposes.

First, CCNG agrees to incorporate these conditions as proposed special conditions in the application for the Permit if CCNG is the applicant for the Permit and to seek the inclusion of these special conditions in the Final Draft Permit to be issued by TRNCC, whether the application for the Permit is made by CCNG or LCRA.

Second, CCNG agrees that the City of Austin may intervene before TNRCC to assist CCNG in securing approval for the inclusion of these special conditions in the Permit.

Third, if the Final Draft Permit does not contain the conditions outlined in Exhibit B, CCNG understands and agrees on behalf of itself and its successors and assigns to operate and maintain the irrigation disposal system for the Property in accordance with the conditions set forth in Exhibit B even if CCNG is not the applicant for the Permit, unless otherwise prohibited by applicable law, rules or requirements of the TNRCC or other regulatory authority, in which case CCNG agrees to operate and maintain the irrigation and disposal system for the property in accordance with the remaining conditions in Exhibit B that are not otherwise prohibited by applicable law, rules, or requirements of the TNRCC or other regulatory authority.

Fourth, CCNG agrees that the terms of this Letter Agreement shall run with the land, and CCNG agrees that it will execute a Restrictive Covenant encumbering that portion of the Property in accordance with the conditions set forth in Exhibit B acceptable in form and content to the City and CCNG reflecting the terms of this Letter Agreement which shall be placed of record in the Real Property Records of Travis County, Texas.

Fifth, if a controversy arises between CCNG and the City regarding any of the terms of this Letter Agreement including whether CCNG is operating and maintaining the irrigation disposal system in compliance with the conditions contained in Exhibit B, specific enforcement of the terms of this Letter Agreement shall be available in a court of competent jurisdiction. Venue for any cause of action arising under this Letter Agreement shall lie in Travis County, Texas.

Sixth, notwithstanding any other remedies provided by this Letter Agreement, the parties to this Letter Agreement understand and agree that neither the City nor CCNG, by entering into this Letter Agreement, have waived or diminished any right, power, or ability either may have to participate in any way in any future administrative proceeding after the issuance of the initial Permit before another government agency with jurisdiction to regulate any matter addressed by this Letter Agreement. Specifically, but without limitation, the parties to this Letter Agreement agree that nothing in this Letter Agreement limits, impairs or in any way changes the City's or CCNG's rights to participate in and/or initiate administrative proceedings or litigation with regard to the



Permit or with regard to CCNG's operation and maintenance of the irrigation disposal system.

Seventh, the City acknowledges that CCNG will request the Village of Bee Cave to take action to request the release of that area of the City's extraterritorial jurisdiction as shown in Exhibit–C, and which is incorporated in this Letter Agreement by reference for all purposes. The staff of the City will place the matter on a City Council agenda within thirty (30) days from the date the City receives the request from the Village of Bee Cave and will support a resolution for consideration by the City council releasing the territory described and shown on that Exhibit to the Village of Bee Cave.

Eighth, CCNG agrees to execute, prior to the release of the territory shown on Exhibit C to the Village of Bee Cave, a conservation easement mutually acceptable in form and content to the City and CCNG in favor of The Nature Conservancy of Texas, Inc. 1) limiting development in the territory shown on Exhibit C to a level which does not exceed 10 percent impervious cover based on the gross area shown on Exhibit C and 2) excluding all development except trails and golf cart paths from an area 100 feet from the centerline of any tributaries with drainage areas greater than 64 acres. CCNG also agrees that the conservation easement will limit the development in the territory shown on Exhibit C to single-family residential; provided, however, development within such area may also include streets, utilities, water quality facilities and recreational amenities, including but not limited to golf course uses involving spray irrigation in connection with such single-family residential use. Development in the area shown on Exhibit C will include water quality control strategies that result in no increase in annual pollutant loads discharged. CCNG shall file a copy of its final water quality plans, with the City, as documentation of compliance with this paragraph.

Ninth, the City and CCNG acknowledge that the City has an existing monitoring station on the Property, but that no written agreement between the parties governs the use of such station. The City and CCNG agree to negotiate in good faith an easement for the operation and maintenance of such station, the terms and conditions of which are to be acceptable to both parties.

Finally, CCNG agrees that this Letter Agreement is binding upon its successors in interest.

I have taken the liberty of forwarding to you two originals of this Letter Agreement; if the terms are acceptable, please sign in the space provided below on both originals and return one original to me. In executing this Letter Agreement on behalf of CCNG Development Company, L.P., you represent that you are the President and Chief Executive Officer of CCNG, Inc., the general partner of CCNG Development Company, L.P., and that you have the authority to commit CCNG Development Company, L.P. to the terms of this Letter Agreement, and that this Letter Agreement is the act of CCNG Development Company, L.P.; and you acknowledge that the City of Austin is relying upon those representations in entering into this Letter Agreement. In executing this letter agreement on behalf of the City I represent that I am the City Manager of the City and that I have authority to commit the City to the terms of this letter agreement and that this letter

CCNG Development Co., L.P.
Letter Agreement, Page 4

agreement is the act of the City and I acknowledge that CCNG is relying upon these representations upon entering into this letter agreement.

Sincerely yours,

_____

Jesus Garza
City Manager
City of Austin

Approved as to
Form and Content:

_____

Daniel B. Porter,    July 14, 1999
President and CEO
of CCNG, Inc.,
General Partner

SH 71

Colorado River

CCNG
Development

AUSTIN

TNC
Conservation
Easement
4,668 Ac.

Shield
Ranch

Barton Creek
Preserve
(The Nature
Conservancy
of Texas)

City of
Austin
Easement
1,676 Ac.

290 W

Barton Creek
Wilderness Preserve
(City of Austin)

Barton Creek Watershed

Travis County
Hays County

Onion Creek

(111 45)

Source:
• DeLorme Topo USA, 1998
• City of Austin GIS Maps:
  Watershed, County, Roads

# Location Map

The
Nature
Conservancy
of Texas

0    1.5    3 Miles



Bosse & Compton Associates

# EXHIBIT B

## CONDITIONS FOR EFFLUENT IRRIGATION ON GOLF COURSES

To the extent a golf course is developed on the Property, CCNG Development ("CCNG") agrees to prepare and implement a Golf Course Management Plan (the "Plan") to include the following components and criteria:

1) **Buffer Zones** – The following specific requirements shall be included in the Plan:

   a) A minimum buffer zone of 1000 feet shall be provided from the centerline of Little Barton Creek to any portion of the golf course or other areas irrigated with effluent, except for a minimum buffer of 500 feet from those specific sites identified on Exhibit B-1.

   b) A minimum buffer zone of 150 feet shall be provided from the centerline of any tributaries to Little Barton Creek that drain more than 64 acres to any portions of the golf course or other areas irrigated with effluent, except where the width of such buffer zone would materially interfere with CCNG's golf course design in which case such buffer zone may be a minimum of 100 feet. Encroachments into the buffer zone along the tributaries may be allowed based upon a water quality mitigation plan agreeable to both CCNG and the City.

   c) The designated buffer zones along Little Barton Creek and the buffer zones along its tributaries shall be maintained:
      i) free of effluent irrigation, except normal drift caused by weather conditions;
      ii) free of fertilizers; and
      iii) free of pesticides

2) **Irrigation Management Plan Goal**: To irrigate effluent water such that effluent irrigation runoff to Little Barton Creek and its tributaries is prevented and to reduce subsurface losses of nutrients and pesticides. Irrigation management will be based on a water budget, and weather conditions and soil moisture data obtained by CCNG's on-site weather station.

   a) The following irrigation management components shall be included in the plan:

      i) Water budget to incorporate all water inputs, such as effluent, raw water, and rainfall for a reliable irrigation plan.

      ii) Total storage capacity, including design freeboard, shall provide a minimum of 50 days storage with 150 acres of irrigation area. In the event additional irrigation area is available the total storage requirement, including design freeboard, shall be 1) based on a water balance and storage calculation that accounts for an average five-day antecedent infiltrated rainfall condition in the water needs and 2) includes an additional 25 percent safety factor on the storage requirement.

iii) On site weather station to measure rainfall, temperature, wind conditions and soil moisture in order to determine evaportranspiration.

iv) Water Quality Management Zones established based on turf and plant type and soils, with specific irrigation strategies specific to the zone

v) Irrigation strategies to account for both the turf and plant growing season and dormant season and water quality management zones.

b) The following specific requirements shall be included in the Plan:

i) acceptance of no more than 400,000 gallons per day of effluent, on an annual average basis, for storage or irrigation

ii) a minimum of 150 acres of irrigable area provided to receive waste water effluent through irrigation

iii) effluent irrigation rate shall not exceed 3.0 acre-feet/acre per year

iv) no irrigation during rain, and use of prudent judgment when rain is pending

v) prohibition of overwatering or saturation of root zone to minimize runoff and leaching losses

vi) maintenance of irrigation facilities, including structural integrity of drainage features and application equipment

vii) maximization of water efficiency by frequent mowing at moderate height, consistent with industry standards

viii) operation of irrigation equipment to encourage deep root development and to avoid wilting and other stress conditions

3) **Nutrient Management Plan Goal:** To limit effluent, raw water and fertilizer nutrient applications to levels equal to or less than turfgrass and vegetation nutrient uptake in order to minimize nutrient transportation via runoff, interflow, or deep percolation, based on best management for golf courses in environmentally sensitive areas.

a) The following nutrient management components shall be included in the Plan:

i) Nutrient budget to account for nutrient constituents in effluent, fertilizers, raw water, and rainfall

ii) Slow release fertilizers used to reduce nitrogen loss below the root zone

iii) Fertilizer applications at times and amounts commensurate with turfgrass growth requirements based on species and cultivar, climate, soil conditions, and chemical formulation

iv) Water Quality Management Zones established based on soils, turf and plant cover goals, and level of use in order to plan fertilizer and irrigation applications

b) The following specific requirements shall be included in the Plan:

i) nutrient applications not to exceed turf and plant uptake requirements during any season

ii) prohibition of chemical applications on bare soils

iii) increased care and handling of fertilizers in areas with low soil depth and karst features.

iv) improvement of nutrient uptake efficacy through selection of realistic turfgrass goals, selection of application rates to meet goals, use of soil and tissue tests to direct application rates, and accounting for nutrient application history or credits (clipping management)

v) development of course monitoring plan to track nutrient levels

vi) assessment of potential off-site transport prior to application

4) **Integrated Pest Management Plan Goal**: To design and implement an integrated pest management ("IPM") component of the Plan in order to minimize toxic chemical transportation via runoff, interflow, or deep percolation, based on best management for golf courses in environmentally sensitive areas.

a) The following pesticide management components shall be included in the plan:

i) IPM Plan integrated with irrigation, fertilization, and cultural management plans

ii) Action thresholds developed and implemented for pests below which no applications is used, to reduce the use of pesticides

iii) Pesticide selection using pest specific products that are less toxic, less mobile, and less persistent or using alternate control strategies to reduce hazards to beneficial organisms

iv) Minimized applications to reduce hazards to beneficial organisms using information from label, chemical characteristics, site characteristics

v) Water Quality Management Zones established based on soils, turf and plant cover goals, and level of use in order to plan pesticide applications

b) The following specific requirements shall be included in the Plan:

i) use of spot treatments wherever possible, rather than broadcast treatments

ii) incorporation of pesticides into soil/turf to reduce exposure to runoff and enhance adsorption

iii) proper equipment maintenance and calibration for all volumes of application

iv) proper disposal of all unused chemicals and containers

v) prohibition on use of chemigation equipment

vi) increase in care of handling of toxic chemicals in areas of low soil depth and karst features

vii) selection of pesticide formulations to reduce pesticide leaching losses (wettable powders, dusts, and microgranules are preferred)

viii) control and timing of pesticide application in relation to local environmental conditions

ix) development of course monitoring plan to track pest infestation

x) assessment of potential off-site transport prior to application

5) **Monitoring Plan**: The City or CCNG may implement a monitoring plan for the golf course, coordinated with CCNG's staff, to obtain quantitative information concerning the impacts of the golf course. The monitoring plan and location of the monitoring devices shall be approved by CCNG and implemented with the least practical interference with the normal operations of the facilities and at no cost to CCNG as to installation, maintenance, operation, analysis, repair or replacement, except that CCNG agrees to reimburse the City for 50% of the cost of the installation, maintenance, operation, analysis, repair or replacement of such facilities up to a maximum of $10,000.00 per year. The monitoring plan may include monitoring of some combination of the following features:

a) surface water monitoring up- and down-stream of the golf course on Little Barton Creek
b) nearby springs and seeps
c) shallow groundwater
d) flowing tributaries draining golf course properties
e) tile drains from greens and fairways

07/12/99



Exhibit B-1



# EXHIBIT 11.02 (a)

# WEST TRAVIS COUNTY REGIONAL WATER SYSTEM
## SCHEDULE FOR RATES, FEES, CHARGES
## AND TERMS AND CONDITIONS
## OF RETAIL TREATED WATER SERVICE

This schedule for rates, fees, charges and terms and conditions of service ("Schedule") is effective as of the _____ day of _____, 1999 for retail treated water service within the LCRA service area for the West Travis County Regional Water System ("System") described and/or depicted in Appendix A, attached hereto.

# TABLE OF CONTENTS

Section 1.0      General Provisions

Section 2.0      Service Rules

Section 3.0      Rates and Service Fees

Section 4.0      Service Extensions

Section 5.0      Definitions

Appendix A      Service Area

Appendix B      Limits of the Village of Bee Cave, Texas, as of July 27, 1999

## SECTION 1.0 – GENERAL PROVISIONS

### Section 1.01 – Jurisdiction

The Lower Colorado River Authority ("LCRA") is a conservation and reclamation district created and functioning under Article 16, Section 59 of the Texas Constitution and exercising powers granted in its enabling legislation and in Chapter 49 of the Texas Water Code, including authority to own and operate a water utility system.

### Section 1.02 – Service Area

a.    The LCRA will sell and deliver potable treated water in accordance with this Schedule within the LCRA service area for the System, which service area ("Service Area") is described or depicted in Appendix A, attached.

b.    The Service Area, as described in Appendix A, may be amended from time to time at the discretion of the LCRA, subject to approval by regulatory authorities as applicable. Any amendments automatically will amend this Schedule without further action or proceeding.

c.    No treated water service will be provided outside of the Service Area boundaries absent the approval of the LCRA.

### Section 1.03 – Non-Discrimination Policy

The LCRA will provide service of treated water to all Applicants who comply with the terms and conditions for service set forth or referenced in this Schedule regardless of race, creed, color, national origin, sex, or marital status.

### Section 1.04 – Applicability of Rules

The Policies, Rules, and Regulations ("Policies") described or referenced in this Schedule apply to the terms and conditions of treated water services furnished by the LCRA and may be amended from time to time by the LCRA's Board of Directors. The LCRA has the authority to deny or to discontinue services if the Applicant or Customer fails to observe these Policies, terms or conditions.

### Section 1.05 – Damage Liability

By accepting service, the Customer will hold the LCRA harmless from any and all claims, liability or damages to persons or property of the Customer or third parties arising from the provision by the LCRA of water service or caused by service interruptions, tampering by other customers/users of the LCRA, or failures of the system.

# SECTION 2.0 – SERVICE RULES AND REGULATIONS

## Section 2.01 – Connection without Approval of LCRA Prohibited

It is unlawful for any person to connect to the LCRA's treated water system without submitting an application to the LCRA for treated water service, obtaining the approval of the LCRA, and executing a water service agreement.

## Section 2.02 – Application for and Provision of Treated Water Service

A person applying for service ("Applicant") will provide all information requested, pay all applicable connection fees, and execute any required easement forms to authorize access and right of entry by the LCRA or its successors or designees to construct and maintain the connection of service.

All applications for service will be made on the LCRA's standard contract form (as amended from time to time) and will be signed by the Applicant before treated water service is provided by the LCRA. A separate contract will be made for each service location application.

Where service has previously been provided at the location, service will be reconnected only after the Applicant has paid all fees for reconnection set forth in this Schedule.

The Applicant qualifies as a Customer ("Customer") once the Applicant meets all requirements for obtaining service. After the Applicant qualifies for service, the LCRA will install tap, meter, and utility cut-off valve and/or take all necessary actions to initiate service.

The Customer will install and maintain any necessary service lines from the LCRA's facilities and equipment to the point of use at its own expense. The Customer will install and maintain at its own expense any Customer service isolation valves, backflow prevention devices, clean-outs, and other equipment as may be specified by the LCRA.

In the event that LCRA agrees to construct the necessary services lines from the Customer's premises and point of use to the LCRA's facilities, the Customer will provide the LCRA, or its designee, reasonable access and right of entry to Customer's property and premises for the purpose of inspecting, constructing, or installing service for the Customer's premises to the LCRA's facilities. Upon completion of construction and installation, Customer will maintain at its own expense the lines and equipment from the LCRA's facility to the point of use.

The Customer will grant to the LCRA any easements or right-of-way for the purpose of installing, maintaining, and operating such pipelines, meters, valves, and any other equipment that the LCRA deems necessary to extend or improve service for existing or future Customers. The LCRA may require the Customer to use certain forms to grant the easement or right of way.

Customer will immediately correct any undesirable plumbing practices. The following undesirable plumbing practices are prohibited by state regulations.

a. No direct connection between the public drinking water supply and a potential source of contamination is permitted.

b. Potential sources of contamination shall be isolated from the public water system by an airgap or an appropriate backflow prevention device in accordance with state plumbing regulations. Additionally, all pressure relief valves and thermal expansion devices must be in compliance with state plumbing codes. No cross-connection between the public drinking water supply and a private water system or private water well is permitted.

c. No connection which allows condensing, cooling or industrial process water to be returned to the public drinking water supply is permitted.

d. No pipe or pipe fitting which contains more than 8.0 % lead may be used for the installation or repair of plumbing on or after July 1, 1988, at any connection which provides water for human consumption.

e. No solder or flux which contains more than 0.2 % lead may be used for the installation or repair of plumbing on or after July 1, 1988, at any connection which provides water for human consumption. (f) No plumbing fixture is installed which is not in compliance with a state-approved plumbing code.

The Customer will, at its own expense, maintain, test, and repair all equipment and lines on its own premises including any backflow prevention device required by the LCRA or its Policies. The Customer will provide copies of all testing maintenance records to the LCRA as required.

## Section 2.03 – Refusal of Service

The LCRA may decline to serve an Applicant until the Applicant has paid all applicable fees, executed all necessary forms and agreements, complied with the terms of this Schedule and any other applicable Policies of the LCRA. The LCRA may decline to serve an Applicant for other reasons as identified in Section 2.06.

In the event that the LCRA refuses to serve an Applicant, the LCRA will inform the Applicant in writing of the basis of its refusal. The LCRA shall not refuse service on the basis of race, color, national origin, religion, sex, age, or handicap.

## Section 2.04 – Meter Requirements, Readings, and Testing

All water sold by the LCRA will be billed based on meter measurements. The LCRA will provide, install, own, and maintain meters to measure amounts of water consumed by its Customers. One meter is required for each residential, commercial or industrial

facility. Service meters will be read at monthly intervals and as nearly as possible on the corresponding day of each monthly meter reading period.

The LCRA will, upon the request of a Customer, make without charge one test of the accuracy of the Customer's meter. If, within a period of two years, the Customer requests a new test, the LCRA will make the test, but if the meter is found to be within the accuracy standards established by the American Water Works Association, the LCRA will charge the customer a fee in accordance with this Schedule that reflects the cost to test the meter. Following the completion of any requested test, the LCRA will promptly advise the Customer of the date of removal of the meter, the date of the test, the result of the test, and who made the test. If Customer's meter is found to be inaccurate, the LCRA will adjust the Customer's bill for the previous six months.

## Section 2.05 – Billing

Bills will be sent monthly. The due date of bills for all fees for treated water service will be on the 15th day after the date of the invoice. Bills will be considered delinquent if not paid by the due date. Payment for treated water service is delinquent if full payment, including late fees and any regulatory assessment, if applicable, is not received at the LCRA or the LCRA's authorized payment agency by 5:00 p.m. on the due date. If the due date falls on a holiday or weekend, the due date for payment purposes will be the next workday after the due date.

In the event of a dispute between a Customer and the LCRA regarding any bill for treated water service, the LCRA will conduct an investigation and report the results to the Customer.

## Section 2.06 – Service Disconnection or Services Denied

Treated water service may be disconnected or denied for the following reasons:

a.     The bill has not been paid in full by the due date listed on the bill. The LCRA will provide the Customer with notice that the Customer is delinquent on a bill and that service will be terminated. The termination date will be 10 days after a termination notice is mailed or hand-delivered.

b.     The Customer fails to comply with this Schedule, the Service Agreement, Construction Agreement, or the regulations, rules or applicable policies of the LCRA.

c.     The Customer fails to provide reasonable access to property to connect service.

d.     The Customer fails to upgrade facilities to standards required by State or Federal agencies

e.      The LCRA determines that providing services will exceed the capacity of the water plant or system.

## Section 2.07 – Reconnection of Service

The LCRA will reconnect service only after the Customer pays all past due bills and any other outstanding charges or corrects the conditions which cause service to be disconnected.

## Section 2.08 – Service Interruptions

The LCRA will make all reasonable efforts to prevent interruptions of service. If interruptions occur, the LCRA will re-establish service within the shortest practicable time. The LCRA will not be liable to Customer or any third parties for interruption of service.

## Section 2.09 – Quality of Service: No Liability for Damages

The LCRA will plan, furnish, and maintain production, treatment, storage, transmission, and distribution facilities as required by Texas Natural Resources Conservation Commission standards. However, the LCRA shall not be liable for any damages to property of any Customer or third parties arising from the LCRA's supplying of treated water service or for inability to supply treated water service.

## Section 2.10 – Number of Taps

All water shall be metered by meters furnished and installed by the LCRA. The meter connection is for the sole use of the Customer and is to provide service as identified below. Extension of pipe(s) to transfer service from one property to another, to share, resell, or submeter water to any other person, dwelling, business, or property is prohibited unless approved in advance by the LCRA.

a.      Each individual residence located on one (1) lot or plat of ground shall have a separate water tap and meter.

b.      Multifamily properties shall have one meter per building or apartment or shall apply for a master meter that will serve all multifamily areas located on the property. If service is provided through a master meter, the LCRA shall have no responsibility to the tenants, and such tenants are not considered customers of the LCRA.

c.      Commercial properties, public properties, schools, or industrial properties shall have meters and service as required by the LCRA.

## Section 2.11 – Right of Access

The LCRA will have the right of access to the Customer's premises at all reasonable times for the purpose of installing, inspecting or repairing water mains, meters, or other components used in connection with its providing treated water service, or for the purpose of removing its property and disconnecting service.

## Section 2.12 – Service through Temporary Construction Meters

An Applicant may request treated water service through a temporary meter to a construction site. The LCRA shall supply water through such a temporary meter for a period not to exceed six months. A Customer who receives treated water service through such a temporary meter may seek no more than two six-month extensions of treated water service through the same meter.

## Section 2.13 – Fire Protection

The primary purpose of the treated water system owned and operated by the LCRA is to provide treated water service to residential and commercial Customers. The LCRA does not guarantee the availability of water for fire protection purposes. Fire hydrants installed within the LCRA's distribution system are provided at the convenience of the LCRA and do not imply any responsibility on the part of the LCRA to meet fire flow requirements of local, county, state, or federal governmental agencies.

## 2.14 – Additional Treated Water Service Rules, Regulations and Policies

The LCRA may adopt additional rules, regulations, and policies that are applicable to the water service herein described and which rules, regulations and policies may be amended from time to time. Such rules, regulations and policies as amended from time to time, are adopted and incorporated herein by reference for all purposes. Copies of such policies are available upon request by the Customer.

## 2.15 – Severability

In the event that any of the terms or conditions of this Schedule, or the application of any such term or condition, shall be held invalid as to any person or circumstances by any court of appropriate jurisdiction, the remainder of such Schedule, and the application of its terms and conditions to treated water service Customers shall not be affected thereby.

## SECTION 3.0 – RATES AND SERVICE FEES

### Section 3.01 – Deposit

At the time the application for service is made, the Applicant must pay to the LCRA a deposit in the following amount before service shall be provided or reserved for the Applicant by the LCRA:

| | |
|---|---|
| 5/8" or 3/4" meter | $75.00 |
| 1" meter | $200.00 |
| 1 ½" meter | $375.00 |
| 2" meter | $600.00 |
| 3" meter | $1,200.00 |
| 4" meter | $1,800.00 |

If service is not connected, or after disconnection of service, the LCRA will promptly refund the Applicant's or Customer's deposit, if any, in excess of the unpaid bills for service furnished.

### Section 3.02 – New Connection Fees

a.    The LCRA shall charge fees for new connection to the system as follows:

For New, Standard Connections: Applicants for new, Standard Connections to the LCRA water system must pay $2,645.00 for application, installation, tap, and inspection and connection fees for each living unit equivalent (LUE) to be served through the new connection to the system("Standard Connection Fees"). This amount includes materials and labor required to make installation upon existing water mains, a standard service connection, along with the cost of processing the application. The fees for new, Standard Connections are made up of the following:

| | |
|---|---|
| Application Fee: | $30.00 |
| Installation Fee: | $40.00 |
| Inspection Fee: | $25.00; and |
| Connection Fee: | $2,550.00 |

For New, Non-Standard Connections: Applicants for new, Non-Standard Connections (including temporary connections for construction sites) to the LCRA water system shall pay, in addition to the fees necessary for new, Standard Connections, any and all construction, labor, materials, engineering, and legal fees associated with the installation of the facilities for the Non-Standard Connection.



## Section 3.03 – Reconnect Fees

The LCRA will charge a reconnect fee to restore service through an existing connection as follows:

Discontinuance due to customer change: where service was discontinued to a previous Customer and service is sought by a new Customer through the same connection, the reconnect fee shall be $40.00.

Discontinuance due to non-payment: where service is discontinued due to non-payment of a bill, the reconnect fee shall be $25.00

## Section 3.04 – Monthly Charges

For 5/8" or 3/4" meter: Each Customer who receives treated water service through a 5/8" or 3/4" meter shall be charged $25.00 per month. There shall be no additional charge for the first 1,000 gallons of water consumed in the same month.

For all other meters: Each Customer who received treated water service through any meter other than a 5/8" or 3/4" meter shall be charged as follows, based on the meter size approved for the Customer by the LCRA's engineer:

| | |
|---|---|
| 1" meter | $50.00 per month |
| 1 ½" meter | $100.00 per month |
| 2" meter | $160.00 per month |
| 3" meter | $320.00 per month |
| 4" meter | $500.00 per month |

There shall be no additional charge for the first 1,000 gallons of water consumed in the same month.

## Section 3.05 – Gallonage Charge

Each Customer shall pay, in addition to monthly charges, gallonage charges for water consumed at the following rates:

| | |
|---|---|
| 1,000 to 19,999 gallons | $2.50 per 1,000 gallons |
| 20,000 to 44,999 gallons | $2.75 per 1,000 gallons |
| 45,000 to 74,999 gallons | $3.00 per 1,000 gallons |

The gallonage charge for treated water service provided through a temporary meter to a construction site shall be $3.25 per 1,000 gallons.



## Section 3.06 – Regulatory Assessment

The LCRA shall collect a fee for regulatory assessments equal to one half of one percent (1/2%) of the total of the Customer's monthly and gallonage charges.

## Section 3.07 – Late Payment Fee

The LCRA shall charge a late payment fee equal to ten percent (10%) of the past due charges.

## Section 3.08 – Returned Check Fee

In the event of a check, draft or any other similar instrument is given by a person, firm, corporation, or partnership to the LCRA for payment of services provided for in this Schedule, and the instrument is returned by the bank or other similar institution as insufficient or non-negotiable for any reason, the treated water service account for which the instrument was issued shall be assessed a returned check fee of $15.00.

## Section 3.09 – Meter Test Fee

The LCRA shall test a Customer's meter upon written request by the Customer. A meter test fee of $25.00 shall be charged to the Customer requesting a second meter test within a two-year period after the first test that indicates the meter is reading accurately.

## Section 3.10 – Meter Re-read Fee

The LCRA shall re-read a Customer's meter upon written request by the Customer. A meter re-read fee of $10.00 shall be charged to the Customer if the re-read indicates that the original meter reading was correct. There shall be no charge if the re-read indicates that the original meter reading was incorrect.

## 3.11 – Equipment Damage Fee

If the LCRA's facilities or equipment have been damaged by tampering, by-passing, installing unauthorized taps, reconnecting service without authority, or other service diversion, a fee shall be charged equal to the actual costs for all labor, material, and equipment necessary for repair, replacement, or other corrective actions by LCRA. This fee shall be charged and paid before service is re-established. If the LCRA's equipment has not been damaged, a fee equal to the actual costs for all labor, material, equipment, and other actions necessary to correct service diversion, unauthorized taps, or reconnection of service without authority shall be charged. All components of the fee will be itemized, and a statement shall be provided to the Customer. If the LCRA's facilities or equipment have been damaged due to negligence or unauthorized use of the LCRA's equipment, right-of-way, or meter shut-off valve, or due to other acts for which the LCRA incurs losses or damages, the Customer shall be liable for all labor and material charges incurred as a result of said acts or negligence.

## SECTION 4.0 – SERVICE EXTENSIONS

### Section 4.01 - Extension to Standard Connection

a.  The LCRA will install up to 200 feet of water line to extend service for a Standard Connection within the Service Area identified in Appendix "A" at no cost (other than the fees provided in Section 3.02) to the Applicant, provided funds are available to the LCRA.

b.  An Applicant for a Standard Connection must pay for all costs of any facilities appropriate to be constructed (in the sole opinion of the LCRA) to provide service to the Customer other than 200 feet of water line, plus all applicable Standard Connection Fees. In addition, the LCRA may require an Applicant for a Standard Connection who requires an extension in excess of 200 feet of water line to meet the requirements applicable with an extension for a Non-Standard Connection. The LCRA shall determine the construction schedule, size, and design of extensions under this section necessary to provide adequate service.

c.  Provided that funds are available to the LCRA, the LCRA will extend service for a Standard Connection to all single-family residences located as of July 27, 1999, inside the Village limits of the Village of Bee Cave, Texas, as described and/or depicted in Appendix B, attached hereto, at no additional cost beyond the Standard Connection Fees to an Applicant who submitted an application for service from the Village and/or LCRA by October 1, 1999. The LCRA shall determine the construction schedule, size and design of extensions under this section necessary to provide adequate service.

### Section 4.02 – Other Extensions

An application for an extension to serve a Non-Standard Connection, or an application or other request by a Developer for the extension of service to the Developer's property, shall meet the following requirements prior to the initiation of service by the LCRA:

a.  The Applicant shall provide the LCRA a written request for service. The request shall specify the location of property, size of development, and number of tracts to be served.

b.  A final plat, approved by the Village, must accompany the application showing the Applicant's requested service area.

c.  If requested by the LCRA, the Applicant shall submit to the LCRA a set of detailed maps, plans, specifications, and demand requirements for the extension project that have been prepared by a registered professional engineer. The maps, plans, specifications and demand requirements shall comply with all Policies, rules and regulations -- including ordinances, rules or regulations of local governmental bodies -- and are subject to approval by the LCRA. The LCRA



reserves the right to upgrade design of service facilities to meet future demands, provided however, that the LCRA pays the expense of such upgrading above the Applicant's facility requirements

d.   All Applicants requesting or requiring an extension to a Non-Standard Connection may be required to enter into a written contract, drawn up by the LCRA's attorney, in addition to submitting the LCRA's Service Application and Agreement. Said contract shall define the terms of service prior to construction of required service facilities. Guidelines for the service contract may include, but are not limited to:

1.   All costs associated with required administration, design, construction, and inspection of facilities for treated water service to the Applicant's service area and terms by which these costs are to be paid;

2.   Procedures by which the Applicant shall accept or deny a contractor's bid, thereby committing to continue or discontinue the project;

3.   Terms by which the Applicant shall indemnify the LCRA from all third party claims or lawsuit in connection with the project contemplated;

4.   Terms by which the Applicant shall deed all constructed facilities to the LCRA and by which the LCRA shall assure operation and maintenance responsibility, including any enforcement of warranties in connection with construction of the applicant's project; or

5.   Terms by which the Applicant shall grant title or easement for right-of-ways, constructed facilities, and facility sites and/or terms by which the Applicant shall provide for the securing required right-of-ways and sites.

e.   The LCRA shall require private right-of-way easement or private property for extensions to Non-Standard Connections as per the following conditions:

1.   If the LCRA determines that right-of-way easements or facility sites outside the Applicant's property are required, the LCRA shall require the Applicant to secure easements or title to facility sites in behalf of the LCRA. All right-of-way easements and property titles shall be researched, validated, and filed by the LCRA at the expense of the Applicant;

2.   The LCRA shall require an exclusive dedicated right-of-way on the Applicant's property (as required by the size of the planned facilities and as determined by the LCRA) for the construction of the LCRA's pipelines and title to property required for other on-site facilities.

f.   Pipeline construction and facility installations for extension to a Non-Standard Connection may be installed by the LCRA or by a contractor retained by the

Applicant subject to approval by the LCRA. The LCRA shall have the right to inspect and approve all pipeline construction and facility installations.

1.  The Applicant shall be required to pay all costs associated with construction and installation of the facilities. These costs shall include, but may not be limited to, expenditures for materials, equipment, labor, legal fees, inspection fees, and design or engineering fees.

2.  If pipeline construction and facility installations are to be performed by the LCRA, the LCRA will provide Applicant with an estimate of the construction and installation costs, and will require payment of one half the estimated costs in advance.

3.  Upon completion of construction and installation, Applicant shall transfer title of all facilities running from the LCRA's water system up to and including the Applicant's retail meter to the LCRA. Thereafter, the LCRA shall own such facilities and shall be responsible for the maintenance thereof.

## SECTION 5.0 – DEFINITIONS

"Developer" means a person who or an entity which: (a) subdivides a single, legal tract of property into multiple tracts; or (b) requests more than two meters for treated water service to a single, legal tract of property.

"Non-Standard Connection" means a connection for which service is provided through a meter larger than a 3/4" meter.

"Service Area" means the area described and/or depicted in Appendix A, attached.

"Standard Connection" means a connection for which service is provided through a 5/8" or 3/4" meter.

"Treated water" means water treated for human consumption in accordance with standards set by the Texas Natural Resource Conservation Commission.

# Appendix A

**West Travis County
Regional Water System
Service Area**

Service Area

N

Lake
Travis

620

Lake Austin

71

2244

3238

Village
of
Bee Cave

71

Travis County
Hays County



# Appendix B



VILLAGE OF BEE CAVE

GRAPHIC SCALE

0   1000   2000   3000

( IN FEET )
1 INCH = 1000

Malone/
Wheeler, Inc.
Engineering & Development Consultants
6316 Hwy. 290 West, Suite 150
Austin, Texas 78735
Phone: (512) 899-0601  Fax: (512) 899-0655

**EXHIBIT 11.03**

# RAW WATER AND EFFLUENT AGREEMENT

## BETWEEN

## LOWER COLORADO RIVER AUTHORITY

## AND

## CCNG DEVELOPMENT COMPANY, L.P.

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

This agreement (hereinafter, the "Agreement") is entered into as of this _19 TH_ day of _NovEmbER_, 1999, by and between the Lower Colorado River Authority, a conservation and reclamation district created under the provisions of Article XVI, Section 59, Texas Constitution (hereafter "LCRA"), and CCNG Development Company, L.P., ("CCNG"), a Texas limited partnership with its principal place of business in the City of Austin, Travis County, Texas.

## RECITALS

LCRA has contracted with CCNG to provide wastewater collection, treatment and disposal services to the CCNG Tract and the Boothe Tract. CCNG may develop an 18-hole golf course on land located within the boundaries of the CCNG Tract. LCRA intends to obtain from the Texas Natural Resources Conservation Commission ("TNRCC") a permit to authorize LCRA to dispose of treated wastewater from LCRA's wastewater treatment plant by irrigation. LCRA has requested that CCNG agree to use LCRA's treated wastewater for irrigation of the proposed golf course to the extent the wastewater can be lawfully and practically disposed of by irrigation. CCNG has requested that LCRA provide treated wastewater suitable for irrigation purposes. CCNG has also requested that LCRA provide raw water suitable for irrigation purposes for the golf course. LCRA and CCNG recognize that the performance of their respective obligations as provided in this Agreement is of benefit and economic value to the other. Accordingly, LCRA and CCNG desire to enter into a definitive agreement to specify the terms and conditions under which LCRA will supply treated wastewater and raw water, or a combination thereof, to CCNG and CCNG will accept treated wastewater and raw water, or a combination thereof, from LCRA to irrigate the proposed golf course on the CCNG Tract.

#15044v5

1

## AGREEMENT

For and in consideration of the mutual promises, covenants, obligations and benefits of this Agreement, LCRA and CCNG contract and agree as follows:

## ARTICLE I

### Definitions

Unless otherwise provided or unless the context otherwise requires, the terms defined in this Agreement shall have the respective meanings specified below:

Boothe Tract: The "Boothe Tract" shall mean the tract owned by Nellie Hampe Partnership I, Ltd. that is located between, and adjoining State Highway 71 and the CCNG Tract and that is presently projected for commercial development and which is more fully identified on "Exhibit I-A."

CCNG Tract: The "CCNG Tract" shall mean the real property described in "Exhibit I-B," and any other real property acquired, owned or controlled by CCNG or affiliates of CCNG that i) is located within the area described in Exhibit I-B and ii) is subsequently designated as part of the CCNG Tract pursuant to a written notice from CCNG to LCRA.

Collection System: The "Collection System" shall mean the sanitary sewer system of LCRA, including sanitary sewers, manholes, intercepting sewers, sewage pumping, and other similar appurtenances, and any improvements, extensions, or enlargements, which LCRA now owns or will acquire and/or construct.

Commission: "Commission" means the Texas Natural Resources Conservation Commission or its successors.

Delivery Points: "Delivery Points" means the points designated on "Exhibit I-C" where LCRA delivers or has the right to deliver Effluent and Raw Water to CCNG pursuant to this Agreement.

Effluent: "Effluent" means the treated wastewater effluent discharged from the Wastewater Treatment Plant or other treated wastewater effluent substantially the same as that discharged from LCRA's Wastewater Treatment Plant.

Effluent Transportation and Storage Facilities: "Effluent Transportation and Storage Facilities" means gravity sewer lines, manholes, lift stations, force mains, effluent holding tanks or ponds, and other facilities used to convey Effluent from the Wastewater Treatment Plant or Raw Water from the Raw Water Diversion Point to the Delivery Points or to store the Effluent

d Raw Water prior to delivery at the Delivery Points, including any future extensions or additions to LCRA's existing facilities.

Golf Course Envelope: "Golf Course Envelope" shall mean those portions of the CCNG Tract, generally depicted in "Exhibit I-D," which areas may be developed as a golf course and conveyed to a golf course operating company or otherwise used as open space, landscaped areas or for recreational purposes.

Irrigated Area: "Irrigated Area" means the irrigable areas located on the CCNG Tract's Golf Course Envelope that meet the requirements of the Permits.

Irrigation Easement: "Irrigation Easement" shall mean the easement for the disposal of effluent on the Golf Course Envelope or other areas of the CCNG Tract designated by CCNG.

Irrigation System: "Irrigation System" means the pumps, force mains, lines, pipes, irrigation pipe, sprinkler heads, control system and other related appurtenances for conveyance of Effluent and Raw Water from the Delivery Points to, and disposal of Effluent and Raw Water on, the Irrigated Area.

Permits: "Permits" means all permits, licenses, orders, other authorizations, and all regulations applicable to the discharge, disposal, or use of Effluent, and the construction, maintenance or operation of the Wastewater Treatment Facilities issued, adopted, or otherwise required by any governmental entity having jurisdiction.

Raw Water: "Raw Water" means the water diverted from Lake Austin or Lake Travis by LCRA.

Wastewater Treatment Facilities: "Wastewater Treatment Facilities" means LCRA's Collection System, Wastewater Treatment Plant, and Effluent Transportation and Storage Facilities, whether located on the CCNG Tract or elsewhere.

Wastewater Treatment Plant: "Wastewater Treatment Plant" means the plant and appurtenant facilities necessary to treat wastewater collected through LCRA's Collection System serving the CCNG Tract and other customers in the Bee Cave area.

## ARTICLE II

### Supply of Effluent for Irrigation Purposes

Section 1. Delivery of Effluent and Raw Water to CCNG. LCRA agrees to deliver at the Delivery Points Effluent from the Wastewater Treatment Facilities, provided that the amount of

Effluent delivered will not exceed 400,000 gallons per day ("gpd") averaged over a number of days as established in the Permits. CCNG agrees to receive all Effluent delivered at the Delivery Points provided that CCNG has no obligation to receive any amounts in excess of 400,000 gpd averaged over a number of days as established in the Permits, and further provided that CCNG's obligation to take any Effluent is subject to the conditions of this Agreement. Future additional Delivery Points may be agreed upon by the parties. LCRA shall be the sole owner of, have exclusive dominion and control over, and be solely responsible for the Effluent within its Wastewater Treatment Facilities until the Effluent reaches the Delivery Points.

Section 2. LCRA Obligations. Subject to the provisions described in this paragraph, LCRA agrees to provide Raw Water, Effluent, or a combination thereof in sufficient quantities as provided in this paragraph to irrigate the Irrigated Area for use as a golf course, landscaped areas, water features, and similar amenities. LCRA shall make available the following minimum amounts of Raw Water, Effluent or combination thereof: i) for the period of seeding turf on the Golf Course Envelope, not to extend more than three (3) years beyond the effective date of this Agreement, one million (1,000,000) gpd; and ii) thereafter, one million (1,000,000) gpd during the months of April to September and seven hundred thousand (700,000) gpd during the months of October to March. It is specifically provided, however, that LCRA's obligations to deliver Raw Water Effluent or a combination of Raw Water and Effluent pursuant to this Agreement shall be subject to the LCRA Water Management Plan and associated policies, rules and regulations heretofore or hereafter adopted by the LCRA Board of Directors, provided that CCNG shall be treated in the same manner as other similarly situated customers.

Section 3. Disposal of Effluent. Provided that the Effluent meets the standards required by the Permits, CCNG agrees to receive and dispose of the Effluent, whether or not combined with Raw Water, delivered by LCRA at the Delivery Points to the extent the Effluent can be disposed of by irrigation of the Irrigated Area and in accordance with the Permits. Provided that the Effluent meets the standards required by the Permits, title to, exclusive dominion and control over, and responsibility for the Raw Water, Effluent, or combination thereof, shall pass from LCRA to CCNG upon its passage through the Delivery Points.

Subject to the other provisions of this Agreement, CCNG agrees to use reasonable efforts to maximize its use of Effluent, whether or not combined with Raw Water, for irrigation purposes on the Irrigated Area so that LCRA fully complies with the Permits; provided, however, that CCNG shall not be obligated accept more effluent than that specified in Section 1



f this Agreement. CCNG further agrees to adopt such additional and further irrigation and disposal practices as may now or hereafter be required by the Permits consistent with its use of the Irrigated Area including that of a golf course. It is specifically provided, however, that CCNG shall not be required to dispose of Effluent by irrigation in violation of law, including any limits on the quantifies of Effluent which may be disposed of on the Irrigated Area under the Permits or otherwise, or if to do so would render the golf course unusable or unsuitable for its intended purpose.

Section 4. Effluent Ponds. LCRA and CCNG shall jointly approve the operation, location, size, design and appearance of the Effluent Storage Facilities including but not limited to the Effluent storage ponds, which shall conform to any applicable Permits and which may, at CCNG's discretion, be incorporated into the design of CCNG's golf course. The parties agree to design the Effluent Storage Facilities to accommodate storage as necessary to prevent the need for disposal of Effluent in a manner which would render the Golf Course Envelope unsuitable for playing golf or golf cart traffic or otherwise impair its operation as a year-round class A golf facility.

Section 5. Operation and Maintenance by LCRA. LCRA shall operate, maintain, repair and, as necessary, replace at its expense the Wastewater Treatment Facilities. CCNG shall immediately notify LCRA if it has reason to believe that the Effluent or the wastewater treatment operation does not meet the requirements of the Permits as to quality or quantity. Upon receipt of such notice, LCRA shall immediately determine whether the Effluent meets the requirements of the Permits, and, if not, shall expeditiously remedy said failure, or if the Effluent is not produced from LCRA's Wastewater Treatment Plant, shall cause the producer of such Effluent to remedy this failure.

Section 6. Operation and Maintenance by CCNG. CCNG or its agents, designees or assignees shall operate, maintain, repair and, as needed, replace the Irrigation System and the Irrigated Area at its expense.

Section 7. Operation of Irrigation System and Irrigated Area. As required by this Agreement, CCNG agrees to cooperate with LCRA and to use the Irrigation System and the Irrigated Area to receive sufficient Effluent from the Wastewater Treatment Facilities and apply such Effluent to the Irrigated Area so that the parties are in compliance with the terms and conditions of the Permits. CCNG shall operate the Irrigation System and the Irrigated Area in

accordance with the Permits and shall be responsible for such additional requirements, if any, including the construction, installation, and maintenance of signs, as may be required by law.

Section 8. Remedies. If either Party fails to comply with its obligations under this Agreement or fails to correct any deficiency in operation within twenty-four (24) hours after notification of such deficiency, the other Party shall have the right to request any court, agency or other governmental authority of appropriate jurisdiction to grant any and all remedies which are appropriate to assure conformance to the provisions of this Agreement. The defaulting Party shall be liable to the other for all costs actually incurred in pursuing such remedies, including attorneys fees, and for any penalties or fines as a result of the failure to comply with the terms.

Section 9. Regulation and Future Modifications. The parties recognize that the operation of the Wastewater Treatment Facilities and the disposal of the Effluent are subject to regulation by the Commission and other governmental entities. Accordingly, the parties agree that they will cooperate with each other as may be necessary to assure compliance with all terms and conditions of all existing Permits. LCRA and CCNG hereby recognize the agreement between CCNG and the City of Austin regarding effluent irrigation on the CCNG golf course, as attached as Exhibit 11.01(a) to the Utility Facilities Acquisition Agreement, and LCRA agrees to provide CCNG with any data within LCRA's custody or control pertaining to CCNG's obligations under that agreement. LCRA and CCNG agree to consult and cooperate with each other to assure compliance with the Permits and to assure that efficient wastewater service may be provided by LCRA while the golf course continues to be operated as a first class golf course. Nothing herein shall be construed to require CCNG to extend its irrigation system or to irrigate any areas other than the Irrigated Area. Should LCRA desire at a later time to irrigate the areas outside the Irrigated Area or the Golf Course Envelope, CCNG and LCRA shall negotiate in good faith with one another regarding such additional irrigation areas, provided, however, that CCNG shall not be required to accept more Effluent on the CCNG Tract than provided in Section 1 of this Agreement.

## ARTICLE III
### General

Section 1. Connection Fee. CCNG shall not be charged any connection fee by LCRA for the provision of Effluent or Raw Water under this Agreement.

Section 2. Rates for Service. LCRA shall not be charged any service fee by CCNG for CCNG's disposal of the Effluent (whether or not combined with Raw Water) on behalf of LCRA. LCRA may, by appropriate order or orders adopted from time to time by its Board of Directors, charge and collect a reasonable rate for the provision of Raw Water, Effluent or a combination thereof, to CCNG. The initial rate shall be $1.10 per 1,000 gallons of Raw Water, Effluent, or combination thereof, as measured at the Delivery Point (Raw Water and/or Effluent). Such rate shall be based on LCRA's capital costs and operation and maintenance costs incurred in providing same, provided that, for a period of ten (10) years, the rate shall not exceed $1.10 per 1,000 gallons of Raw Water, Effluent, or combination thereof except to account for i)increases in the standard rate set by the LCRA Board of Directors for firm, stored water at the Colorado River, which rate is currently set at 32 cents per 1,000 gallons, or ii) power charge increases or decreases of more than twenty percent (20%) from date of execution of this Agreement related to transportation of the Raw Water, Effluent, or combination thereof. If LCRA increases the rate after the ten-year period, then LCRA shall provide a cost of service analysis to CCNG annually and adjust the rates in accordance with that analysis. CCNG agrees that LCRA needs and has the right to vary the rate from time to time, subject to the limitations of this paragraph.

Section 3. Term. Unless terminated by mutual agreement of the Parties or their successors and assigns, this Agreement shall continue in force and effect for a period of forty (40) years from the date of its execution and may thereafter be continuously renewed in writing by mutual agreement of the parties.

Section 4. Force Majeure. In the event that either CCNG or LCRA is rendered unable, wholly or in part, to perform any of its obligations under this Agreement (by reason of failure or national moratorium of operation of the banks, transfer agents, brokers, stock exchanges or modes of transportation; or work stoppages or restraint by court order or other public authority; or action or inaction concerning governmental or regulatory authorizations; or transportation delay; or death or personal injury of a representative of either Party whose signature is necessary), upon the provision of written notice which fully relates the particulars of the claimed force majeure, including but not limited to the dates on which it commenced and ceased or is expected to cease by the Party claiming force majeure to the other Party as soon as is reasonably practicable after the occurrence of the cause relied upon, the obligations of the Party claiming force majeure, to the extent they are affected by the force majeure, shall be suspended during the continuance of any inability of performance so caused, but in no event for longer than sixty (60)

days. This Agreement shall not be terminated by reason of any such cause but shall remain in full force and effect. Either Party rendered unable to fulfill any of its obligations under this Agreement by reason of force majeure shall exercise the utmost diligence to remove such inability. The suspension of obligations of a Party to this Agreement pursuant to this Section shall be added to the time specified in other provisions of this Agreement for the purpose of calculating the date on which certain conditions of this Agreement are to be satisfied, but in no event shall such additional time extend the satisfaction of an obligation under this Agreement more than sixty (60) days.

Section 5. Modification. This Agreement shall be subject to change or modification only with the mutual written consent of CCNG and LCRA.

Section 6. Captions. The captions appearing at the first of each numbered section or paragraph in this Agreement are included solely for convenience and shall never be considered or given any effect in construing this Agreement.

Section 7. Severability. The provisions of this Agreement are severable, and if any provision or part of this Agreement shall ever be held by any court of competent jurisdiction to be invalid or unconstitutional for any reason, the remainder of this Agreement and the application of such provision or part of this Agreement to other persons or circumstances shall not be affected thereby.

Section 8. Cooperation. Each Party hereby agrees that it will take all actions necessary to fully carry out the purposes and intent of this Agreement.

Section 9. Addresses and Notice. All notices hereunder from CCNG to LCRA shall be sufficient if sent by certified mail or facsimile transmission, addressed to LCRA to the attention of the Manager of WaterCo at 3700 Lake Austin Boulevard, Austin, Texas 78703, (Facsimile: 512-473-3551); and all notices hereunder from LCRA to CCNG shall be sufficiently given if sent by certified mail or facsimile transmission to CCNG at 98 San Jacinto, Suite 1730, Austin, Texas 78701 (Facsimile: 512-476-6890) with copy to David Armbrust, Armbrust, Brown & Davis, 100 Congress Avenue, Suite 1300, Austin, Texas, 78701 (Facsimile: 512-435-2360) and all such notices shall be deemed to have been given on the date of mailing or sending of such notice. Either Party can change its address upon five (5) days written notice to the other Party.

Section 10. Assignability.

CCNG shall have the right to assign this Agreement in the event it sells or transfers all or a portion of the CCNG Tract or the Boothe Tract. In addition, CCNG shall have the right to

assign this Agreement to the owner or operator of any golf course on the CCNG or Boothe Tract. Provided, however, any such assignments under this section shall be effective only after notice to LCRA of the assignment and provided that the assignee agrees to assume and be bound by and perform any duties of CCNG under this Agreement with respect to the property being acquired by the assignee. LCRA may require the assignee to execute a reasonably appropriate document evidencing such assumption.

LCRA shall have the right to assign this Agreement in the event it sells or transfers all or an appropriate portion of the Wastewater Treatment Facilities to a transferee, provided, however, that any such assignments are effective only after notice to CCNG of the assignment and provided that the assignee agrees to assume and be bound by and perform any duties of LCRA under this Agreement with respect to the property being acquired by the assignee. CCNG may require the assignee to execute an appropriate document evidencing such assumption.

Section 11. Easement and Record. LCRA and CCNG shall execute and record in the real property records of Travis County, Texas an easement ("Irrigation Easement") in a form reasonably acceptable to the parties, which shall have attached a legal description of the Golf Course Envelope and which reflects both the rights and the obligations of the Parties to deliver and receive Effluent and Raw Water. The Parties agree to execute and record from time to time amendments to the Easement to evidence any changes in this Agreement.

Section 12. Lender Acknowledgment. CCNG agrees to obtain from any lender with a lien on or security interest in the Irrigation Easement or other property affected by this Agreement an appropriate acknowledgement of LCRA's rights and obligations.

Section 13. Extent of Agreement. This Agreement represents the entire agreement between CCNG and LCRA relating to raw water/effluent service and effluent disposal and irrigation and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Manager. Nothing contained in this Agreement is intended to benefit any third party.

IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be signed, sealed and attested in duplicate by their duly authorized officers, this the _19 TH_ day of _November_, 1999.

LOWER COLORADO RIVER AUTHORITY



By: _____
Joseph J. Beal
Manager, WaterCo.


CCNG DEVELOPMENT COMPANY, L.P.
CCNG, Inc, General Partner

By: _____
Daniel B. Porter
CEO and President


Approved as to form:

By: _____
David Armbrust
Armbrust, Brown & Davis
100 Congress Avenue, Suite 1300
Austin, Texas 78701
Counsel for CCNG Development Company, L.P.

# EXHIBIT I-A



**Exhibit I - A**

Description of Boothe Tract

# EXHIBIT I-B



**Exhibit I - B**

CCNG Tract and Land
That Can Be Added
to the CCNG Tract

CCNG Tract

Other Tracts

# EXHIBIT I-C



DELIVERY POINT
FOR RAW WATER

ELIVERY POINT
R EFFLUENT

LITTLE BARTON CREEK

S.H. 71

R.R. 2244

BARTON CREEK

N

750  50  0  750  1500
(SCALE IN FEET)

**mec**
Murfee Engineering Company

EXHIBIT I-C
DELIVERY POINTS FOR
RAW WATER & EFFLUENT

1101 South Capital of Texas Highway, Building D, Suite 110, Austin, Texas 78746 (512) 327-9204

# EXHIBIT I-D



**Exhibit D-1**

Golf Course Envelope

**EXHIBIT 16.16**

# MEMORANDUM OF AGREEMENT

This Memorandum of Agreement is filed by the CCNG Development Company, L.P., a limited partnership ("CCNG") and the Lower Colorado River Authority ("LCRA").

WHEREAS, CCNG and LCRA have heretofore entered into that certain "Utility Facilities Acquisition Agreement between Lower Colorado River Authority and CCNG Development Company, L.P." (the "Acquisition Agreement");

WHEREAS, the Acquisition Agreement provides for certain rights and duties of CCNG and LCRA regarding the construction and acquisition of water and wastewater utility infrastructure and provision of water and wastewater utility service to that certain real property situated in Travis County, Texas, as more particularly described on Exhibit A hereto (the "Property");

WHEREAS, the Acquisition Agreement provides that the parties are to record a memorandum of the Acquisition Agreement in the Real Property Records of Travis County, Texas, in order to provide notice to future owners of all or any portion of the Property of the existence of the Acquisition Agreement; NOW, THEREFORE,

CCNG and LCRA hereby notify the public and all future owners of all or any portion of the Property of the existence of the Acquisition Agreement. A copy of same may be obtained from either CCNG or LCRA.

CCNG DEVELOPMENT COMPANY, L.P.

Dated: 11.19.99

By: _____

Name: DANIEL B. PORTER

Title: PRESIDENT & CEO, CCNG, INC., GENERAL PARTNER

LOWER COLORADO RIVER AUTHORITY

Dated: 22 Nov 99

By: _____

Name: Joseph J. Beal

Title: Manager, WaterCo

1

STATE OF TEXAS       §

                           §

COUNTY OF TRAVIS     §

This instrument was acknowledged before me, on the _19th_ day of _November_, 1999, by _Daniel B. Porter_, _President & CEO of CNG_ of CCNG Development Company, L.P., a Texas limited partnership, on behalf of said limited partnership.

(SEAL)

Notary Public, State of Texas
Printed Name: _Nicole A. Morales_
My Commission Expires: _04-22-2002_

STATE OF TEXAS       §

                           §

COUNTY OF TRAVIS     §

This instrument was acknowledged before me, on the _22_ day of _November_ 1999, by Joseph J. Beal, P.E., Manager, WaterCo, Lower Colorado River Authority, a Texas conservation and reclamation district, on behalf of said district.

(SEAL)

Notary Public, State of Texas
Printed Name: _TAMMY HOFF_
My Commission Expires: _August 31, 2003_

2

EXHIBIT "A"

Property Description

TRACT ONE:
APPROXIMATELY 300.800 ACRES of land out of and a portion of the Jarrett Medlin Survey No. 520, the Fred C. Pecht Survey No. 38 and the H. Ottens Survey No. 55, situated in Travis County, Texas, and being a portion of the same tract of land more particularly described by metes and bounds in the deeds recorded in Volume 11141, Page 1308, Volume 11141, Page 1313, and Volume 11141, Page 1318, Real Property Records of Travis County, Texas

TRACT TWO - Parcel One:
Lots Seventeen (17), Eighteen (18), Nineteen (19), Twenty (20), Twenty-one (21), Twenty-two (22), Twenty-three (23), Twenty-four (24), Twenty-five (25), Twenty-six (26), Twenty-seven (27), Twenty-eight (28), Twenty-nine (29), Thirty (30), Thirty-one (31), Thirty-two (32), Thirty-three (33), Thirty-nine (39), Forty (40), Forty-two (42), Forty-three (43), Forty-four (44), Forty-five (45), Forty-six (46), Forty-seven (47), Forty-eight (48), Forty-nine (49), Fifty (50), Fifty-one (51), Fifty-two (52), Fifty-three (53) and Fifty-four (54), BARTON CREEK BLUFFS, SECTON ONE, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 79, Page 363, Plat Records of Travis County, Texas.

TRACT TWO Parcel Two:
Lots Thirty-four (34), Thirty-five (35), Thirty-six (36), Thirty-seven (37), Thirty-eight (38), Seventy-five (75), Seventy-six (76), Seventy-seven (77), Seventy-eight (78), Seventy-nine (79), Eighty (80), Eighty-one (81), Eighty-two (82), Eighty-three (83), Ninety (90), Ninety-one (91), and Ninety-four (94), BARTON CREEK BLUFFS, SECTION TWO, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 81, Page 186, Plat Records of Travis County, Texas.

TRACT TWO  Parcel Three:
Lots Forty-one (41), Fifty-five (55), Fifty-six (56), Fifty-seven (57), Fifty-eight (58), Fifty-nine (59), Sixty (60), Sixty-one (61), and Sixty-two (62), BARTON CREEK BLUFFS, SECTION THREE, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 81, Page 188, Plat Records of Travis County, Texas.

TRACT TWO Parcel Four:
Lots Sixty-five (65), Sixty-six (66), Sixty-seven (67), Sixty-eight (68), Sixty-nine (69), Seventy (70), Seventy-one (71), Seventy-two (72), Seventy-three (73), and Seventy-four (74), BARTON CREEK BLUFFS, SECTION FOUR, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 81, Page 191, Plat Records of Travis County, Texas.

TRACT TWO Parcel Five:
APPROXIMATELY 249.30 ACRES of land out of and a portion of the T.T.R.R. CO. SURVEY NO. 169, the I. & G.N.R.R. CO. SURVEY NO. 57 and the D. BOHLS SURVEY NO. 905 situated in Travis County, Texas and being a portion of the same property described by metes and bounds as Tract Five in Warranty Deed S recorded in Volume 11346, Page 1283, and corrected in Volume 11933, Page 1633, both in the Real Property Records of Travis County, Texas.

TRACT TWO Parcel Six:

APPROXIMATELY 7.354 ACRES of land out of and a portion of the MATTHEW WILLIAMS SURVEY NO. 901, situated in Trav. County, Texas, and being the same property described by metes and bounds as 7.354 acres of land, in Warranty Deed recorded in Volume 11346, Page 1283, and corrected by Volume 11933, Page .633, both in the Real Property Records of Travis County, Texas.

TRACT TWO Parcel Seven:

APPROXIMATELY 3.30 ACRES of land out of a portion of the S. S. JARBOE SURVEY NO. 498 and the D. BOHLS SURVEY NO. 905, situated in Travis County, Texas and being the same property described as 3.29 acres of land, in Warranty Deed recorded in Volume 11346, Page 1283 and corrected in Volume 11933, Page 1633, both in the Real Property Records of Travis County, Texas.

TRACT TWO Parcel Eight:

APPROXIMATELY 0.657 OF AN ACRE of land out of and a portion of the S. S. JARBOE SURVEY NO. 498 and the D. BOHLS SURVEY NO. 905, situated in Travis County, Texas and being the same property described by metes and bounds in Warranty Deed recorded in Volume 11346, Page 1283 and corrected in Volume 11933, Page 1633, both in the Real Property Records of Travis County, Texas.

Porter Tract

TRACT ONE: Being 230.92 acres, more or less, situated in Orran Wade Survey No. 540, Abstract No. 811; the Matthew William Survey No. 900, Abstract No. 823; the D. Bohls Survey No. 905, Abstract No. 129; the Tyler Tap R.R. Co. Survey No. 169, Abstract No. 2179; the I. & G.N.R.R. Co. Survey No. 57, Abstract No. 2109; the Fredrich C. Pecht Survey No. 68, Abstract No. 635; and the Jarrett Medlin Survey No. 520, Abstract No. 539, Travis County, Texas.

# INTERIM WASTEWATER SERVICE AGREEMENT

# CCNG DEVELOPMENT COMPANY, L.P.

This Interim Wastewater Service Agreement ("Interim Agreement") between the Lower Colorado River Authority, a conservation and reclamation district, ("LCRA") and CCNG Development Company, L.P., a Texas limited partnership ("CCNG") is made and entered into effective the 24th day of October, 2001.

## RECITALS

A.   The LCRA owns and operates the West Travis County Regional System ("WTC System") with the capacity to provide wastewater collection and treatment services to areas within the current service area, as depicted on the West Travis County Regional System Schedule for Rates, Fees, Charges and Terms and Conditions of Retail Treated Water and Wastewater Service ("WTC Wastewater Service Area"), in addition to some areas outside of the WTC Wastewater Service Area.

B.   CCNG seeks wastewater collection and treatment services to serve the Spanish Oaks Golf Course, which is located on approximately 983 acres of land in Travis County, Texas, known as the "CCNG Tract". Currently, the CCNG Tract is not included in the WTC Wastewater Service Area.

C.   The LCRA has acquired or will acquire certain water and wastewater facilities pursuant to the Utility Facilities Acquisition Agreement Between the Lower Colorado River Authority and CCNG dated November 19, 1999 ("Acquisition Agreement"), and is prepared to provide interim wastewater collection and treatment services for up to a maximum of five (5) living unit equivalents to CCNG.

D.   This Interim Agreement will be in effect to ensure that the LCRA provides wastewater services to the Spanish Oaks Golf Course on the CCNG Tract until such time as the WTC Wastewater Service Area is extended to include the CCNG Tract.

JMV

E.      At the time that the WTC Wastewater Service Area is expanded to include the CCNG Tract, this Interim Agreement will terminate and CCNG shall enter into a Retail Customer Service Agreement for wastewater service and shall be subject to the terms and conditions of the West Travis County Regional System Schedule for Rates, Fees, Charges and Terms and Conditions of Retail Treated Water and Wastewater Service, as amended ("WTC Rate Schedule").

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL COVENANTS HEREINAFTER SET FORTH AND OTHER GOOD AND VALUABLE CONSIDERATION, THE PARTIES HERETO AGREE AS FOLLOWS:

## AGREEMENT

## SECTION 1.0 GENERAL PROVISIONS OF THE SERVICE AGREEMENT

**Sec. 1.01.** Provision of Wastewater Collection and Treatment Services. The LCRA will provide wastewater collection and treatment services meeting the minimum standards of the Texas Natural Resources Conservation Commission to CCNG and CCNG will purchase, receive, and/or reserve service from the LCRA in accordance with this Service Agreement and any additional agreements between the LCRA and CCNG.

**Sec. 1.02.** Service Commitment. The LCRA will provide wastewater collection and treatment services for a maximum of five (5) living unit equivalents ("LUEs") to the Spanish Oaks Golf Course, for use at its clubhouse and maintenance facilities located on the CCNG Tract. If CCNG increases the number of LUEs to be served on the CCNG Tract, then CCNG and the LCRA must agree in writing to provide service to the additional LUEs, subject to the treatment capacity of the WTC Regional Wastewater System and the payment of all applicable fees.

**Sec. 1.03.** Term. The Service Agreement will continue in effect until the LCRA extends the WTC Wastewater Service Area to include the CCNG Tract. Upon termination of this Interim Agreement, CCNG shall execute a Retail Customer Service Agreement for the Spanish Oaks Golf Course with the LCRA, pursuant to the WTC Rate Schedule.

**Sec. 1.04.** Service Interruptions. The LCRA will make all reasonable efforts to prevent interruptions of service. If interruptions occur, the LCRA will re-establish service within the shortest practicable time. The LCRA will not be liable to CCNG or any third parties for interruption of service.

**Sec. 1.05.** Hold Harmless. BY ACCEPTING SERVICE, CCNGAGREES TO HOLD LCRA HARMLESS IN CONNECTION WITH CLAIMS, LIABILITY OR DAMAGES ARISING FROM THE:

(a)     CONSTRUCTION OF THE FACILITIES,
(b)     SERVICES PROVIDED,
(c)     SERVICE INTERRUPTIONS,
(d)     TAMPERING BY OTHERS, OR
(e)     FAILURES OF THE SYSTEM,

INCLUDING CLAIMS, LIABILITY OR DAMAGES ARISING FROM THE ALLEGED NEGLIGENCE OR STRICT LIABILITY OF THE LCRA, ITS OFFICERS, AGENTS, EMPLOYEES, OR CONTRACTORS.

## SECTION 2.0 CUSTOMER'S RESPONSIBILITIES

**Sec. 2.01.** Right of Access. CCNG hereby grants the LCRA and its agents the right of access to the premises of the Spanish Oaks Golf Course and other portions of the CCNG Tract on which facilities serving CCNG pursuant to this Interim Agreement are located at all reasonable times for the purpose of installing, inspecting, reading, or repairing wastewater lines, meters, or other components used in connection with its providing wastewater service, or for the purpose of removing its property and disconnecting service; provided, that such right of access shall be on the same terms specified for easements in the Acquisition Agreement between LCRA and CCNG. CCNG will grant to the LCRA any easements or right-of-way for the purpose of installing, maintaining, and operating such pipelines, meters, valves, and any other equipment that the LCRA deems necessary to extend or improve service for existing or future Customers.

**Sec. 2.02.** CCNG Maintenance and Ownership of Certain Equipment and Facilities. Pursuant to the Acquisition Agreement, the LCRA has acquired or will acquire the Wastewater Collection Facilities located on the CCNG Tract; however, the LCRA specifically will not acquire the customer-owned sewer service lines located on the individual lots of retail customers. CCNG will install and maintain any necessary sewer service lines from the point at which the sewer service line connects to the LCRA's Wastewater Collection Facilities ("Point of Collection") to the primary location where sewage is generated ("Point of Use") at its own expense. In addition, CCNG will install and maintain at its own expense any backflow prevention devices, clean-outs, and other equipment as may be required by the LCRA.

**Sec. 2.03.** Quality of Wastewater Discharge and Pretreatment. CCNG agrees to comply with the following requirements regarding pretreatment and the quality of wastewater discharged into the system:

(a)     Discharges into the System shall consist only of wastewater and other waste free from the prohibited constituents listed in subsection (b) and limited in BOD, Suspended Solids, dissolved sulfides, and pH as hereinafter provided.

(b)     Gasoline; cleaning solvents; non emulsified oils and greases; mineral oils, ashes; cinders; sand; gravel; tar, asphalt; ceramic wastes; plastics; other viscous

substances; feathers; hair; rags; metal; metal filings; glass; wood shavings; sawdust; unshredded garbage; pesticides; toxic, corrosive, explosive or malodorous gases; acetylene generation sludge; cyanide or cyanogen compounds capable of liberating hydrocyanic gas on acidification in excess of 2 mg/l by weight as CN; radioactive materials which will permit a transient concentration higher than 100 microcuries per liter; emulsified oil and grease, exclusive of soaps, exceeding on analysis an average of 100 mg/l of ether-soluble matter; acids or alkalis having a pH value lower than 6.0 or higher than 10.0; pesticides; Hazardous Waste, as defined by 40 CFR Part 261 and Chapter 361, Texas Health and Safety Code (the Texas Solid Waste Disposal Act); and wastewater containing specific pollutant concentrations in excess of any of the numerical limitations named hereunder are prohibited from discharge to the WTC System:

| Maximum Allowable Pollutant | Concentration (ug/l) |
|---|---|
| Arsenic | 100 |
| Barium | 1,000 |
| Cadmium | 100 |
| Chromium | 1,000 |
| Copper | 1,500 |
| Lead | 1,000 |
| Manganese | 1,500 |
| Mercury | 5 |
| Nickel | 1,000 |
| Selenium | 50 |
| Silver | 100 |
| Zinc | 2,000 |
| Total Toxic Organics | 1,000 |

(c) The Biochemical Oxygen Demand (BOD) of wastewater delivered to the WTC System as determined by a Standard methods grab sample shall not exceed 400 mg/l.

(d) Total Suspended Solids delivered to the WTC System, as determined by a Standard Methods grab sample, shall not exceed 400 mg/l.

(e) The pH of wastewater delivered to the WTC System shall not be lower than 6 nor higher than 10. No acids shall be discharged into the WTC System unless neutralized to a pH of 6 or more.

(f) Dissolved sulfides in wastewater at the point of delivery to the WTC System shall not exceed 1.0 mg/l.

(g) To determine the quality of wastewater, the LCRA may collect samples of any of CCNG's wastewater discharges and cause same to be analyzed in accordance with Standard Methods. Samples will be taken at intervals determined by the LCRA as necessary to determine wastewater quality. Concentrations in the wastewater of the constituents shown in the following table shall not exceed the

values shown in the "Two Months Out of Three" column during any two out of three consecutive months and shall never exceed the values shown in the "Not to Exceed" column, unless provided otherwise in a separate agreement between CCNG and the LCRA.

| | Two Months Out of Three | Not to Exceed |
|---|---|---|
| BOD | 200 mg/l | 400 mg/l |
| TSS | 200 mg/l | 400 mg/l |
| Dissolved Sulfide | 0.1 mg/l | 1.0 mg/l |

(h)    Should the analysis disclose concentrations higher than those listed in Subsections (a), (b), (c), (d), (e), (f), or (g), above, the LCRA will inform CCNG of the violation and such discharges shall cease immediately. However, with the approval of the LCRA, wastewater with concentrations of BOD and TSS greater than specified above may be discharged by CCNG into the WTC System on an emergency and temporary basis, subject to the payment of a surcharge (in addition to all other payments required by this Interim Agreement), which surcharge shall be determined by the LCRA and shall be in an amount sufficient to cover and pay for all additional actual costs incurred for the transportation, treatment, and disposal related to such discharges.

(i)    Notwithstanding the foregoing provisions of this Section, federal and state regulatory agencies periodically modify standards on prohibited discharges; therefore, revisions to, additions to, or deletions from the items listed in this Section may become necessary in the future to comply with these latest standards.

**Sec. 2.04.** Requirement for Pretreatment

(a)    If discharges or proposed discharges to the WTC System may deleteriously affect wastewater facilities, processes, equipment or receiving waters; create a hazard to life or health; or create a public nuisance, CCNG shall pretreat to an acceptable condition prior to discharge to the WTC System. The LCRA may require CCNG to perform engineering studies to demonstrate that the proposed pretreatment method will be effective in eliminating the deleterious effects of the discharge. The entire cost of pretreatment, including sampling and testing performed by the LCRA to insure compliance with pretreatment requirements, shall be borne by CCNG.

(b)    Wastewater discharges requiring pretreatment include:

  (1)    wastewater containing fat, grease or oil in excessive amounts;

  (2)    wastewater containing sand or grit in excessive amounts; and

  (3)    any other wastewater determined by the LCRA to require pretreatment.

(c)    If it is determined by the LCRA that CCNG must implement pretreatment, then CCNG shall, at CCNG's expense and as required by the LCRA, provide

equipment and facilities of a type and capacity as deemed necessary by the LCRA. The pretreatment equipment shall be located in a manner that provides ready and easy accessibility for cleaning and inspection. The pretreatment facility shall be maintained in effective operating condition.

## SECTION 3.0 METERS, RATES, AND BILLING

**Sec. 3.01.** Meters.

(a)     All wastewater collected by the LCRA will be billed based on meter measurements of CCNG's current water usage. The LCRA will provide, install, own, and maintain meters up to five-eighths (5/8") inch meters to measure amounts of water consumed by CCNG. Any meters larger than a five-eighths inch (5/8") meter must be purchased by CCNG.

(b)     Service meters will be read at monthly intervals and as nearly as possible on the corresponding day of each monthly meter reading period.

(c)     Upon the request of CCNG, the LCRA will make one test of the accuracy of CCNG's meters without any additional charge. For each additional test, the LCRA will charge a meter testing fee of $50.00. Following the completion of any requested test, the LCRA will promptly advise CCNG of the date of removal of the meter, the date of the test, the result of the test, and who made the test. If CCNG's meter is found to be inaccurate, the LCRA will adjust CCNG's bill according to the test results for the previous month.

(d)     The water meter connection and wastewater connection is for the sole use of CCNG. Any attempt to transfer wastewater service from one property to another is prohibited unless approved in advance by the LCRA. If property with more than one dwelling and a single connection is to be subdivided, any owner of the subdivided property who wishes to continue wastewater services must obtain a connection to serve that individual property. The owner of the subdivided property must convey all easements necessary to provide wastewater services to the property.

**Sec. 3.02.** Rates. The rate charged to CCNG will be the monthly minimum charge per living unit equivalent of $35.00 per month and the flow charge of $4.80 per 1,000 gallons.

**Sec. 3.03.** Deposit.

(a)     CCNG must pay a deposit to LCRA in the following amount before service shall be provided by the LCRA:

|  |  |
|---|---|
| 5/8" or 3/4" meter | $75.00 |
| 1" meter | $200.00 |

|            |            |
|------------|------------|
| 1 ½" meter | $375.00    |
| 2" meter   | $600.00    |
| 3" meter   | $1,200.00  |
| 4" meter   | $1,800.00  |

(b)   If service is not connected, or after disconnection of service, the LCRA will promptly refund CCNG's deposit, if any and without interest, in excess of the unpaid bills for service furnished.

(c)   Deposits will be held until CCNG maintains service for 12 consecutive months without having been delinquent in payment or disconnected for non-payment.

**Sec. 3.04.** Fees. CCNG will be responsible for the payment of the following fees:

(a)   Inspection Fee:          $50.00 per inspection

(b)   Tap Fee:                 $600.00

(c)   Connection Fee:          $2,500 per LUE

Those fees to be paid per number of LUEs will be based on the following meter to LUE equivalency table:

| METER TYPE | METER SIZE | Number of LUEs |
|------------|------------|----------------|
| SIMPLE     | 5/8"       | 1.0            |
| SIMPLE     | 3/4"       | 1.5            |
| SIMPLE     | 1"         | 2.5            |
| SIMPLE     | 1 1/2"     | 5.0            |
| SIMPLE     | 2"         | 8.0            |
| COMPOUND   | 2"         | 8.0            |
| TURBINE    | 2"         | 10.0           |
| COMPOUND   | 3"         | 16.0           |
| TURBINE    | 3"         | 24.0           |
| COMPOUND   | 4"         | 25.0           |
| TURBINE    | 4"         | 42.0           |
| COMPOUND   | 6"         | 50.0           |
| TURBINE    | 6"         | 92.0           |
| COMPOUND   | 8"         | 80.0           |
| TURBINE    | 8"         | 160.0          |
| COMPOUND   | 10"        | 115.0          |
| TURBINE    | 10"        | 250.0          |
| TURBINE    | 12"        | 330.0          |

As additional LUEs are added to the CCNG Tract, CCNG will be responsible for the additional connection fees. Any transfer of service from one Point of Use to another will require the payment of a tap fee; however, the connection fee will not apply unless additional LUEs are added.

(d)     **Village of Bee Cave Remittance.** CCNG will be charged a sum equivalent to five per cent (5%) of the charges in Section 3.02 in the event LCRA is required to remit the same amount to the Village of Bee Cave.

(e)     **Regulatory Assessment.** LCRA shall collect from CCNG in the monthly bills a regulatory assessment fee equal to the regulatory charge imposed by the TNRCC for water and sewer utility services, as applicable. The regulatory charge is currently set at one-half of one percent of the monthly charges for retail water and/or sewer service.

**Sec. 3.05.** Late Fees. The LCRA will charge a late payment fee equal to ten percent (10%) of the past due charges or $5, whichever is greater.

**Sec. 3.06.** Billing. Bills for wastewater service will be sent monthly. The due date of bills will be stated on the invoice. Payment for service will be considered late if full payment, including late fees, etc., is not received at the LCRA or the LCRA's authorized payment agency by the due date. If the due date falls on a holiday or weekend, the due date for payment purposes will be the next workday after the due date. In the event of a dispute between CCNG and the LCRA regarding any bill for service, the LCRA will conduct an investigation and report the results to CCNG.

## SECTION 4.0 – MISCELLANEOUS

**Sec. 4.01.** Remedies. In the event that either CCNG or the LCRA fails or refuses to timely comply with its obligations under this Interim Agreement or fails to correct any deficiency in operation within seventy- two (72) hours after notification of such deficiency, the other party shall have the following remedies:

(a)     to enforce this Interim Agreement by writ of mandamus, specific performance, injunction, or any other remedy available in equity in a court of competent jurisdiction; or

(b)     to terminate this Interim Agreement.

The defaulting party shall be liable to the other for all costs actually incurred in pursuing such remedies, including attorney's fees, and for any penalties or fines as a result of the failure to comply with the terms.

**Sec. 4.02.** Assignability. CCNG has the right to assign this Interim Agreement in the event of the sale or transfer of all or part of the CCNG Tract, provided, however, any such assignments are effective only after notice to the LCRA of the assignment and provided that the assignee agrees to assume and be bound by and perform any duties of CCNG under this Interim Agreement.

**Sec. 4.03.** Notices. All notices sent to the LCRA must be sent via certified mail or with facsimile transmission with confirmation of delivery, addressed to the LCRA attention Randy Goss, Executive Manager of Water and Wastewater Utility Services, P.O. Box 220 MS H200, Austin, Texas, 78767-0220 with a copy to Leigh Sebastian, Associate General Counsel, P.O. Box 220 MS H424, Austin, Texas, 78767-0220. All notices sent to CCNG must be sent via certified mail or with facsimile transmission with confirmation of delivery to CCNG at 13453 Highway 71 West, Bee Cave, Texas 78738, with a copy to David Armbrust, Armbrust, Brown, & Davis, L.L.P., 100 Congress Avenue, Suite 1300, Austin, Texas 78701. All such notices will be deemed to have been given on the days of mailing or sending of such notice.

**Sec. 4.04.** Severability. In the event that any of the terms or conditions of this Interim Agreement, or the application of any such term or condition, shall be held invalid as to any person or circumstances by any court of appropriate jurisdiction, the remainder of such Interim Agreement, and the application of its terms and conditions to either party shall not be affected thereby.

**Sec. 4.05.** Headings. Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Interim Agreement.

**Sec. 4.06.** Governing Law and Forum. THIS INTERIM AGREEMENT SHALL BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS AND THE OBLIGATIONS OF THE PARTIES HERETO ARE AND SHALL BE PERFORMABLE IN THE COUNTY WHEREIN THE PROPERTY IS LOCATED. BY EXECUTING THIS AGREEMENT, EACH PARTY HERETO EXPRESSLY (a) CONSENTS AND SUBMITS TO PERSONAL JURISDICTION AND VENUE CONSISTENT WITH THE PREVIOUS SENTENCE, (b) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL CLAIMS AND DEFENSES THAT SUCH JURISDICTION AND VENUE ARE NOT PROPER OR CONVENIENT, AND (c) CONSENTS TO THE SERVICE OF PROCESS IN ANY MANNER AUTHORIZED BY TEXAS LAW.

**Sec. 4.07.** No Oral Modification. This Interim Agreement may not be modified or amended, except by an agreement in writing signed by both the LCRA and CCNG.

**Sec. 4.08.** No Oral Waiver. The parties may waive any of the conditions contained herein or any of the obligations of the other party hereunder, but any such waiver shall be effective only if in writing and signed by the party waiving such conditions or obligations.

**Sec. 4.09.** Time of Essence. Time is of the essence of this Interim Agreement.

**Sec. 4.10.** No Modification of Acquisition Agreement. This Interim Agreement does not modify or amend the Acquisition Agreement, and in the event of any conflict between this Interim Agreement and the Acquisition Agreement, the terms of the Acquisition Agreement shall control.

**Sec. 4.11.** Counterpart Execution. To facilitate execution, this Interim Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Interim Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto.

**Sec. 4.12.** Effective Date. The Effective Date of this Interim Agreement shall be the date set forth on the first page hereof.

## SECTION 5.0– DEFINITIONS

The following terms and expressions as used in this Interim Agreement shall have the following meanings, unless the context clearly shows otherwise.

"Acquisition Agreement" means the Utility Facilities Acquisition Agreement between the Lower Colorado River Authority and CCNG Development Company, L.P. dated November 19, 1999.

"BOD" (denoting Biochemical Oxygen Demand) means the quantity of oxygen utilized in the biochemical oxidation of organic matter under standard laboratory procedure in five (5) days at 20 degrees Centigrade, expressed in terms of weight and concentration (pounds per day [lbs./day] and/or milligrams per liter [mg/l], respectively).

"Building Sewer" (also called house lateral or house connection) means the extension from the building drain to the public sewer or other place of disposal.

"CCNG" means the CCNG Development Company, L.P., a Texas limited partnership.

"CCNG Tract" means approximately 983 acres of land in Travis County, Texas.

"Garbage" means solid wastes from the preparation, cooking, and dispensing of food, and from handling, storage and sale of produce.

"Grease" means fats, waxes, oils, and other similar nonvolatile materials in wastewater, which are extracted by Freon from an acidified sample using the Partition-Gravimetric method.

"Infiltration Water" means water that has migrated from the ground into the wastewater collection system.

"Lower Colorado River Authority" ("LCRA") means the political subdivision owning and operating the system, or its designated contractor.

"LUE" means a living unit equivalent.

"pH" means the common logarithm of the reciprocal of the weight of hydrogen ions in grams per liter of solution.

"Point of Collection" means the point at which the wastewater service lateral, or sewer service line, connects to the Wastewater Collection Facilities.

"Point of Use" means the primary location where water is used or sewage is generated.

'Properly Shredded Garbage" means garbage that has been shredded to such degree that all particles will be carried freely under the flow conditions normally prevailing in public sewers with no particle greater than ½ inch in any dimension.

"Sewage or Wastewater" means sewage, industrial waste, municipal waste, recreational waste, and agricultural waste, as defined in Chapter 26, Texas Water Code, together with properly shredded garbage and such infiltration water that may be present.

"Sewage Treatment Plant or Wastewater Treatment Plant" means the facility devices and structures used for receiving and treating wastewater from the sanitary sewer system.

"Sewer Service Line" (also called house lateral, service lateral, or building sewer) means the extension from the building drain to the public sewer or other place of disposal.

"Standard Methods" means the latest edition of Standard Methods for the Examination of Water and Wastewater, a joint publication of the Water Environment Federation, the American Water Works Association and the American Public Health Association.

"Suspended Solids" means solids that either float on the surface or are in suspension in water, sewage, or other liquids, and which are removable by laboratory filtering, expressed in milligrams per liter.

"Wastewater Collection Facilities" is given the same definition as that in the Acquisition Agreement: the collection lines and related equipment and improvements necessary for LCRA to collect and convey wastewater from the customer-owned sewer service lines to the regional wastewater interceptor. The term shall not include customer-owned sewer service lines located on individual lots of retail customers. .

"Wastewater Service Area" means the area for wastewater service described and/or depicted in Appendix A of the West Travis County Regional System Schedule for Rates, Fees, Charges and Terms and Conditions of Retail Treated Water and Wastewater Service, as amended.

"WTC Rate Schedule" is the West Travis County Regional System Schedule for Rates, Fees, Charges and Terms and Conditions of Retail Treated Water and Wastewater Service, as amended.

"WTC System" means the West Travis County Regional System, including the Water Service and Wastewater Service areas depicted in Appendix A of the West Travis County Regional System Schedule for Rates, Fees, Charges and Terms and Conditions of Retail Treated Water and Wastewater Service, as amended.

CCNG DEVELOPMENT COMPANY, L.P.
By its General Partner, CCNG Realty, Inc.

By: _____
JOHN MATTHEW Matt Whelan III
Vice President of CCNG Realty, Inc.


LOWER COLORADO RIVER AUTHORITY

By: _____
Randy J. Goss, P.E.
Executive Manager, Water and Wastewater
Utility Services

# EXHIBIT 2

**Present:**

Larry Fox, President
Ray Whisenant, Secretary/Treasurer
Scott Roberts, Director
Bill Goodwin, Director

**Consultants:**

Don Rauschuber, Agency General Manager
Curtis Wilson, District Engineer
Stefanie Albright (Lloyd Gosselink Rochelle & Townsend, P.C.), Agency General Counsel
David Klein (Lloyd Gosselink Rochelle & Townsend, P.C.), Agency General Counsel
Dennis Lozano (Murfee Engineering Company, Inc.), Agency Engineer
Autumn Phillips (Municipal Accounts & Consulting, LP), Agency Bookkeeper
Nelisa Heddin (Nelisa Heddin Consulting, LLC), Agency Financial Advisor

## I.  CALL TO ORDER

Director Fox called the meeting to order at 9:05 a.m.

## II.  ESTABLISH A QUORUM

A quorum was established with Directors Fox, Whisenant, Roberts and Goodwin present. Director Murphy was absent from the meeting. Also present were the above-referenced consultants.

## III.  PUBLIC COMMENT

Ms. Judy Jeffrey, Lake Pointe resident, addressed the Board regarding recent odor issues in Lake Pointe. She asked the Board for help resolving the ongoing odor problems in Lake Pointe.

## IV.  CONSENT AGENDA

    **A. Approve minutes of the March 6, 2014 Special Board of Directors Meeting and the March 20, 2014 Board of Directors meeting. (See Exhibit A)**

1

4417191.3

**MOTION:** Motion was made by Director Goodwin and seconded by Director Whisenant to approve the minutes of the March 6, 2014 Special Board Meeting and the March 20, 2014 Board Meeting.

The vote was taken with the following result:

Voting Aye: Directors Fox, Whisenant, Roberts, and Goodwin
Voting Nay: None
Absent: Director Murphy

**B. Approve bookkeepers report, payment of outstanding invoices, and other related bookkeeping matters. (See Exhibit B)**

Ms. Autumn Phillips presented the bookkeepers report to the Board. Director Roberts asked why there was money in the Bank of Houston. Ms. Phillips replied that with CD's they look for the most competitive interest rates. Director Roberts requested that priority be given to local banks.

**MOTION:** Motion was made by Director Whisenant and seconded by Director Roberts to approve the bookkeepers report as presented by staff.

The vote was taken with the following result:

Voting Aye: Directors Fox, Whisenant, Roberts, and Goodwin
Voting Nay: None
Absent: Director Murphy

**C. Fire Hydrant Meter Requests, including:**

1. **Cash Construction Company (12-in force main project);**
2. **Ranger Excavation (Belvedere Section VII); and**
3. **CC Carlton Industries (Belvedere Section VII)**

Mr. Don Rauschuber presented the fire hydrant meter variance requests to the Board. **(See Exhibit C)** He recommended approval of all requests and noted that there is no landscape watering allowed.

**MOTION:** Motion was made by Director Whisenant and seconded by Director Goodwin to approve the fire hydrant meter variance requests as presented.

The vote was taken with the following result:

Voting Aye: Directors Fox, Roberts, Whisenant, and Goodwin.

2

4417191.3

Voting Nay: None
Absent: Director Murphy

## V. OPERATOR'S REPORT

**A. Discuss, consider and take action on report from Severn Trent Environmental Services, Inc. regarding water and wastewater system operations, maintenance and billing.**

Mr. Mark Steelman presented the Operator's Report to the Board **(See Exhibit D)**. Mr. Steelman answered questions from the Board regarding the odor issues at Lake Pointe.

## VI. ENGINEER'S REPORT

**Discuss, consider and take action on reports from Agency Engineering Representatives, including:**

**A. Bohls Tract 0.325 MGD Wastewater Treatment Plant (Pay Estimate No. 9).**

Mr. Lozano presented Pay Estimate No. 9 **(See Exhibit E)** in the amount of $436,579.15 and recommended approval for payment.

**MOTION:** Motion was made by Director Goodwin and seconded by Director Whisenant to approve Pay Estimate No. 9 as presented by Mr. Lozano.

The vote was taken with the following result:

Voting Aye: Directors Fox, Whisenant, Roberts, and Goodwin
Voting Nay: None
Absent: Director Murphy

**B. Wastewater Force Main—Lift Station 14 to Bohls Wastewater Treatment Plant.**

Mr. Lozano gave an update on the Force Main Project. He provided a contractor schedule **(See Exhibit F)** with the plan for initial operation to begin approximately July 27, 2014.

**C. Lake Pointe Wastewater Treatment Plant**

**1. Plant No. 2 Clarifier Replacement and Repair (The Wallace Group Task Order No. 6); and**
**2. Filter Replacement and Metering Improvements Project (Change Order No. 1 and Change Order No. 2).**

3

4417191.3

**MOTION:** Motion was made by Director Whisenant and seconded by Director Goodwin to approve the Wallace Group Task Order No. 6 **(See Exhibit G)** regarding clarifier replacement and repair as presented by staff.

The vote was taken with the following result:

Voting Aye: Directors Fox, Whisenant, Roberts, and Goodwin
Voting Nay: None
Absent: Director Murphy

Mr. Dennis Lozano presented the Filter Replacement and Metering Improvements Project change orders **(See Exhibit H)**. He explained that Change Order No. 1 was a reduction of $36,924.00 and Change Order No. 2 was an additional $5,044.00. Director Whisenant asked what the purpose of the project was, and Mr. Lozano explained that this will provide filtration redundancy and revise the way effluent is metered. Overall this project will provide replacement of facilities, compliance and improvement.

**MOTION:** Motion was made by Director Goodwin and seconded by Director Whisenant to approve Change Order No. 1 and Change Order No. 2 as presented by staff.

The vote was taken with the following result:

Voting Aye: Directors Fox, Whisenant, Roberts, and Goodwin
Voting Nay: None
Absent: Director Murphy

**D. Vapex Odor Treatment Project (Pay Estimate No. 3 and Final).**

Mr. Lozano presented Pay Estimate No. 3 **(See Exhibit I)** for $1,861.52 which is a release of the retainer for this project.

**MOTION:** Motion was made by Director Whisenant and seconded by Director Roberts to approve Pay Estimate No. 3.

The vote was taken with the following result:

Voting Aye: Directors Fox, Roberts, Whisenant and Goodwin
Voting Nay: None
Absent: Director Murphy

4

4417191.3

**E. SH71 Relocations for TxDOT-Phase I (Pay Estimate No. 3 and Final).**

Mr. Lozano presented Pay Estimate No. 3 for the TxDOT-Phase I project for the SH71 waterline relocation **(See Exhibit J)** in the amount of $3,507.85.

> **MOTION:** Motion was made by Director Whisenant and seconded by Director Roberts to approve Pay Estimate No. 3 as presented by staff.
>
> The vote was taken with the following result:
>
> Voting Aye: Directors Fox, Roberts, Whisenant and Goodwin
> Voting Nay: None
> Absent: Director Murphy

**F. US290 at Spring Valley Relocations for Travis County (Bid Tabulation and Recommendation of Award).**

Mr. Lozano presented this item **(See Exhibit K)**. He recommended awarding the contract to the second lowest bidder, DeNucci Constructors for $290,998.00, due to the fact that the lowest bidder was subcontracting a significant percentage of the work and the subcontractor had not demonstrated experience working on this size of pipe.

> **MOTION:** Motion was made by Director Goodwin and seconded by Director Whisenant to award the bid to DeNucci Constructors **(See Exhibit K)**.
>
> The vote was taken with the following result:
>
> Voting Aye: Directors Fox, Roberts, Whisenant and Goodwin
> Voting Nay: None
> Absent: Director Murphy

**G. Presentation on Raw Water Line Preliminary Engineering Report.**

Mr. Lozano presented this report **(See Exhibit L)** to the Board for guidance in moving forward on this project. Director Fox asked for a map showing contours and elevation. The Board discussed the timing and expense of this project. No action was taken on this item.

**VII. OLD BUSINESS**

> **A. Discuss, consider and take action regarding** *CCNG Development Co., L.P. v West Travis County Public Utility Agency and Lower Colorado River Authority; in the 345th Judicial District Court, Travis County, Texas; Cause No. D-1-GN-14-000163.*

5

4417191.3

This item was discussed in Executive Session (see below). No action was taken.

**B. Discuss, consider and take action regarding** *Petition of Travis County Municipal Utility District No. 12 Appealing Change of Wholesale Water Rates Implemented by West Travis County Public Utility Agency, City of Bee Cave, Texas, Hays County, Texas and West Travis County Municipal Utility District No. 5.*

This item was discussed in Executive Session (see below). No action was taken.

**C. Discuss, consider and take regarding possible legislative efforts in the 2015 Legislative Session, including:**

      **1. Drafting and filing of Agency legislation; and**
      **2. Engagement of Diverse Planning and Development.**

Mr. Ariel Axelrod addressed the Board and urged them to address current customer issues and table legislative efforts.

Mr. Don Rauschuber presented the engagement letter from Diverse Planning and Development to the Board **(See Exhibit M)**. He requested approval of Phase I at $50,000.

> **MOTION:** Motion was made by Director Fox and seconded by Director Roberts to engage Diverse Planning and Development for the 2015 legislative session.
>
> The vote was taken with the following result:
>
> Voting Aye: Directors Fox, Roberts, and Goodwin
> Voting Nay: None
> Absent: Director Murphy
> Abstained: Director Whisenant

Mr. Rauschuber noted that the engagement of Diverse Planning and Development was not to exceed $50,000 for Phase I.

**D. Discuss, consider and take action regarding extension of Water Reservation for Cedar Valley Investments, LLC.**

Mr. Rauschuber presented the extension of Water Reservation for Cedar Valley Investments **(See Exhibit N)**.

4417191.3

**MOTION:** Motion was made by Director Whisenant and seconded by Director Goodwin to approve the extension the Water Reservation for 10 LUEs to Cedar Valley Investments.

The vote was taken with the following result:

Voting Aye: Directors Fox, Roberts, Whisenant and Goodwin
Voting Nay: None
Absent: Director Murphy

Director Roberts confirmed that Cedar Valley Investments will be subject to Optional Enhanced Measures.

## VIII.    NEW BUSINESS

**A. Discuss, consider and take action on requests for preliminary finding of capacity to serve ("PFCS") or non-standard service agreements ("NSSA"), including:**

1. **CCNG (Office Expansion) (NSSA); and**
2. **Parten Ranch (PFCS).**

Mr. Rauschuber recommended discussing the Non-Standard Service Agreement for CCNG in Executive Session if there were legal questions.

Mr. Curtis Wilson presented the Preliminary Finding of Capacity to Serve for Parten Ranch (**See Exhibit O**) for 580 LUEs. Mr. Wilson stated that all LUEs were in the Agency's service area, and partially within the Agency's water CCN.

Mr. John Clark, LJA Engineering, addressed the Board and explained that this project was 541 acres and would have 575 lots. They are proposing less than 20% impervious cover and USFWS buffers, but there will be concentrated areas with 20% impervious cover which will meet the Optional Enhanced Measures.

**MOTION:** Motion was made by Director Roberts aand seconded by Director Whisenant to approve the Preliminary Finding of Capacity to Serve for Parten Ranch as presented by staff.

The vote was taken with the following result:

Voting Aye: Directors Fox, Roberts, Whisenant and Goodwin
Voting Nay: None
Absent: Director Murphy

7

4417191.3

**B. Discuss, consider and take action to consider policy regarding customer accounts, including:**

      1.      Hardship requests for service; and
      2.      Refunds of customer deposits after one year.

Mr. Rauschuber presented the requests for hardship provisions. He explained that he received a call from Senator Frasier's office regarding a customer with a financial hardship wanting to move from a well to PUA water. Mr. Rauschuber explained to the Board that the tariff provides for payment agreements for monthly bills but not for Impact Fees. The Board discussed the issue and asked Mr. Rauschuber to bring back a resolution regarding the hardship requests.

Mr. Rauschuber recommended to the Board to modify the tariff to refund customer deposits after one year if the customer is in good standing.

> **MOTION:** Motion was made by Director Roberts and seconded by Director Whisenant to refund customer deposits after one year if customer is in good standing, and require that the customer be required to submit a new deposit if the customer no longer became in good standing.
>
> The vote was taken with the following result:
>
> Voting Aye: Directors Fox, Goodwin, Roberts and Whisenant
> Voting Nay: None
> Absent: Director Murphy

**C. Discuss, consider and take action on approval of Second Amendment to the Water Utility Facilities Acquisition Construction and Service Agreement with Lazy Nine Municipal Utility District No. 1.**

This item was discussed in Executive Session (see below). No action was taken.

**D. Discuss, consider and take action regarding amendment to Barton Creek West Wholesale Agreement.**

Mr. Rauschuber presented the amendment to Barton Creek West Wholesale Agreement and recommended approval **(See Exhibit P)**. This amendment is based on the form wholesale amendment presented to the Wholesale Customer Committee. The Barton Creek West WSC has asked for a retroactive effective date to January 1, 2014 to allow the rates to reflect the lower reserved capacity. Mr. Rauschuber recommended an approval of January 1, 2014 effective date.

8

4417191.3

**MOTION:** Motion was made by Director Goodwin and seconded by Director Whisenant to approve the Barton Creek West Wholesale Agreement, with an effective date of January 1, 2014.

The vote was taken with the following result:

Voting Aye: Directors Fox, Roberts, Goodwin and Whisenant
Voting Nay: None
Absent: Director Murphy

**E. Discuss, consider and take action regarding website updates.**

Director Goodwin explained that he would like to include the Board members contact information on the PUA website.

**F. Discuss, consider and take action on engagement letter with Nelisa Heddin Consulting, LLC for the performance of a cost of service and rate design study for 2015.**

Mr. Don Rauschuber presented an engagement letter for a rate study for 2015 to be done by Nelisa Heddin Consulting, LLC **(See Exhibit Q)** for $38,000.

**MOTION:** Motion was made by Director Whisenant and seconded by Director Roberts to approve the engagement letter **(See Exhibit Q)** with Nelisa Heddin Consulting, LLC for a rate design study.

The vote was taken with the following result:

Voting Aye: Directors Fox, Roberts, Goodwin and Whisenant
Voting Nay: None
Absent: Director Murphy

**G. Receive Request for Qualifications presentations from Severn Trent Environmental Services, Inc. and U.S. Water regarding operations and customer services.**

**H. Discuss, consider and take action on negotiation and preparation of a contract for operations and customer services.**

Items G and H were considered together. Mr. Rauschuber requested direction from the Board to issue a formal Request for Proposal to Severn Trent and U.S. Waters for operations and customer services. He suggested a Special Meeting on May 1, 2014 to consider proposals. Director Roberts requested further discussion in Executive Session.

9

4417191.3

## IX. GENERAL MANAGER'S REPORT

**Discuss, consider and take action on report from General Manager, including:**

**A. Agency Administrative and Operations Report.**

Mr. Rauschuber presented the General Managers report to the Board. He noted that he met with Blue Water regarding potentially purchasing groundwater through the City of Austin's system. Director Roberts commented that the Board needs to make direct contact with Austin City Councilmembers regarding emergency interconnects.

**B. Approval of STES Work Order No. 863751-WTP Finish Water Autovalve 2.**

**Mr. Rauschuber presented STES Work Order 863751 (See Exhibit R) for $7,500 and recommended approval from the Board.**

> **MOTION:** Motion was made by Director Whisenant and seconded by Director Roberts to approve the STES Work Order 863751 as presented by staff.
>
> The vote was taken with the following result:
>
> Voting Aye: Directors Fox, Roberts, Goodwin and Whisenant
> Voting Nay: None
> Absent: Director Murphy

At 12:30 p.m. President Fox announced that the Board would move into Executive Session regarding the following items:

1. *CCNG Development Co., L.P. v West Travis County Public Utility Agency and Lower Colorado River Authority* (Item No. VII A) pursuant to the Open Meetings Act, Tex. Gov't Code Ann. § 551.071 – Consultation with Attorney.

2. *Petition of Travis County Municipal Utility District No. 12 Appealing Change of Wholesale Water Rates Implemented by West Travis County Public Utility Agency* (Item No. VII B) pursuant to the Open Meetings Act, Tex. Gov't Code Ann. § 551.071 – Consultation with Attorney.

3. Requests for Non-Standard Service Agreement, CCNG Office Expansion (Item No. VIII D, 2.) pursuant to the Open Meetings Act, Tex. Gov't Code Ann. § 551.071 – Consultation with Attorney.

4417191.3

4.    Approval of Second Amendment to the Water Utility Facilities Acquisition Construction and Service Agreement with Lazy Nine Municipal Utility District No. 1A (Item No. VIII C) pursuant to the Open Meetings Act, Tex. Gov't Code Ann. § 551.071 – Consultation with Attorney.

5.    Requests for Qualifications presentations from Severn Trent Environmental Services, Inc. and U.S. Water regarding operations and customer services and take action on negotiation and preparation of a contract for operations and customer services (Item No. VIII G & H) pursuant to the Open Meetings Act, Tex. Gov't Code Ann. § 551.071 – Consultation with Attorney.

The Board of Directors reconvened in open session at 1:45 p.m. President Fox stated that no action was taken during Executive Session.

## VIII.  NEW BUSINESS

**A.  Discuss, consider and take action on requests for Preliminary Finding of Capacity to Serve ("PFCS") or Non-Standard Service Agreements ("NSSA"), including:**

2.    **CCNG Office Expansion Project (Lot 1, Block A) (NSSA);**

**MOTION:**  Motion was made by Director Roberts and seconded by Director Whisenant to grant request for service to CCNG for 2 water and 6 wastewater LUEs with no Non-Standard Service Agreement **(See Exhibit S).**

The vote was taken with the following result:

Voting Aye: Directors Fox, Roberts, Whisenant, and Goodwin
Voting Nay: None
Absent: Director Murphy

**H.  Discuss, consider and take action on negotiation and preparation of a contract for operations and customer services.**

**MOTION:** Motion was made by Director Roberts and seconded by Director Whisenant to move forward with the Request for Proposals to be submitted to Severn Trent and US Waters and to adopt the revised RFQ/RFP schedule.

The vote was taken with the following result:

Voting Aye: Directors Fox, Roberts, Whisenant, and Goodwin
Voting Nay: None

11

4417191.3

Absent: Director Murphy

## X.  ADJOURNMENT

**MOTION:** Motion was made by Director Whisenant and seconded by Director Roberts to adjourn the meeting at 1:50 p.m.

The vote was taken with the following result:

Voting Aye:     Directors Fox, Whisenant, Roberts, and Goodwin
Voting Nay:     None
Absent:         Director Murphy

PASSED AND APPROVED this _____ 15th _____ day of ___ May ___, 2014.

_____
Larry Fox, President

ATTEST:

_____
Ray Whisenant, Jr., Secretary/Treasurer

12

4417191.3

# EXHIBIT 5

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-GN-14-000163
COURT OF APPEALS NO. 03-16-00521-CV

CCNG DEVELOPMENT COMPANY,    )  IN THE DISTRICT COURT
L.P.                         )
                             )
     Plaintiff               )
                             )
VS.                          )
                             )
                             )
WEST TRAVIS COUNTY PUBLIC    )
UTILITY AGENCY, LOWER        )  TRAVIS COUNTY, TEXAS
COLORADO RIVER AUTHORITY,    )
and LARRY FOX, MICHAEL       )
MURPHY, RAY WHISENANT,       )
BILL GOODWIN, and SCOTT      )
ROBERTS, each in his         )
official capacity as a       )
director of the WEST         )
TRAVIS COUNTY PUBLIC         )
UTILITY AGENCY,              )
                             )
     Defendants.             )  345TH JUDICIAL DISTRICT

-------------------------------------------------------

HEARING ON MOTION TO REINSTATE

-------------------------------------------------------

On the 5th day of August, 2016, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Scott H. Jenkins, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

**A P P E A R A N C E S**

FOR THE PLAINTIFF:

    DOUG KILDAY
    SBOT NO. 00787834
    GRAVES, DOUGHERTY, HEARON & MOODY
    401 Congress Avenue, Suite 2200
    Austin, Texas  78701
    (512) 480-5680


FOR DEFENDANTS WEST TRAVIS COUNTY PUBLIC UTILITY AGENCY, LARRY FOX, MICHAEL MURPHY, RAY WHISENANT, BILL GOODWIN AND SCOTT ROBERTS, EACH IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE WEST TRAVIS COUNTY PUBLIC UTILITY AGENCY:

    JAMES F. PARKER, III
    SBOT NO. 24027591
    LLOYD, GOSSELINK, ROCHELLE & TOWNSEND
    816 Congress Avenue, Suite 1900
    Austin, Texas  78701
    (512) 322-5878


FOR DEFENDANT LOWER COLORADO RIVER AUTHORITY:

    JAMES N. RADER
    SBOT NO. 16452570
    LOWER COLORADO RIVER AUTHORITY
    P.O. Box 220
    Austin, Texas  78767
    (512) 578-3559

**I N D E X**

**VOLUME 1**

**MOTION ON HEARING FOR REINSTATEMENT**

**AUGUST 11, 2016**

|  | <u>Page</u> | <u>Vol.</u> |
|---|---|---|
| Announcements.......................... | 4 | 1 |
| Argument by Mr. Kilday................. | 5 | 1 |
| Argument by Mr. Parker................. | 8 | 1 |
| Comments by Mr. Rader.................. | 13 | 1 |
| Further Argument by Mr. Kilday........ | 15 | 1 |
| Court's Ruling........................ | 16 | 1 |
| Adjournment........................... | 18 | 1 |
| Court Reporter's Certificate.......... | 19 | 1 |

**PROCEEDINGS**

THE COURT: We're on the record in Cause No. GN-14-163, CCNG Development Company, LP vs. West Travis County Public Utility Agency and the Lower Colorado River Authority. Would you announce your presence for the record, please, beginning with counsel for plaintiff.

MR. KILDAY: Good morning, Your Honor. Doug Kilday with Graves, Dougherty, Hearon & Moody on behalf of the plaintiff.

MR. PARKER: Good morning, Your Honor. James Parker for West Travis County Public Utility Agency and its directors who are sued in their official capacities.

MR. RADER: James Rader for the Lower Colorado River Authority.

THE COURT: All right. Counsel, you're set today on a simple motion, what appeared to be a simple motion, until I tried to speed-read this filing that came in late yesterday from one of the defendants. This came to me off the central docket this morning, very little notice. You're set on the 15-minute rocket docket. You have seven minutes a side. You may share your time if you wish. That gives me one minute to give you the answer. I will hold you to that because I have

a string of cases under advisement that are ahead of you, so I'm sure you can understand that I need to attend to that.

With that, it's your motion. I see that it was a simple DWOP'd case. It was on the DWOP docket. You now wish to reinstate it. I sped-read your motion. You can save part of your seven minutes to rebut the other side if you wish. Hopefully you've already sped-read their response and you can start to address that. I'll keep track of your time. And you may proceed.

MR. KILDAY: Thank you, Your Honor. Our motion is very simple, as you pointed out. This case was inadvertently dismissed on July 11th. This cause was included on a blanket order with many other cases. We first received notice that this was even contemplated 11 days thereafter on the 20 -- whatever. Just last week we learned that the case had been dismissed. There was no prior notice that it had been placed on the DWOP docket.

THE COURT: Do you see them even fighting that part of your motion or are they really -- is their only fight that I shouldn't allow it to be reinstated because it's a moot matter? Is that the only opposition you sense from the other side?

MR. KILDAY: I believe that's correct. I'm told by Mr. Rader that the LCRA does not oppose our motion. The PUA does oppose our motion on the grounds you've just set forth, so I'll move quickly to address that.

This is a case that's been pending for two and a half years. It's been in active negotiation. The record includes 22 Rule 11 agreements where we have extended deadlines at their request to respond to discovery while we have worked very actively and very hard to try to get this case resolved. And there are certain matters pleaded -- if I may approach.

THE COURT: No, it's too late for that. They asked for that ahead of the hearing. Just tell me what you want to tell me.

MR. KILDAY: Okay.

THE COURT: And then I'll gather it at the end and I'll listen to this other case.

MR. KILDAY: In essence, we are seeking -- in our claim we are seeking reimbursement of some expenses we incurred to install infrastructure out at the Spanish Oaks development near Bee Cave. We're also seeking service to be provided for water and wastewater for the residents out there. Those are the two essential claims that we are making. We're also seeking

declaratory relief and injunctive relief.

Since the lawsuit was filed and during the negotiations, a number of additional tracts had come to the point where reimbursements were owed on those tracts as well, but because we were negotiating, they were never added to the pleading.

Yesterday afternoon on the eve of this hearing, two checks were sent to me for the principal amount owed on the two tracts that are discussed in the pleading. No interest was included. No attorneys' fees were included. Those are still active pleadings that we are seeking relief for in this lawsuit.

In addition, the declaratory relief potentially could be case dispositive for the other tracts. And those have been unaddressed by the Court and are unaddressed by the mailing I received yesterday. The injunctive relief is also still a live pending action before the Court that has not been addressed either by the Court or by Mr. Parker's letter yesterday afternoon.

So we would respectfully request that the Court reinstate this case to correct a clerical error, the error being no notice was apparently sent to any of us that this case had been placed on the DWOP docket and reinstate the case. And as the Court may be aware, they

have plenty of remedies to address any of their substantive issues about summary judgment or about dismissal or plea to the jurisdiction. Those can all be brought to the Court's attention and addressed, and we would have plenty of responses to those arguments, but we would need more than 15 minutes to address that. Today all we're seeking is correct this error and reinstate the case. And I'll be happy to respond to any of their arguments on rebuttal.

THE COURT: Because you'd like an opportunity to make a more ample response, which you've tried to do orally briefly here today to this 200-and-some-odd-page filing that came in yesterday in response to your motion to reinstate.

MR. KILDAY: Of course, Your Honor.

THE COURT: I understand.

MR. KILDAY: Thank you, Your Honor.

THE COURT: All right. Your turn.

MR. PARKER: Thank you, Your Honor. The case has been dismissed. It is a dead case. And so in order to reinstate the case, the Court would have to extend its jurisdiction over it. And the Court has no subject matter jurisdiction because the case has been entirely mooted.

THE COURT: And how can I tell that today

on this record today without giving them an opportunity to make any response to your argument that it's moot?

MR. PARKER: On the record today, the Court needs to only look at the amended petition, which was the amended petition, the live pleading, when it was dismissed, and then the evidence on record. And it's not contested --

THE COURT: But what I'm saying is they need to have an opportunity to respond to the evidence on record. I respect that. I don't mean to give you a hard time.

MR. PARKER: Sure.

THE COURT: It may be when they have an opportunity to respond to your 215-page filing last night, they might be able to raise a fact question that essentially shows that it's not entirely moot. He says there's also declaratory relief they're seeking, there's injunctive relief they're seeking, so it's not simply a matter of payment of money owed. Those are two arguments that would maybe negate the mootness argument.

But even if it's a money owed case, surely you would understand that I'd want to give them an opportunity to respond to your 200-and-some-odd-page filing before we decide, no, we're not going to reinstate this, case over.

MR. PARKER: And I understand that, Your Honor. In fairness, my response is only five pages. 195 pages of it is the contract, which is in evidence to demonstrate to the Court -- it's a very long contract. And nowhere in that 195 pages is there any entitlement under the contract to attorneys' fees or interest.

THE COURT: Have they sought declaratory relief in their petition?

MR. PARKER: They have, although it is purely derivative of their claim for the money and the service, which has been extended.

THE COURT: Have they also sought injunctive relief in their petition?

MR. PARKER: Yeah, it's entirely derivative of the payment and the service. The payment has been made. The service has been extended. There is -- there are three claims. A payment for 552,000; that was paid. A payment for 583,000; that was paid. Service on an office building; that was done back in April of 2014. What they want --

THE COURT: So what injunctive relief are they asking for that's derivative?

MR. PARKER: To stop not giving us service is the injunctive relief that they are asking for.

THE COURT: Oh, they want to be able to get injunctive relief that allows them to cut off your service?

MR. PARKER: No, no. We provide service to them.

THE COURT: Ah, backwards.

MR. PARKER: And so they apply for service and we extend the service.

THE COURT: They want to prevent you from cutting off their service.

MR. PARKER: No, they want new service.

THE COURT: Okay.

MR. PARKER: They want a mandatory injunction to force us to give them service.

THE COURT: That's the problem with these 15-minute dockets. You know, if you've got a complex case, you can't really wrap your head around, you know, all the nuances. Apparently LCRA sold to you some part of the LCRA's service that existed previously. That's as far as I got into this.

MR. PARKER: And I'll make it real simple, Your Honor. Everything in their first amended petition -- and they say this in their response. What they want to do -- everything in the first amended petition is dead. They've got their first amended

petition. And again, this is their response. They say they're going to promptly file a second amended petition.

THE COURT: This is their response to what?

MR. PARKER: I'm sorry. This is their motion to reinstate. And what they want to do is they want to take the cause number of this case and then everything under the cause number just go (demonstrating) and have an entirely new pleading leaving only the cause number, well, so, as Mr. Kilday said, they can rush to a trial that they want in October with entirely new allegations that haven't even been pleaded yet.

THE COURT: Oh, no judge is going to let them do that. You'll probably get a motion for continuance granted if you've got new allegations, new, you know --

MR. PARKER: I would suggest, Your Honor --

THE COURT: -- new damages, all of that.

MR. PARKER: They have 100 percent new allegations.

THE COURT: Okay.

MR. PARKER: Everything in this dismissed

case is dead. It's moot.

THE COURT: So what they need to do, you would say, is just file a new lawsuit.

MR. PARKER: Yes, Your Honor. Walk downstairs to the district clerk's office. That's how we do it every day. Don't reinstate this case. It's moot. There's no case in controversy. The Court doesn't have subject matter jurisdiction, and it shouldn't exercise subject matter jurisdiction over a case that doesn't have it.

THE COURT: Anything else I need to understand?

MR. PARKER: No, thank you, Your Honor.

THE COURT: All right. Mr. Rader, I think you said before we went on the record you didn't have anything -- you didn't care one way or the other or you were not going to take a formal position.

MR. RADER: Let me just say that, because as of yesterday, I had -- well, I saw the pleadings from the West Travis County Public Utility Agency at the same time everybody else did. So I'm not disagreeing with their pleadings either. Originally I did tell Mr. Kilday that I didn't oppose the motion to reinstate. The only thing I'd ask the Court to consider if you're going to re -- if it is going to be reinstated, that

they be -- that some kind of alternative dispute resolution process be ordered as well, and I think that may be in the local rules.

THE COURT: Well, that's not in front of me today, but you'd like that. You're indicating that you'd like everybody to sit down at the mediation table and see if they could resolve it.

MR. RADER: Yes, Your Honor. We've had numerous, numerous over the last few years settlement discussions and off-channel discussions as well, and it might very well be helpful in my opinion.

THE COURT: And you have not had a mediator be involved in this to date?

MR. RADER: Not -- no, we have not.

THE COURT: Okay. Well, you're all here today. You ought to think about that because I think your clients could benefit from that. Not only -- even if they don't settle the entire case, frequently mediators can settle the process and have you agree upon a process that saves your clients money by which you can more expeditiously resolve disputes as they exist now and as they might come up, because your position is this is a placeholder for new allegations. I understand. Okay. Thank you. Good idea.

MR. RADER: That's all I have, Your Honor.

THE COURT: Your response.

MR. KILDAY: Yes, Your Honor, just very quickly. Mr. Parker has asserted that this is a dead case, and that's simply not true.

THE COURT: Well, what he's saying is that you're basically taking this vehicle, this shell of a cause number, and you've now filled it with completely new allegations and complaints.

MR. KILDAY: They're not new --

THE COURT: And his other argument is the declaratory judgment action and the injunctive relief are all derivative. Those are his best arguments.

MR. KILDAY: And I'm glad we have a record for that because in the event there is a dismissal here, I want to use those words to ensure there's no argument of res judicata or collateral estoppel on the other tracts, so I'm very relieved we have a record here today. We would dispute that if we end up with a dismissal sticking here today, but that is our concern.

We have claims that are unadjudicated for declaratory relief. We have claims that are unadjudicated for injunctive relief. We have claims that are unadjudicated for attorneys' fees and interest. Mr. Parker has attached the contract, and he has asserted there is no contractual basis for a claim for

interest. And Section 10.02(b) of the contract, which he has included in the record, has a very specific provision entitling us to interest.

THE COURT: So you still have a dispute about interest.

MR. KILDAY: We still have a dispute about interest, attorneys' fees, declaratory and injunctive relief. And yes, we do intend to insert tracts that were not part of our pleading into this cause of action. They are well aware of that because we've been negotiating over all of that and more over the last couple of years. And if they don't want an October trial setting, we won't have one. I've urged one because I know the old practice here in Travis County district court is if there's a DWOP docket and you want it reinstated, you need a fast-track trial setting. We're agreeable to that. If the defendants are not agreeable to that, we will work with them to find another trial date. And that's why we've submitted two different proposed forms of order, one with an October trial date, one with no trial date. And whichever one the Court chooses to sign, we are okay with that. Thank you very much, Your Honor.

THE COURT: All right. That completes our record. Thank you all, Counsel.

I am going to grant the motion for new trial and to reinstate. This is without prejudice, of course -- jurisdictional arguments can always be raised, so it's without prejudice to your opportunity to continue to argue or reargue, urge in a different hearing a motion to dismiss for lack of jurisdiction because the case is moot. It appears to me based on this brief argument you have now, given the interest arguments, given the attorneys' fees arguments, regardless whether injunctive relief and declaratory relief is derivative, those two issues alone would cause the case to survive as to those remaining claims for damages.

So I'm reinstating the case. I try to be transparent about my thoughts so that you understand what I'm thinking, for better or worse, or that I am thinking and listening to you. And so I am going to reinstate the case without a trial date. And I know all of you and all your firms, and so I know that you'll work collaboratively to reset this trial -- or to set this trial at a date that's merciful for all of you and your clients.

Would you like to go off the record and chat about mediation for a minute? May we do that? Is that okay? Or do you want to stay on the record about

that?

MR. PARKER:  No, Your Honor, we can go off.

THE COURT:  Great.  That concludes our record.  Thank you.

*(End of proceedings)*

**REPORTER'S CERTIFICATE**

THE STATE OF TEXAS  )

COUNTY OF TRAVIS    )

I, Chavela V. Crain, Official Court Reporter in and for the 53rd District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.  I further certify that the total cost for the preparation of this Reporter's Record is $86.50 and will be paid by counsel for Defendants West Travis County Public Utility Agency and its directors who are sued in their official capacities.

WITNESS MY OFFICIAL HAND this the 12th day of August, 2016.

*/s/ Chavela V. Crain*
Chavela V. Crain, CSR, RDR, RMR, CRR
Texas CSR 3064, Expiration Date:  12/31/2017
Official Court Reporter, 53rd District Court
Travis County, P.O. Box 1748
Austin, Texas 78767   (512) 854-9322          *

# EXHIBIT 6

CAUSE NO. D-1-GN-14-000163

| | | |
|---|---|---|
| CCNG DEVELOPMENT CO., L.P., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, LOWER | § | |
| COLORADO RIVER AUTHORITY, and | § | TRAVIS COUNTY, TEXAS |
| LARRY FOX, MICHAEL MURPHY, | § | |
| RAY WHISENANT, BILL GOODWIN, | § | |
| and SCOTT ROBERTS, each in his | § | |
| official capacity as a director of the | § | |
| WEST TRAVIS COUNTY PUBLIC | § | |
| UTILITY AGENCY, | § | |
| Defendants. | § | 345th JUDICIAL DISTRICT |

## ORDER GRANTING PLAINTIFF'S MOTION FOR NEW TRIAL AND MOTION TO REINSTATE CASE

On August 5, 2016, came on to be heard Plaintiffs' Motion for New Trial and Motion to Reinstate, and the Court, having reviewed the motion, the pleadings, the evidence and arguments presented, and having heard the arguments of counsel, is of the opinion that there is good cause to grant Plaintiffs' Motion for New Trial and Motion to Reinstate. It is accordingly

ORDERED that Plaintiffs' Motion for New Trial and Motion to Reinstate is hereby GRANTED and that this case is hereby REINSTATED on the court's active docket.

SIGNED this 5th day of August, 2016.

JUDGE PRESIDING

# EXHIBIT 7

| From: | Kilday, Doug |
|---|---|
| Sent: | Monday, August 08, 2016 11:46 AM |
| To: | 'Jose de la Fuente' |
| Cc: | Karen Mallios; Melvin, Robin A.; Madison.Jechow@LCRA.ORG; James.Rader@LCRA.ORG; Lein, David; David Klein; James Parker; Christie Dickenson; Catherine Daniels; Lissette Ruiz |
| Subject: | RE: Cause No. D-1-GN-14-000163; CCNG v. WTCPUA and LCRA |

Joe –

Thank you for your email. Several points in response:

1. Even the partial payments you have been discussing have <u>not</u> yet been paid to CCNG. The PUA's bank is telling CCNG this morning that there are not sufficient funds in the PUA's bank account to allow it to honor either of the checks that were sent to my office last Thursday afternoon. CCNG attempted to deposit both checks at CCNG's bank on Friday afternoon. It appears that your firm's representations to the Court on Thursday and Friday about having "paid" the principal amounts owed for Los Robles and Spanish Oaks Section I (without required amounts for interest or attorneys' fees) were not accurate. <u>To date, zero has been paid.</u> Please let me know whether the PUA will immediately replenish its own bank account so these checks can be honored by your client's bank, or whether these two hot checks will simply bounce.

2. Even if the checks are honored by the PUA's bank, <u>zero</u> cents on the dollar have been paid for CCNG's attorneys' fees, which have been substantial. That is an unpaid and not-yet-adjudicated claim in our lawsuit. We intend to pursue that claim until it is paid. That has always been our intent.

> [NOTE: Mr. Parker misrepresented to the Court on Friday that the only authority cited in our pleading for an award of attorneys' fees was Chapter 38 of the Civil Practice & Remedies Code. That was simply false. Paragraph 65 of our pleading plainly refers to both Chapter 37 and 38, i.e., the Declaratory Judgment statute and the separate Attorneys' Fees statute. Fees are owed to CCNG under both chapters.]

3. Your client and your firm are both well aware of the broader conversation that has been negotiated over these last two-and-a-half years regarding many phases within the CCNG Tract. We were discussing a $4.3 million resolution to a problem that involves many phases within the CCNG Tract. After 2 & 1/2 years of meticulous, multi-party negotiations and what appeared to be a final meeting of the minds, the PUA abruptly changed course and reneged on several fundamental issues. As we have discussed, the Reimbursable Costs on several other phases/tracts have come due during our discussions. We have presented those for payment. It took 6 & 1/2 years for CCNG to get a check for partial payment on the Los Robles Tract, and it appears that payment was made with a hot check that will bounce. The same issues that have caused years of unnecessary delay and attorneys' fees on the Los Robles Tract are in play on the other phases as well, which is why we need the declaratory relief we have requested. Our request for declaratory relief has not yet been resolved or adjudicated. Please note that our request for declaratory relief addressed the "**_phases_** of the Internal Facilities **_that CCNG has built or will build_** pursuant to the Utility Agreement." (1st Am. Pet. at ¶ 57.) Our request for declaratory relief is about the broader issues and the dispute over how the PUA has consistently mis-construed the provision. It is not focused on just one phase or tract. We are seeking the declaratory relief so we will not be required to wait 6 & 1/2 years or longer to receive payments for Reimbursable Costs owed on other phases.

4. We are still awaiting resolution on requests for service for the West Village and East Village, which have also been part of our discussions over these last 2 & 1/2 years. The same issues that plagued the office expansion project are also involved in the other phases, including East Village and West Village, which is why we need the declaratory and

1

injunctive relief we have requested in Paragraphs 59-62 of our pleading. The PUA has always treated the obligations under the Utility Agreement as somehow conditional, even though the conditions applied by the PUA do not appear in the Utility Agreement. Our request for declaratory and injunctive relief in Paragraphs 59-62 of our pleading remain unresolved and unadjudicated. (*See* 1st Am. Pet. at ¶ 62: "Plaintiff also asks the court to enjoin WTCPUA's directors from denying "interim service" to CCNG." This request for injunctive relief relates to the CCNG Tract as a whole, and is not confined to the office expansion project that originally brought this issue to a head in April 2014.)

5. The Court very clearly has jurisdiction to decide these many unresolved claims. There is no good faith basis for any assertion to the contrary.

6. The July 14 dismissal was the result of a clerical error at the Clerk's office in failing to send any party notice of the DWOP docket. The Court has now correctly remedied that clerical error.

7. The Court pointedly declined to rule upon any arguments regarding jurisdiction, reserving those arguments for another hearing when more than 15 minutes would be available, and when the parties and the Court would have more than a few hours to review your lengthy submission. No plea to the jurisdiction was before the Court last Friday, nor was any similar motion that would allow for proper consideration of jurisdictional issues. No ruling has been made on any jurisdictional issues. If you would like to raise jurisdictional issues, you may do so and set a motion for hearing. We reserve the right to file a Motion for Sanctions, as there is no good faith basis for any assertion that the Court lacks jurisdiction.

8. Please withdraw your Notice of Appeal, which is frivolous and has no good faith basis in law or in fact. We reserve the right to seek sanctions if the Notice of Appeal is not withdrawn.

9. I look forward to hearing from you on (i) your plans regarding the Notice of Appeal, and (ii) your client's plans on whether to provide funds to allow its own bank to honor the hot checks that Mr. Parker delivered to me last Thursday afternoon.

Best regards,

-gdk

**G. Douglas Kilday**
Direct: 512.480.5680
Facsimile: 512.480.5880
E-mail: dkilday@gdhm.com



**GRAVES DOUGHERTY HEARON & MOODY**

401 Congress Avenue, Suite 2200
Austin, Texas 78701
Phone: 512.480.5600
www.gdhm.com

**From:** Jose de la Fuente [mailto:jdelafuente@lglawfirm.com]
**Sent:** Monday, August 08, 2016 10:22 AM
**To:** Kilday, Doug
**Cc:** Karen Mallios; Melvin, Robin A.; Madison.Jechow@LCRA.ORG; James.Rader@LCRA.ORG; Lein, David; David Klein; James Parker; Christie Dickenson; Catherine Daniels; Lissette Ruiz
**Subject:** RE: Cause No. D-1-GN-14-000163; CCNG v. WTCPUA and LCRA

Doug,

First and foremost . . . I must admit that I am puzzled, because I have never seen a party struggle so hard to keep a fight going even after it was paid 100 cents on the dollar for the amount that it claimed to be owed, on top of long-ago getting the thing that it wanted from injunctive relief (service provided to your facility, which was done over two years ago). The courthouse is for resolution of disputes, and your client got what it was asking for. That's what we're supposed to do – resolve disputes. Having done so, our hope is that the parties could begin to move forward in a more productive manner, as circumstances dictate that they will have an ongoing relationship for years to come.

That said, we understand that you have a different take on the law as it applies to this case, as is often the case in an adversarial proceeding. Additionally, I am familiar with the proceedings before Judge Jenkins, including his affirmative refusal to maintain the dismissal of your Petition in the face of jurisdictional failings. As to your bullet-point arguments as to why the case on file did not have jurisdictional failings, we also understand that the parties have a different opinion on those. Our positions in that respect were stated in our Response to your Motion to Reinstate, and again, we understand that you may disagree with them.

The parties will have every chance to brief all of these matters, and of course, you are free to make any or all of your arguments to the court, which will then decide these issues as may be necessary. Alternatively, we could all simply agree to the dismissal of your case (as you have been paid everything to which you claimed to be entitled, and service has long-since been provided), and the parties could begin to work going forward in a cooperative and consultative manner, rather than being adversarial and litigious.

Please feel free to call me if you have any questions.

Sincerely,

Joe de la Fuente


**Jose de la Fuente**
Attorney



816 Congress Ave., Suite 1900
Austin, Texas 78701
http://www.LGLawFirm.com/
**Telephone:** 512.322.5849
**Telecopier:** 512.472.0532

---

**From:** Kilday, Doug [mailto:DKilday@gdhm.com]
**Sent:** Friday, August 5, 2016 5:15 PM
**To:** Jose de la Fuente
**Cc:** Karen Mallios; Melvin, Robin A.; Madison.Jechow@LCRA.ORG; James.Rader@LCRA.ORG; Lein, David; David Klein; James Parker; Christie Dickenson; Catherine Daniels; Lissette Ruiz
**Subject:** RE: Cause No. D-1-GN-14-000163; CCNG v. WTCPUA and LCRA

I have read the *Simons* case, which holds that an interlocutory appeal can be taken from a refusal to dismiss for want of jurisdiction, even where the procedural vehicle is a motion for summary judgment instead of a plea to the jurisdiction.

That simply is not our case.

I suggest that you visit with Mr. Parker to learn the contents of the transcript you will be receiving (and potentially litigating) from this morning's hearing. The Court very specifically declined to take up any arguments about jurisdictional issues, telling the parties that those would need to be raised and decided separately by way of a plea to the jurisdiction or a motion for summary judgment. The Court correctly observed that the sole issue before the Court today was a procedural question as to whether the case should be reinstated, with the jurisdictional issues and the merits issues to be decided at a later time when we were not on a quick 15-minute docket. There has been no ruling on any jurisdictional issue.

Further, the Court very clearly does have jurisdiction over this case. Any argument to the contrary is frivolous.
- Our pleading makes clear that we are seeking attorneys' fees. That claim has not been adjudicated or otherwise resolved.
- Our pleading makes clear that we are seeking interest. That claim has not been adjudicated or otherwise resolved.
- Our pleading makes clear that we are seeking declaratory relief (two counts). Those claims have not been adjudicated or otherwise resolved.
- Our pleading makes clear that we are seeking injunctive relief. That claim has not been adjudicated or otherwise resolved.

We reject your client's attempt to introduce yet more delay into these proceedings, and we renew our request that you withdraw your frivolous Notice of Appeal.

-gdk

**G. Douglas Kilday**
Direct: 512.480.5680
Facsimile: 512.480.5880
E-mail: dkilday@gdhm.com



**GRAVES DOUGHERTY HEARON & MOODY**

401 Congress Avenue, Suite 2200
Austin, Texas 78701
Phone: 512.480.5600
www.gdhm.com

---

**From:** Jose de la Fuente [mailto:jdelafuente@lglawfirm.com]
**Sent:** Friday, August 05, 2016 3:50 PM
**To:** Kilday, Doug
**Cc:** Karen Mallios; Melvin, Robin A.; Madison.Jechow@LCRA.ORG; James.Rader@LCRA.ORG; Lein, David; David Klein; James Parker; Christie Dickenson; Catherine Daniels; Lissette Ruiz
**Subject:** Re: Cause No. D-1-GN-14-000163; CCNG v. WTCPUA and LCRA

Doug,

I am presently out of the office, and will respond to your email below in more detail on Monday. The PUA's interlocutory appeal is proper, and I will provide additional information to that effect then, and I'll be happy to discuss it with you further. In the meantime and as a starting point, I'll refer you to TDCJ v Simons, 140 SW3d 338, 349 (Tex 2004).

Have a good weekend,

Joe

Sent from my iPhone

On Aug 5, 2016, at 11:24 AM, Kilday, Doug <DKilday@gdhm.com> wrote:

James (Parker) –

I have reviewed your Notice of Appeal, which improperly purports to stay all proceedings.

Your Notice of Appeal relies upon Section 51.014(a)(8) of the Texas Civil Practice & Remedies Code. That code provision allows a governmental agency to pursue an interlocutory appeal from an order that "grants or denies *__a plea to the jurisdiction__* by a governmental unit as that term is defined in Section 101.001." (Emphasis added.) No such plea to the jurisdiction has even been filed in this case, and there certainly has been no ruling granting or denying any such plea to the jurisdiction.

As you know, the only motion that was set for hearing today was our motion to correct a clerical mistake by the clerk's office in inadvertently placing our case on the dismissal docket without first giving proper notice to the parties. (I did not receive any notice of a planned dismissal for want of prosecution. James Rader (LCRA) did not receive any such notice. You have informed me that you are unaware of any such notice received by anyone at your firm.) The Court did what it was legally required to do in reinstating the case to the active docket. That's all the Court did. The Court pointedly declined to address the merits of any of the underlying issues in the case and invited the parties to prepare whatever motions they wanted to prepare – including a plea to the jurisdiction or a motion for summary judgment – to address the merits at a different hearing. The only ruling today was to grant our motion for new trial and reinstate the case on the active docket, which is exactly where it should have remained.

No plea to the jurisdiction has been filed or set for hearing in this case, and there has been no ruling that would allow for an interlocutory appeal. To put it in the language of the code provision you have cited, the Court has *__not__* "grant[ed] or denie[d] a plea to the jurisdiction."

Your Notice of Appeal is completely improper and is not in good faith. Its only possible purpose is to inject delay into the proceedings.

We respectfully request that you withdraw your Notice of Appeal and its attempt to delay these proceedings.

We reserve all rights, including the right to seek sanctions. If your Notice of Appeal is not withdrawn, we also reserve the right to supply the Court with a copy of this correspondence, along with the transcript of today's hearing, in support of a motion for sanctions.

Best regards,

-gdk

**G. Douglas Kilday**
Direct: 512.480.5680
Facsimile: 512.480.5880
E-mail: dkilday@gdhm.com

<image002.png>

401 Congress Avenue, Suite 2200

5

Austin, Texas 78701
Phone: 512.480.5600
www.gdhm.com

---

**From:** Karen Mallios [mailto:kmallios@lglawfirm.com]
**Sent:** Friday, August 05, 2016 9:50 AM
**To:** Melvin, Robin A.; Kilday, Doug; 'Madison.Jechow@LCRA.ORG'; 'James.Rader@LCRA.ORG'; Lein, David
**Cc:** David Klein; Jose de la Fuente; James Parker; Christie Dickenson; Catherine Daniels; Lissette Ruiz; Karen Mallios
**Subject:** Cause No. D-1-GN-14-000163; CCNG v. WTCPUA and LCRA

Please see the attached copy of the Defendant West Travis County Public Utility Agency's Notice of Appeal which was filed with the Court today.


**Karen W. Mallios**
512.322.5885 **direct**
512.472.0532 **fax**

<image004.png>

Lloyd Gosselink Rochelle & Townsend, P.C.
816 Congress Avenue, Suite 1900
Austin, Texas 78701
www.lglawfirm.com

****ATTENTION TO PUBLIC OFFICIALS AND OFFICIALS WITH OTHER INSTITUTIONS SUBJECT TO THE OPEN MEETINGS ACT ****

A "REPLY TO ALL" OF THIS EMAIL COULD LEAD TO VIOLATIONS OF THE TEXAS OPEN MEETINGS ACT. PLEASE REPLY ONLY TO LEGAL COUNSEL.


CONFIDENTIALITY NOTICE:
This email (and all attachments) is confidential, legally privileged, and covered by the Electronic Communications Privacy Act. Unauthorized use or dissemination is prohibited. If you have received this message in error please delete it immediately. For more detailed information click http://www.lglawfirm.com/email-disclaimer/ .

NOT AN E-SIGNATURE:
No portion of this email is an "electronic signature" and neither the author nor any client thereof will be bound by this e-mail unless expressly designated as such as provided in more detail at www.lglawfirm.com/electronic-signature-disclaimer/ .


This electronic communication (including any attached document) may contain privileged and/or confidential information. If you are not an intended recipient of this communication, please be advised that any disclosure, dissemination, distribution, copying, or other use of this communication or any attached document is strictly prohibited. If you have

received this communication in error, please notify the sender immediately by reply e-mail and promptly destroy all electronic and printed copies of this communication and any attached document.

This electronic communication (including any attached document) may contain privileged and/or confidential information. If you are not an intended recipient of this communication, please be advised that any disclosure, dissemination, distribution, copying, or other use of this communication or any attached document is strictly prohibited. If you have received this communication in error, please notify the sender immediately by reply e-mail and promptly destroy all electronic and printed copies of this communication and any attached document.